# ADDENDUM

## Subject Attorneys' Comments and/or Objections to the Report Pursuant to the Court's Order, dated February 8, 2012

## Exhibit 2a

## JAMES A. GOEKE

## APPENDIX

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

——————————————————x
                    :
In re SPECIAL PROCEEDINGS      :   Misc. No. 09-mc-00198-EGS
                    :
——————————————————x


**Submission on Behalf of James A. Goeke**


*Appendix of Exhibits*


Matthew I. Menchel
Danielle L. Rose
Daniel L. Rashbaum

KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel +1 212 488 1200

*Counsel for James A. Goeke*

## APPENDIX TABLE OF CONTENTS

**Exhibits**

Ex. A – September 29, 2008 Email from Edward Sullivan, CRM BOTTINI 033612 ... A-1

Ex. B – December 20, 2007 Email from William Welch,
CRM089170, Goeke Ex. 21 ................................................................................ A-3

Ex. C – Memoranda from Deputy Attorney General David W. Ogden to All Dep't
Prosecutors and United States Attorneys (Jan. 4, 2010) ............................ ................A-5

Ex. D – September 8, 2008 Email from James Goeke,
CRM GOEKE 087276-77 ...................................................................... A-14

Ex. E – September 9, 2008 Email from James Goeke, CRM GOEKE 087461-64 ...... A-17

Ex. F – September 9, 2008 Email from Edward Sullivan,
CRM BOTTINI 030581-90 .................................................................... A-22

Ex. G – September 9, 2008 *Brady* letter to Alex Romain, Goeke Ex. 2 ...................... A-33

Ex. H – March 5, 2007 Email from James Goeke, CRM BOTTINI 030460-63 .......... A-39

Ex. I – October 4, 2007 Fax from Joseph Bottini,
CRM BOTTINI 059454-69, Goeke Ex. 24 ............................................ A-44

Ex. J – September 7, 2008 Email from James Goeke,
CRM GOEKE 078272-74 ...................................................................... A-54

Ex. K – August 14, 2008 Email from Nicholas Marsh,
CRM 030882-84, Goeke Ex. 22 ........................................................... A-58

Ex. L – August 25, 2008 *Brady* Letter Draft, CRM GOEKE 079582-87 .................... A-62

Ex. M – August 22, 2008 Email from Brenda Morris, CRM BOTTINI 027428 ......... A-69

Ex. N – September 7, 2008 Email from James Goeke, CRM GOEKE 087255 ........... A-71

Ex. O – September 8, 2008 Email from James Goeke, CRM GOEKE 087439-43 ...... A-73

Ex. P – September 8, 2008 Email from James Goeke, CRM GOEKE 087294-98 ...... A-79

Ex. Q – November 7, 2006 Rocky Williams Grand Jury Transcript,
    CRM GOEKE 007011-87 ......................................................................................... A-85

Ex. R – September 14, 2006 Rocky Williams 302, CRM GOEKE 001846-48 ......... A-163

Ex. S – September 28, 2006 Rocky Williams 302, CRM GOEKE 001849-55 .......... A-167

# EXHIBIT A

CRM BOTTINI 033612

**From:**     Sullivan, Edward
**To:**       "Bateman, Larry"; Bateman, Larry; Bottini, Joe; Bottini, Joe (USAAK);
              Bradison, Jodi (USAAK); Goeke, James (USAAK); Joy, Chad E. (FBI);
              "Kepner, Mary Beth"; Marsh, Nicholas; Morris, Brenda; "Roberts, Dennis";
              Roberts, Dennis; Sullivan, Edward; Walker, Kelli (USAAK);
**Subject:**  Please confirm that the judge is aware of the ECF filing problem.
**Date:**     Monday, September 29, 2008 5:04:00 PM

Jim and I are totally in the dark re: what's going on in court.

# EXHIBIT B

CRM089170

| **From:** | Welch, William |
| --- | --- |
| **To:** | Sullivan, Edward; Bottini, Joe (USAAK); Goeke, James (USAAK); Marsh, Nicholas; |
| **cc:** | Morris, Brenda; |
| **Subject:** | Polar Pen |
| **Date:** | Thursday, December 20, 2007 5:18:00 PM |

I understand PRAO rendered their advice.  I tried to call Nelson to talk to him, but he was in a meeting.

We've done all that we are going to do on the matter.  I'm off for vacation starting tomorrow, but will try to talk to Nelson sometime next week.  In the meantime, nothing will be filed in our case.  Joe and Jim, per the recusal notice, you work for PIN, and so these are your marching orders until I talk to Nelson.



EXHIBIT
Goeke 21
JH 1·8·10
PENGAD 800-631-6989

EXHIBIT C

US Justice: Print Friendly Version

Home  »  Briefing Room  »  Justice News

**JUSTICE NEWS**

### MEMORANDUM FOR DEPARTMENT PROSECUTORS

#### Monday, January 4, 2010

FROM:     David W. Ogden
          Deputy Attorney General

SUBJECT:  Issuance of Guidance and Summary of Actions Taken in Response
          to the Report of the Department of Justice Criminal Discovery and
          Case Management Working Group

Earlier this year, on behalf of the Attorney General, I asked the Assistant Attorney General of the Criminal Division and the Chair of the Attorney General's Advisory Committee to convene a working group to undertake a thorough review of the Department of Justice's policies, practices, and training related to criminal case management and discovery and to evaluate areas for improvement. Members of this working group included senior level prosecutors from United States Attorneys' Offices (USAOs) and Main Justice, Information Technology support personnel, and law enforcement representatives. In addition, members of the Attorney General's Advisory Committee and the Department's Criminal Chiefs Working Group reviewed and provided comments on the Report. The case management discovery working group examined current Department of Justice policies, and surveyed all of the USAOs, the criminal litigating components of Main Justice, and the Department of Justice's law enforcement agencies, as well as the United States Postal Inspection Service, to evaluate current discovery practices, case management practices, and related training, and to identify areas for improvement.

The Attorney General and I want to thank the members of the Working Group for the time and effort they put into this review and for the thorough and helpful report that the review produced. I called for the review in order to determine whether the Department was well positioned to meet its discovery obligations in future cases. The Working Group primarily focused on three areas pertinent to this determination: resources, training, and policy guidance. The Working Group's survey demonstrated that incidents of discovery failures are rare in comparison to the number of cases prosecuted. This conclusion was not surprising and reflects that the vast majority of prosecutors are meeting their discovery obligations. I thank you all for the extraordinary efforts you make every day in pursuit of criminal justice. Any discovery lapse, of course, is a serious matter. Moreover, even isolated lapses can have a disproportionate effect on public and judicial confidence in prosecutors and the criminal justice system. Beyond the consequences in the individual case, such a loss in confidence can have significant negative consequences on our effort to achieve justice in every case.

Justice Sutherland's observations regarding the role of a prosecutor are as true today as they were when he wrote them over 70 years ago. He wrote:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor--indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935). In the alcove outside the Attorney General's Office here in Washington, an inscription that rings the space reads: "The United States wins its point whenever justice is done its citizens in the courts." Over the years, the Department has consistently taken the necessary steps to assure that we meet these expectations. Towards that end, the United States Attorney's Manual (USAM) sets forth broad discovery policies that establish the Department's minimum expectations for prosecutors handling criminal cases in all jurisdictions. *See* USAM §§ 9-5.001 and 9-5.100. In 2006, the Department amended the United States Attorney's Manual regarding *Brady/Giglio* [1] obligations by requiring prosecutors to go beyond the requirements of the Constitution and "take a broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence." USAM § 9-5.001. With the advice of the Working Group, I have approached any further revisions to Department policy with the understanding that local practices and judicial expectations vary among districts, and that a one-size-fits-all approach might result in significant changes in some districts and no changes in others.

As representatives of the United States, our duty is to seek justice. In many cases, broad and early disclosures might lead to a speedy resolution and preserve limited resources for the pursuit of additional cases. In other cases, disclosures beyond those required by relevant statutes, rules and policies may risk harm to victims or witnesses, obstruction of justice, or other ramifications contrary to our mission of justice.

Recognizing this reality, we have today issued the Department's Guidance for Prosecutors Regarding Criminal Discovery that establishes the minimum considerations that prosecutors should undertake in every case. This guidance was developed at my request by a working group of experienced attorneys with expertise regarding criminal discovery issues that included attorneys from the Office of the Deputy Attorney General, the United States Attorneys' Offices, the Criminal Division, and the National Security Division. The working group sought comment from the Office of the Attorney General, the Attorney General's Advisory Committee, the Criminal Chiefs Working Group, the Appellate Chiefs Working Group, the Professional Responsibility Advisory Office, and the Office of Professional Responsibility. The working group produced a consensus document intended to assist Department prosecutors to understand their obligations and to manage the discovery process. I thank all concerned for the resulting memorandum.

By making deliberate choices regarding discovery issues, prosecutors are most likely to comply with discovery obligations imposed by law and Department policy and assure that the goals of a prosecution are met. By separate memorandum to the United States Attorneys and to the heads of components that prosecute criminal cases, I am directing that each USAO and component develop a discovery policy that establishes discovery practice within the district or component. This directive will assure that USAOs and components have developed a discovery strategy that is consistent with the guidance and takes into account controlling precedent, existing local practices, and judicial expectations.

In addition to issuing this discovery guidance and establishing component discovery policies, the Department is taking further steps in response to the Working Group report. Each USAO and the litigating components handling criminal cases have now named a discovery coordinator, and those coordinators attended a "Train the Trainer" discovery conference at the National Advocacy Center in October. These coordinators will provide discovery training to their respective offices no less than annually and will serve as on-location advisors with respect to discovery obligations. In addition, we will:

Create an online directory of resources pertaining to discovery issues that will be available to all prosecutors at their desktop;
Produce a Handbook on Discovery and Case Management similar to the Grand Jury Manual so that prosecutors will have a one-stop resource that addresses various topics

Case 1:09-mc-00198-EGS   Document 84-3   Filed 03/15/12   Page 11 of 108

relating to discovery obligations;

Implement a training curriculum and a mandatory training program for paralegals and law enforcement agents;

Revitalize the Computer Forensics Working Group to address the problem of properly cataloguing electronically stored information recovered as part of federal investigations;

Create a pilot case management project to fully explore the available case management software and possible new practices to better catalogue law enforcement investigative files and to ensure that all the information is transmitted in the most useful way to federal prosecutors.

These efforts will be overseen by an attorney detailed to Washington to assure timely completion of all of these measures.

All of the steps that the Department is taking are intended to ensure that we have the resources, training and guidance to meet our obligations and that we thoroughly and thoughtfully evaluate our discovery obligations in every case in a manner that facilitates our sole function–to seek justice. Thank you in advance for your cooperation in this effort.

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972).

Home  »  Briefing Room  »  Justice News

**JUSTICE NEWS**

**MEMORANDUM FOR HEADS OF DEPARTMENT LITIGATING COMPONENTS HANDLING CRIMINAL MATTERS**

**ALL UNITED STATES ATTORNEYS**

Monday, January 4, 2010

FROM:     David W. Ogden
            Deputy Attorney General

SUBJECT:  Requirement for Office Discovery Policies in Criminal Matters

Earlier this year, I asked the Assistant Attorney General of the Criminal Division and the Chair of the Attorney General's Advisory Committee to convene a working group to undertake a thorough review of the Department of Justice's policies, practices, and training related to criminal case management and discovery and to evaluate areas for improvement. Members of this working group included senior level prosecutors from United States Attorneys' Offices (USAOs) and Main Justice, Information Technology support personnel, and law enforcement representatives. In addition, members of the Attorney General's Advisory Committee and the Department's Criminal Chiefs Working Group reviewed and provided comments on the Working Group Report. The case management and discovery working group examined current Department of Justice policies, and surveyed all of the USAOs, the criminal litigating components of Main Justice, and the Department of Justice's law enforcement agencies, as well as the U.S. Postal Inspection Service, to evaluate current discovery practices, case management practices, and related training, and to identify areas for improvement.

Today, in response to some of the recommendations in the Working Group Report, I sent out a memorandum to all prosecutors that included Guidance for Prosecutors Regarding Criminal Discovery that prosecutors should follow to help ensure that they meet discovery obligations in future cases. This guidance is not intended to establish new disclosure obligations. Those obligations are already set forth in Fed.R.Crim.P. 16 and 26.2, *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and 18 U.S.C. §3500 (the Jencks Act). In addition, Department policy provides for broader disclosures of exculpatory and impeachment information than *Brady* and *Giglio* require. *See* USAM §9-5.001. Prosecutors in every district and component must comply with legal requirements and with Department policy. Moreover, there are times when providing discovery broader than that provided for even by current Department policy serves the interests of justice. Providing broad and early discovery often promotes the truth-seeking mission of the Department and fosters a speedy resolution of a case. On the other hand, there are times when countervailing considerations counsel against broad and early disclosure. For these reasons, the discovery guidance is intended to assure that prosecutors make considered decisions about whether to disclose information beyond the requirements of law and policy and when to disclose it.

The Working Group Report recognized that some local variation in discovery practices is inevitable. Inconsistent discovery practices among prosecutors within the same office, however, can lead to burdensome litigation over the appropriate scope and timing of disclosures, judicial frustration and confusion, and disparate discovery disclosures to a defendant based solely on the identity of the prosecutor who happens to have been assigned a case. In many instances, the discovery guidance directs that prosecutors be familiar with circuit and district court precedent and the local rules of the district in which they practice.

In order to assist prosecutors maintain this familiarity and to establish uniform criminal discovery practices within the same office, I am today directing the USAOs and each Department litigating component handling criminal matters to develop a discovery policy that reflects circuit and district court precedent and local rules and practices.

This directive requires each office to establish a discovery policy with which prosecutors in that office must comply. The policy should also provide that specific, case-related considerations may warrant a departure from the uniform discovery practices of the office. Because it is expected that such considerations will sometimes justify a departure from the particular office practice, your policy must set forth procedures prosecutors are required to follow to obtain supervisory approval to depart from the uniform practices in an appropriate case.

Although the format is left to your discretion, the policy should address recurring issues such as: the timing of disclosures; disclosure of reports of interview for testifying or non-testifying witnesses; providing disclosure beyond the requirements of Fed.R.Crim.P 16 and 26.2, *Brady*, *Giglio*, the Jencks Act, and USAM §9-5.001; the scope of the "prosecution team" in national security cases [1] or cases involving regulatory agencies, parallel proceedings, or task force investigations; storing and reviewing substantive, case-related communications such as email; obtaining *Giglio* information from local law enforcement officers; disclosure questions related to trial preparation witness interviews; disclosure of agent notes; and maintaining a record of disclosures. I encourage you to seek input from investigative agencies regarding these issues as well.

The Criminal Discovery and Case Management Survey conducted as part of the Working Group's efforts showed that 90% of USAOs currently have standardized discovery policies or practices, so in many offices this directive requires only that you re-visit or formalize your current policy and revise as necessary to make sure that your policy reflects law and practice and addresses, to the extent appropriate, the issues set forth above.

The Working Group survey showed that 52% of the litigating components reported having standardized discovery policies or practices. I recognize that the litigating components that practice in multiple districts cannot develop a practice to reflect the local rules and practices of each district. Each litigating component should nonetheless develop a policy that guides the discovery practice of the component, understanding that litigating component prosecutors should examine—and in appropriate circumstances defer to—local policy when litigating in a particular district. Component policies should also address as appropriate the topics set forth above.

I encourage you to create or modify your policy as soon as possible, but in any event you are directed to have a revised or new policy in place no later than March 31, 2010, and to provide a copy to the Office of the Associate Attorney General and the Office of the Deputy Attorney General. USAOs should also provide a copy to the Executive Office for United States Attorneys.

I am confident that this effort along with the other steps being taken in response to the Working Group report will facilitate discovery practices that comply with our legal obligations and enhance our ability to achieve justice in every case. Thank you very much for your cooperation in this effort.

_____

[1] The Department will be issuing additional guidance on this issue by separate memorandum.

Home  »  Briefing Room  »  Justice News

**JUSTICE NEWS**

### MEMORANDUM FOR DEPARTMENT PROSECUTORS

Monday, January 4, 2010

FROM:    David W. Ogden
           Deputy Attorney General

SUBJECT: Guidance for Prosecutors Regarding Criminal Discovery

The discovery obligations of federal prosecutors are generally established by Federal Rules of Criminal Procedure 16 and 26.2, 18 U.S.C. §3500 (the Jencks Act), *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). In addition, the United States Attorney's Manual describes the Department's policy for disclosure of exculpatory and impeachment information. *See* USAM §9-5.001. In order to meet discovery obligations in a given case, Federal prosecutors must be familiar with these authorities and with the judicial interpretations and local rules that discuss or address the application of these authorities to particular facts. In addition, it is important for prosecutors to consider thoroughly how to meet their discovery obligations in each case. Toward that end, the Department has adopted the guidance for prosecutors regarding criminal discovery set forth below. The guidance is intended to establish a methodical approach to consideration of discovery obligations that prosecutors should follow in every case to avoid lapses that can result in consequences adverse to the Department's pursuit of justice. The guidance is subject to legal precedent, court orders, and local rules. It provides prospective guidance only and is not intended to have the force of law or to create or confer any rights, privileges, or benefits. *See United States v. Caceres*, 440 U.S. 741 (1979).

The discovery obligations of federal prosecutors are generally established by Federal Rules of Criminal Procedure 16 and 26.2, 18 U.S.C. §3500 (the Jencks Act), Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972). In addition, the United States Attorney's Manual describes the Department's policy for disclosure of exculpatory and impeachment information. See USAM §9-5.001. In order to meet discovery obligations in a given case, Federal prosecutors must be familiar with these authorities and with the judicial interpretations and local rules that discuss or address the application of these authorities to particular facts. In addition, it is important for prosecutors to consider thoroughly how to meet their discovery obligations in each case. Toward that end, the Department has adopted the guidance for prosecutors regarding criminal discovery set forth below. The guidance is intended to establish a methodical approach to consideration of discovery obligations that prosecutors should follow in every case to avoid lapses that can result in consequences adverse to the Department's pursuit of justice. The guidance is subject to legal precedent, court orders, and local rules. It provides prospective guidance only and is not intended to have the force of law or to create or confer any rights, privileges, or benefits. See United States v. Caceres, 440 U.S. 741 (1979).

By following the steps described below and being familiar with laws and policies regarding discovery obligations, prosecutors are more likely to meet all legal requirements, to make considered decisions about disclosures in a particular case, and to achieve a just result in every case. Prosecutors are reminded to consult with the designated criminal discovery coordinator in their office when they have questions about the scope of their discovery obligations. Rules of Professional Conduct in most jurisdictions also impose ethical obligations on prosecutors regarding discovery in criminal cases. Prosecutors are also reminded to contact the Professional Responsibility Advisory Office when they have questions about those or any other ethical responsibilities.

### Department of Justice Guidance for Prosecutors Regarding Criminal Discovery

**Step 1: Gathering and Reviewing Discoverable Information** [1]

**A. Where to look–The Prosecution Team**

Department policy states:

It is the obligation of federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all members of the prosecution team. Members of the prosecution team include federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant.

USAM §9-5.001. This search duty also extends to information prosecutors are required to disclose under Federal Rules of Criminal Procedure 16 and 26.2 and the Jencks Act.

In most cases, "the prosecution team" will include the agents and law enforcement officers within the relevant district working on the case. In multi-district investigations, investigations that include both Assistant United States Attorneys and prosecutors from a Department litigating component or other United States Attorney's Office (USAO), and parallel criminal and civil proceedings, this definition will necessarily be adjusted to fit the circumstances. In addition, in complex cases that involve parallel proceedings with regulatory agencies (SEC, FDIC, EPA, etc.), or other non-criminal investigative or intelligence agencies, the prosecutor should consider whether the relationship with the other agency is close enough to make it part of the prosecution team for discovery purposes.

Some factors to be considered in determining whether to review potentially discoverable information from another federal agency include:

Whether the prosecutor and the agency conducted a joint investigation or shared resources related to investigating the case;
Whether the agency played an active role in the prosecution, including conducting arrests or searches, interviewing witnesses, developing prosecutorial strategy, participating in targeting discussions, or otherwise acting as part of the prosecution team;
Whether the prosecutor knows of and has access to discoverable information held by the agency;
Whether the prosecutor has obtained other information and/or evidence from the agency;
The degree to which information gathered by the prosecutor has been shared with the agency;
Whether a member of an agency has been made a Special Assistant United States Attorney;
The degree to which decisions have been made jointly regarding civil, criminal, or administrative charges; and
The degree to which the interests of the parties in parallel proceedings diverge such that information gathered by one party is not relevant to the other party.

Many cases arise out of investigations conducted by multi-agency task forces or otherwise involving state law enforcement agencies. In such cases, prosecutors should consider (1) whether state or local agents are working on behalf of the prosecutor or are under the prosecutor's control; (2) the extent to which state and federal

governments are part of a team, are participating in a joint investigation, or are sharing resources; and (3) whether the prosecutor has ready access to the evidence. Courts will generally evaluate the role of a state or local law enforcement agency on a case-by-case basis. Therefore, prosecutors should make sure they understand the law in their circuit and their office's practice regarding discovery in cases in which a state or local agency participated in the investigation or on a task force that conducted the investigation.

Prosecutors are encouraged to err on the side of inclusiveness when identifying the members of the prosecution team for discovery purposes. Carefully considered efforts to locate discoverable information are more likely to avoid future litigation over *Brady and Giglio* issues and avoid surprises at trial.

Although all the considerations set forth above generally apply in the context of national security investigations and prosecutions, special complexities arise in that context. Accordingly, the Department expects to issue additional guidance for such cases. Prosecutors should begin considering potential discovery obligations early in an investigation that has national security implications and should also carefully evaluate their discovery obligations prior to filing charges. This evaluation should consider circuit and district precedent and include consultation with national security experts in their own offices and in the National Security Division.

B. What to Review

To ensure that all discovery is disclosed on a timely basis, generally all potentially discoverable material within the custody or control of the prosecution team should be reviewed [2]. The review process should cover the following areas:

1. The Investigative Agency's Files: With respect to Department of Justice law enforcement agencies, with limited exceptions [3], the prosecutor should be granted access to the substantive case file and any other file or document the prosecutor has reason to believe may contain discoverable information related to the matter being prosecuted. Therefore, the prosecutor can personally review the file or documents or may choose to request production of potentially discoverable materials from the case agents. With respect to outside agencies, the prosecutor should request access to files and/or production of all potentially discoverable material. The investigative agency's entire investigative file, including documents such as FBI Electronic Communications (ECs), inserts, emails, etc. should be reviewed for discoverable information. If such information is contained in a document that the agency deems to be an "internal" document such as an email, an insert, an administrative document, or an EC, it may not be necessary to produce the internal document, but it will be necessary to produce all of the discoverable information contained in it. Prosecutors should also discuss with the investigative agency whether files from other investigations or non-investigative files such as confidential source files might contain discoverable information. Those additional files or relevant portions thereof should also be reviewed as necessary.

2. Confidential Informant (CI)/Witness (CW)/Human Source (CHS)/Source (CS) Files: The credibility of cooperating witnesses or informants will always be at issue if they testify during a trial. Therefore, prosecutors are entitled to access to the agency file for each testifying CI, CW, CHS, or CS. Those files should be reviewed for discoverable information and copies made of relevant portions for discovery purposes. The entire informant/source file, not just the portion relating to the current case, including all proffer, immunity and other agreements, validation assessments, payment information, and other potential witness impeachment information should be included within this review.

If a prosecutor believes that the circumstances of the case warrant review of a non-testifying source's file, the prosecutor should follow the agency's procedures for requesting the review of such a file.

Prosecutors should take steps to protect the non-discoverable, sensitive information found within a CI, CW, CHS, or CS file. Further, prosecutors should consider whether discovery obligations arising from the review of CI, CW, CHS, and CS files may be fully discharged while better protecting government or witness interests such as security or privacy via a summary letter to defense counsel rather than producing the record in its entirety.

Prosecutors must always be mindful of security issues that may arise with respect to disclosures from confidential source files. Prior to disclosure, prosecutors should consult with the investigative agency to evaluate any such risks and to develop a strategy for addressing those risks or minimizing them as much as possible, consistent with discovery obligations.

3. Evidence and Information Gathered During the Investigation: Generally, all evidence and information gathered during the investigation should be reviewed, including anything obtained during searches or via subpoenas, etc. As discussed more fully below in Step 2, in cases involving a large volume of potentially discoverable information, prosecutors may discharge their disclosure obligations by choosing to make the voluminous information available to the defense.

4. Documents or Evidence Gathered by Civil Attorneys and/or Regulatory Agency in Parallel Civil Investigations: If a prosecutor has determined that a regulatory agency such as the SEC is a member of the prosecution team for purposes of defining discovery obligations, that agency's files should be reviewed. Of course, if a regulatory agency is not part of the prosecution team but is conducting an administrative investigation or proceeding involving the same subject matter as a criminal investigation, prosecutors may very well want to ensure that those files are reviewed not only to locate discoverable information but to locate inculpatory information that may advance the criminal case. Where there is an ongoing parallel civil proceeding in which Department civil attorneys are participating, such as a qui tam case, the civil case files should also be reviewed.

5. Substantive Case-Related Communications: "Substantive" case-related communications may contain discoverable information. Those communications that contain discoverable information should be maintained in the case file or otherwise preserved in a manner that associates them with the case or investigation. "Substantive" case-related communications are most likely to occur (1) among prosecutors and/or agents, (2) between prosecutors and/or agents and witnesses and/or victims, and (3) between victim-witness coordinators and witnesses and/or victims. Such communications may be memorialized in emails, memoranda, or notes. "Substantive" communications include factual reports about investigative activity, factual discussions of the relative merits of evidence, factual information obtained during interviews or interactions with witnesses/victims, and factual issues relating to credibility. Communications involving case impressions or investigative or prosecutive strategies without more would not ordinarily be considered discoverable, but substantive case-related communications should be reviewed carefully to determine whether all or part of a communication (or the information contained therein) should be disclosed.

Prosecutors should also remember that with few exceptions ( *see, e.g.,* Fed.R.Crim.P. 16(a)(1)(B)(ii)), the format of the information does not determine whether it is discoverable. For example, material exculpatory information that the prosecutor receives during a conversation with an agent or a witness is no less discoverable than if that same information were contained in an email. When the discoverable information contained in an email or other communication is fully memorialized elsewhere, such as in a report of interview or other document(s), then the disclosure of the report or interview or other document(s) will ordinarily satisfy the disclosure obligation.

6. Potential *Giglio* Information Relating to Law Enforcement Witnesses : Prosecutors should have candid conversations with the federal agents with whom they work regarding any potential *Giglio* issues, and they should follow the procedure established in USAM §9-5.100 whenever necessary before calling the law enforcement employee as a witness. Prosecutors should be familiar with circuit and district court precedent and local practice regarding obtaining *Giglio* information from state and local law enforcement officers.

7. Potential *Giglio* Information Relating to Non-Law Enforcement Witnesses and Fed.R.Evid. 806 Declarants : All potential *Giglio* information known by or in the possession of the prosecution team relating to non-law enforcement witnesses should be gathered and reviewed. That information includes, but is not limited to:

Prior inconsistent statements (possibly including inconsistent attorney proffers, *see United States v. Triumph Capital Group*, 544 F.3d 149 (2d Cir. 2008))
Statements or reports reflecting witness statement variations (see below)
Benefits provided to witnesses including:
Dropped or reduced charges
Immunity
Expectations of downward departures or motions for reduction of sentence
Assistance in a state or local criminal proceeding
Considerations regarding forfeiture of assets
Stays of deportation or other immigration status considerations
S-Visas
Monetary benefits
Non-prosecution agreements
Letters to other law enforcement officials ( *e.g.* state prosecutors, parole boards) setting forth the extent of a witness's assistance or making substantive recommendations on the witness's behalf
Relocation assistance
Consideration or benefits to culpable or at risk third-parties
Other known conditions that could affect the witness's bias such as:
Animosity toward defendant
Animosity toward a group of which the defendant is a member or with which the defendant is affiliated
Relationship with victim
Known but uncharged criminal conduct (that may provide an incentive to curry favor with a prosecutor)
Prior acts under Fed.R.Evid. 608
Prior convictions under Fed.R.Evid. 609
Known substance abuse or mental health issues or other issues that could affect the witness's ability to perceive and recall events

8. Information Obtained in Witness Interviews: Although not required by law, generally speaking, witness interviews [5] should be memorialized by the agent [6]. Agent and prosecutor notes and original recordings should be preserved, and prosecutors should confirm with agents that substantive interviews should be memorialized. When a prosecutor participates in an interview with an investigative agent, the prosecutor and agent should discuss note-taking responsibilities and memorialization before the interview begins (unless the prosecutor and the agent have established an understanding through prior course of dealing). Whenever possible, prosecutors should not conduct an interview without an agent present to avoid the risk of making themselves a witness to a statement and being disqualified from handling the case if the statement becomes an issue. If exigent circumstances make it impossible to secure the presence of an agent during an interview, prosecutors should try to have another office employee present. Interview memoranda of witnesses expected to testify, and of individuals who provided relevant information but are not expected to testify, should be reviewed.

a. Witness Statement Variations and the Duty to Disclose: Some witnesses' statements will vary during the course of an interview or investigation. For example, they may initially deny involvement in criminal activity, and the information they provide may broaden or change considerably over the course of time, especially if there are a series of debriefings that occur over several days or weeks. Material variances in a witness's statements should be memorialized, even if they are within the same interview, and they should be provided to the defense as *Giglio* information.

b. Trial Preparation Meetings with Witnesses: Trial preparation meetings with witnesses generally need not be memorialized. However, prosecutors should be particularly attuned to new or inconsistent information disclosed by the witness during a pre-trial witness preparation session. New information that is exculpatory or impeachment information should be disclosed consistent with the provisions of USAM §9-5.001 even if the information is first disclosed in a witness preparation session. Similarly, if the new information represents a variance from the witness's prior statements, prosecutors should consider whether memorialization and disclosure is necessary consistent with the provisions of subparagraph (a) above.

c. Agent Notes: Agent notes should be reviewed if there is a reason to believe that the notes are materially different from the memorandum, if a written memorandum was not prepared, if the precise words used by the witness are significant, or if the witness disputes the agent's account of the interview. Prosecutors should pay particular attention to agent notes generated during an interview of the defendant or an individual whose statement may be attributed to a corporate defendant. Such notes may contain information that must be disclosed pursuant to Fed.R.Crim.P. 16(a)(1)(A)-(C) or may themselves be discoverable under Fed.R.Crim.P. 16(a)(1)(B). *See, e.g., United States v. Clark*,
385 F.3d 609, 619-20 (6th Cir. 2004) and *United States v. Vallee*, 380 F.Supp.2d 11, 12-14
(D. Mass. 2005).

Step 2: Conducting the Review

Having gathered the information described above, prosecutors must ensure that the material is reviewed to identify discoverable information. It would be preferable if prosecutors could review the information themselves in every case, but such review is not always feasible or necessary. The prosecutor is ultimately responsible for compliance with discovery obligations. Accordingly, the prosecutor should develop a process for review of pertinent information to ensure that discoverable information is identified. Because the responsibility for compliance with discovery obligations rests with the prosecutor, the prosecutor's decision about how to conduct this review is controlling. This process may involve agents, paralegals, agency counsel, and computerized searches. Although prosecutors may delegate the process and set forth criteria for identifying *potentially* discoverable information, prosecutors should not delegate the disclosure determination itself. In cases involving voluminous evidence obtained from third parties, prosecutors should consider providing defense access to the voluminous documents to avoid the possibility that a well-intentioned review process nonetheless fails to identify material discoverable evidence. Such broad disclosure may not be feasible in national security cases involving classified information.

Step 3: Making the Disclosures

The Department's disclosure obligations are generally set forth in Fed.R.Crim.P. 16 and 26.2, 18 U.S.C. §3500 (the Jencks Act), *Brady, and Giglio* (collectively referred to herein as "discovery obligations"). Prosecutors must familiarize themselves with each of these provisions and controlling case law that interprets these provisions. In addition, prosecutors should be aware that Section 9-5.001 details the Department's policy regarding the disclosure of exculpatory and impeachment information and provides for broader disclosures than required by *Brady* and *Giglio*. Prosecutors are also encouraged to provide discovery broader and more comprehensive than the discovery obligations. If a prosecutor chooses this course, the defense should be advised that the prosecutor is electing to produce discovery beyond what is required under

the circumstances of the case but is not committing to any discovery obligation beyond the discovery obligations set forth above.

A. <u>Considerations Regarding the Scope and Timing of the Disclosures</u>: Providing broad and early discovery often promotes the truth-seeking mission of the Department and fosters a speedy resolution of many cases. It also provides a margin of error in case the prosecutor's good faith determination of the scope of appropriate discovery is in error. Prosecutors are encouraged to provide broad and early discovery consistent with any countervailing considerations. But when considering providing discovery beyond that required by the discovery obligations or providing discovery sooner than required, prosecutors should always consider any appropriate countervailing concerns in the particular case, including, but not limited to: protecting victims and witnesses from harassment or intimidation; protecting the privacy interests of witnesses; protecting privileged information; protecting the integrity of ongoing investigations; protecting the trial from efforts at obstruction; protecting national security interests; investigative agency concerns; enhancing the likelihood of receiving reciprocal discovery by defendants; any applicable legal or evidentiary privileges; and other strategic considerations that enhance the likelihood of achieving a just result in a particular case. In most jurisdictions, reports of interview (ROIs) of testifying witnesses are not considered Jencks material unless the report reflects the statement of the witness substantially verbatim or the witness has adopted it. The Working Group determined that practices differ among the USAOs and the components regarding disclosure of ROIs of testifying witnesses. Prosecutors should be familiar with and comply with the practice of their offices.

Prosecutors should never describe the discovery being provided as "open file." Even if the prosecutor intends to provide expansive discovery, it is always possible that something will be inadvertently omitted from production and the prosecutor will then have unintentionally misrepresented the scope of materials provided. Furthermore, because the concept of the "file" is imprecise, such a representation exposes the prosecutor to broader disclosure requirements than intended or to sanction for failure to disclose documents, *e.g.*, agent notes or internal memos, that the court may deem to have been part of the "file."

When the disclosure obligations are not clear or when the considerations above conflict with the discovery obligations, prosecutors may seek a protective order from the court addressing the scope, timing, and form of disclosures.

B. <u>Timing</u>: Exculpatory information, regardless of whether the information is memorialized, must be disclosed to the defendant reasonably promptly after discovery. Impeachment information, which depends on the prosecutor's decision on who is or may be called as a government witness, will typically be disclosed at a reasonable time before trial to allow the trial to proceed efficiently. *See* USAM §9-5.001. Section 9-5.001 also notes, however, that witness security, national security, or other issues may require that disclosures of impeachment information be made at a time and in a manner consistent with the policy embodied in the Jencks Act. Prosecutors should be attentive to controlling law in their circuit and district governing disclosure obligations at various stages of litigation, such as pre-trial hearings, guilty pleas, and sentencing.

Prosecutors should consult the local discovery rules for the district in which a case has been indicted. Many districts have broad, automatic discovery rules that require Rule 16 materials to be produced without a request by the defendant and within a specified time frame, unless a court order has been entered delaying discovery, as is common in complex cases. Prosecutors must comply with these local rules, applicable case law, and any final court order regarding discovery. In the absence of guidance from such local rules or court orders, prosecutors should consider making Rule 16 materials available as soon as is reasonably practical but must make disclosure no later than a reasonable time before trial. In deciding when and in what format to provide discovery, prosecutors should always consider security concerns and the other factors set forth in subparagraph (A) above. Prosecutors should also ensure that they disclose Fed.R.Crim.P. 16(a)(1)(E) materials in a manner that triggers the reciprocal discovery obligations in Fed.R.Crim.P. 16(b)(1).

Discovery obligations are continuing, and prosecutors should always be alert to developments occurring up to and through trial of the case that may impact their discovery obligations and require disclosure of information that was previously not disclosed.

C. <u>Form of Disclosure</u>: There may be instances when it is not advisable to turn over discoverable information in its original form, such as when the disclosure would create security concerns or when such information is contained in attorney notes, internal agency documents, confidential source documents, Suspicious Activity Reports, etc. If discoverable information is not provided in its original form and is instead provided in a letter to defense counsel, including particular language, where pertinent, prosecutors should take great care to ensure that the full scope of pertinent information is provided to the defendant.

**Step 4: Making a Record**

One of the most important steps in the discovery process is keeping good records regarding disclosures. Prosecutors should make a record of when and how information is disclosed or otherwise made available. While discovery matters are often the subject of litigation in criminal cases, keeping a record of the disclosures confines the litigation to substantive matters and avoids time-consuming disputes about what was disclosed. These records can also be critical when responding to petitions for post-conviction relief, which are often filed long after the trial of the case. Keeping accurate records of the evidence disclosed is no less important than the other steps discussed above, and poor records can negate all of the work that went into taking the first three steps.

**Conclusion**

Compliance with discovery obligations is important for a number of reasons. First and foremost, however, such compliance will facilitate a fair and just result in every case, which is the Department's singular goal in pursuing a criminal prosecution. This guidance does not and could not answer every discovery question because those obligations are often fact specific. However, prosecutors have at their disposal an array of resources intended to assist them in evaluating their discovery obligations including supervisors, discovery coordinators in each office, the Professional Responsibility Advisory Office, and online resources available on the Department's intranet website, not to mention the experienced career prosecutors throughout the Department. And, additional resources are being developed through efforts that will be overseen by a full-time discovery expert who will be detailed to Washington from the field. By evaluating discovery obligations pursuant to the methodical and thoughtful approach set forth in this guidance and taking advantage of available resources, prosecutors are more likely to meet their discovery obligations in every case and in so doing achieve a just and final result in every criminal prosecution. Thank you very much for your efforts to achieve those most important objectives.

---

[1] For the purposes of this memorandum, "discovery" or "discoverable information" includes information required to be disclosed by Fed.R.Crim.P. 16 and 26.2, the Jencks Act, *Brady, and Giglio*, and additional information disclosable pursuant to USAM §9-5.001.

[2] How to conduct the review is discussed below.

[3] Exceptions to a prosecutor's access to Department law enforcement agencies' files are documented in agency policy, and may include, for example, access to a non-testifying source's files.

Case 1:09-mc-00198-EGS   Document 84-3   Filed 03/15/12   Page 17 of 108

[4]Nothing in this guidance alters the Department's Policy Regarding the Disclosure to Prosecutors of Potential Impeachment Information Concerning Law Enforcement Agency Witnesses contained in USAM §9-5.100.

[5]"Interview" as used herein refers to a formal question and answer session with a potential witness conducted for the purpose of obtaining information pertinent to a matter or case. It does not include conversations with a potential witness for the purpose of scheduling or attending to other ministerial matters. Potential witnesses may provide substantive information outside of a formal interview, however. Substantive, case-related communications are addressed above.

[6]In those instances in which an interview was audio or video recorded, further memorialization will generally not be necessary.

# EXHIBIT D

CRM GOEKE 087276

| | |
|---|---|
| **From:** | Goeke, James (USAAK) |
| **To:** | Sullivan, Edward; Marsh, Nicholas; Kepner, Mary Beth (FBI); |
| | Joy, Chad E. (FBI); Bottini, Joe (USAAK); Morris, Brenda; |
| **Subject:** | Persons GJ Brady review |
| **Date:** | Monday, September 08, 2008 11:00:49 AM |

Here is the results of the Brady review of Persons GJ. I'm trying to be overly inclusive, so I know much of this stuff does not rise to Brady in the normal course:

- With regard to airline charters by VECO/Bill Allen, Persons says TS asked for an invoice. This relates to the NM charter TS reimbursed VECO for (Vol I, p. 25/26);
- Persons stated the pre-remodel chalet was falling down (Vol I, p. 30);
- Persons stated TS said none of this would have happened if Bill had done what TS asked, which was for instance simply get Christmas lights and put them up, not all these rope lights TS and CAS hate and don't know how to use and can't get down. Also TS asked Bill to get a generator, hook up, and get him a bill (Vol I p. 40);
- Persons stated doesn't know if generator worked, hopes Bill sent TS and invoice (Vol I, p. 40);
- Re rope lights again, CAS can't turn on, Persons doesn't think they were ever on, CAS doesn't like Allen, and didn't like Allen putting lights all over house and tree (Vol I p. 44);
- TS and BP would have stopped Allen putting up lights; doesn't think TS there when installed; sure CAS wasn't there (Vol I, p. 45);
- TS didn't know until recently that someone from VECO put up lights (Vol I, p. 45);
- TS suspected VECO put up lights (Vol I, p. 47);
- VECO left tool chest at Chalet, TS asked them to come get tools (Vol I, p. 49);
- TS won't accept comp meals at Double Musky (Vol I, p. 60);
- BP told TS house was falling apart, paint peeling, gutters falling, metal supports rusting (Vol I, p. 64);
- Roof was badly designed (Vol I, p. 66);
- Sheet rock in garage cracked from snow/ice falling off roof to garage (Vol I, p.68);
- Dave Anderson was the reason initial framing for remodel under lifted house screwed up; Dave bad about drinking all the time (Vol I, p. 86);
- Dave liked to sit in truck and drink whiskey (Vol I, p. 92);
- BP would think TS paying for Rocky, Dave, Bill Allen (Vol I, p. 92);
- CAS said she was taking a mortgage to pay for remodel (Vol I, p. 92);
- Dave drank too much (Vol I, p. 95);

CRM GOEKE 087277

- Framing by Dave, Rocky, others bad, house lifter refused to set down house (Vol I, p. 97);
- Strange relationship intermingled there between Mark Tyree, his very young daughter, and Bill Allen "and stuff [Persons] don't want to get into") (Vol I, p. 119);
- Persons wrote in email to TS that he was worried that Dave and Rocky or Bill lied to FBI (Vol I, p. 136);
- TS concerned about Dave telling lies after Dave had a falling out with Bill over Bill's girlfriend (Vol I, p. 138);
- BP thinks everybody that worked on house got paid and CAS paid them (Vol I, p. 139);
- Work was not a $140k job (Vol I, p. 140);
- Augie told BP that Bill Allent told him he had to eat last invoice on house, but CAS cut him a check for last payment (Vol I, p. 141);
- Augie said took forever to get last money out of Bill (Vol I, p. 142);
- Bill didn't want TS to pay labor on Chugach sewer bill (Vol II, p. 17);
- CAS/TS didn't want the lights, didn't want them in the tree (Vol II, p. 25-26);
- BP told that Roger Chan's and Pete Leathard's view of what happened at VECO different than Allen's (Vol II, p. 29);
- Old school means you don't tell lies about people and don't hurt your friends; BP and TS are old school, implied Allen not (Vol II, p. 51);
- All of Paone's invoices went to VECO for review (Vol II, p. 87).


JAMES A. GOEKE
Assistant U.S. Attorney
District of Alaska

(907) 271-3387

# EXHIBIT E

CRM GOEKE 087461

| | |
|---|---|
| **From:** | Goeke, James (USAAK) |
| **To:** | Marsh, Nicholas; Bottini, Joe (USAAK); Sullivan, Edward; Morris, Brenda; Welch, William; |
| **Subject:** | RE: Revised Brady/Giglio letter |
| **Date:** | Tuesday, September 09, 2008 3:33:55 AM |

Nick, here's an overly expansive, blunt first cut on Paone to add:

On November 8, 2006, Augie Paone testified.

1.      Paone testified that all invoices for the remodel of the defendant's home went to Robert Williams or Dave Anderson and VECO.

2.      Paone testified that Allen, Paone, and Williams all had input on how billing would be done with regard to the remodel of the defendant's home.

3.      Paone testified that he would submit bills to Allen and/or VECO for review and that they would then be sent on to Catherine Stevens and that he did not send any bills directly to the Stevenses unless Allen or Williams confirmed the billing was correct.

4.      Paone testified that he had a great deal of admiration for the defendant and what he was doing for Alaska.

5.      Paone recalled sending one invoice directly to Catherine Stevens.

6.      Paone testified that hopefully the electricians and plumbers working on the renovation were being paid by the defendant because he did not pay them.

7.      Paone testified that the last invoice he produced for the remodel went to Dave Anderson.

8.      Paone testified that he estimated the value of the electrical and plumbing work at the remodel to $10,000-$15,000 for each type of work and that he did not bill for that work.

9.      Paone testified that while he was never paid by the defendant for the last work he performed at the remodel of the defendant's home, Paone believed the defendant never

CRM GOEKE 087462

received the last bill for work during the renovation.

10.      Paone testified that Dave Anderson suggested that Paone may just have to not get paid for the last invoice related to the remodel of the defendant's home.

11.      Paone testified that he met with Allen to discuss payment for Paone's last invoice related to the remodel of the defendant's home and that Allen said he would eventually take care of the issue.

12.      Paone testified that someone at VECO must have ultimately decided to put outstanding costs related to the remodel of the defendant's home into invoices for Allen's own home remodel.

13.      Paone testified that he received payment for the outstanding costs from the  remodel of the defendant's home after billing those costs through Allen's home remodel months later.

14.      Paone testified that Allen's speech was impacted by his motorcycle accident and he did not know how else it affected Allen's brain.

15.      Paone wondered why the last outstanding invoice for approximately $13,000 was not simply sent to the defendant because Paone believed the defendant would pay the invoice.

16.      Paone stated his opinion was that the defendant might have mentioned to his friends a year or so before the remodel that he wanted to remodel his house and that he was going to spend $100,000 or $150,000 and Allen said he would run the project and make sure it did not cost over a certain amount.  Paone further speculated that then the project cost more than Allen promised the defendant it would cost and then there was a con.  Paone further speculated that he believed Allen may not have wanted to tell the defendant.

17.      Paone testified that he finally came to a conclusion that he would not get paid for a portion of his outstanding invoice related to the remodel of the defendant's home and that he wanted to keep good records because he was concerned about what accusations might follow about the

CRM GOEKE 087463

work he did on the defendant's home.

18.     Paone testified that he has a great deal of admiration for the defendant and that he felt everyone loves the defendant.

19.     Paone testified that he was comfortable with the way billing was handled for the remodel of the defendant's home until he could not understand why he was not being paid for the last invoice.

20.     Paone testified that the decision to have Paone's last invoice and additional work at the defendant's home billed and paid through Allen's remodel of his home was attributable to Dave Anderson and that Williams and Anderson were really big alcoholics.

21.     Paone testified that he did not want to make a $13,000 contribution to anyone.

22.     Paone testified that Williams was drinking a lot and that he could smell alcohol on his breath.

23.     Paone testified that he did what he could to make sure there was no harm anywhere, but noted that plumber and electricians were already there and the house was already jacked up.

24.     Paone testified that he concentrated on record keeping to protect his business.

25.     Paone testified that Allen last spoke with him around a year prior to his grand jury testimony concerned that one of Paone's employees was speaking to the press. Paone said he laughed to himself, thinking that it was Allen who had two drunks for employees.

26.     Paone stated that his personal opinion was that even though the project got out of hand, he did not personally think that anybody got any favors and that he thought the defendant paid everything that went past his desk and "they" were doing him wrong by trying to do him good. Paone added that "they" were trying to show the defendant respect and affection and that it was done in the wrong way. Paone further stated that if the defendant knew that he had another $50,000 bill, he would have figured out a wayt to pay it.

A-20

CRM GOEKE 087464

27.      Paone stated he did not have an open line to the defendant.

---

**From:** Marsh, Nicholas (CRM)
**Sent:** Monday, September 08, 2008 4:53 PM
**To:** Bottini, Joe (USAAK); Goeke, James (USAAK); Sullivan, Edward (CRM); Morris, Brenda (CRM); Welch, William (CRM)
**Subject:** Revised Brady/Giglio letter

Subsection 3 revised to include the Bambi Tyree stuff we discussed earlier today, as well as a tuneup to the Bill Bittner discussion below it.  I did not yet make a cut to the listed information in Sub 1.

EXHIBIT F

CRM BOTTINI 030581

| | |
|---|---|
| **From:** | Sullivan, Edward |
| **To:** | Bottini, Joe (USAAK); Goeke, James (USAAK); Marsh, Nicholas; |
| | Morris, Brenda; Welch, William; Kepner, Mary Beth (FBI); |
| | Joy, Chad E. (FBI); "Roberts, Dennis"; "Bateman Larry R"; |
| **Subject:** | Emailing: Romain 9-9-08 v 2 (3) |
| **Date:** | Tuesday, September 09, 2008 10:16:00 AM |
| **Attachments:** | Romain 9-9-08 v 2 (3).wpd |

Current version of B/G letter attached.

The message is ready to be sent with the following file or link attachments:

Romain 9-9-08 v 2 (3)


Note: To protect against computer viruses, e-mail programs may prevent sending or receiving certain types of file attachments.  Check your e-mail security settings to determine how attachments are handled.

CRM BOTTINI 030582



**U.S. Department of Justice**

Criminal Division

---

*Washington, D.C.  20530*

September 8, 2008

BY ELECTRONIC MAIL

Alex G. Romain, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005

      Re:    <u>United States Senator Theodore F. Stevens</u>

Dear Mr. Romain:

      As noted in several of our prior letters, and as set forth in certain of our briefs, the government has re-reviewed agents' notes and formal memoranda and grand jury transcripts for additional <u>Brady</u>/<u>Giglio</u> material.  We have also searched for additional documents in our possession, custody, and control concerning the prior and pending local law enforcement investigations of potential government witness Bill Allen.  The following, supplemental information is being furnished to you in a manner consistent with our prior agreement.

**1.      <u>Potential Brady/Giglio Information Located In Grand Jury Transcripts</u>**

      a.      On December 7, 2006, David Anderson testified that he was fired from VECO, and that he was paid $3,800 by the FBI for lodging, food, and gas expenses.

      b.      On January 7, 2007, Derrick Awad testified he never saw defendant or his family at the Girdwood residence while Awad was present at the location.

      c.      On February 7, 2007, Special Agent Mary Beth Kepner testified that defendant had not hampered the investigation.

      d.      On November 8, 2006, Jack Billings testified it was his understanding that defendant was going to pay for rain gutters and a water heater that Billings had installed.  Billings further testified he was convicted of certain drug-related crimes in the mid-1970s in the State of Utah.  The government, thus far, has not located  records relating to these convictions.

      e.      On February 9, 2007, Cecil Dale III testified that a flaw in the remodeling caused the need for the snow melt system.

      f.      On May 4, 2007, John David testified that miscoding can sometimes cause billings problems.

CRM BOTTINI 030583

g.      On February 9, 2007, John Hess testified he received a letter from defendant asking for a bill for Hess' services.  Hess further testified he informed defendant by letter that his time and labor was paid by VECO and defendant would have to address the issue with Bill Allen.

h.      On March 9, 2007, Pat Hudgens testified he had a conversation with John Hess concerning a request by defendant to obtain a bill for Hess' services.

i.      On May 6, 2007, Robin Friend testified that David Anderson has been removed from a job for drinking and a terrible work record.

j.      On June 3, 2008, Justin Stiefel testified he performed consulting and polling work for Governor Frank Murkowski's re-election campaign.  Stiefel testified he agreed with Rick Smith to have VECO pay a polling company for services performed by Stiefel and charged to polling company.  Stiefel testified this was done so that payments would not go directly from VECO to Stiefel.  Stiefel further testified he never received any payment from VECO or the polling company.

k.      On June 7, 2007, Linda Carpenter testified that Catherine Stevens contacted her and asked for advice from KPMG regarding the best way to pay for certain improvements at the Girdwood residence.  Carpenter testified that the Stevenses took out a $100,000 loan to pay for the improvements.  Carpenter further testified that the loan was paid off, but could not recall the date.

l.      On August 8, 2007, Larry Daniels testified that defendant asked Daniels to remove lights from a tree on the property, but to preserve them due to the on-going investigation.  Daniels testified that defendant told Daniels to send him a bill for the removal of the lights from the tree, which Daniels did after receiving defendant's address in Washington, D.C. from James Helms.

m.      On June 6, 2007, Wendy Dow testified that defendant would ask for individual checks when eating with a group of the people at the Double Musky Inn, presumably to avoid violating the Senate Rules concerning gifts.  Dow further testified that Bill Allen would pay the entire bill, however, including defendant's portion.

n.      On June 5, 2007, Charles Hart testified he performed repair work on a boiler at defendant's residence in Girdwood, Alaska.  Hart testified he originally sent an invoice to VECO for the entire cost.  However, he subsequently received a telephone call from Bill Allen who instructed Hart to split the bill in half.  Pursuant to Allen's instructions, Hart sent VECO a bill for the labor and a bill to defendant for the material/parts.  VECO paid the bill for labor.

CRM BOTTINI 030584

o.    On August 7, 2007, James Helms testified that he gave Larry Daniels the address for defendant in Washington, D.C., in order to send a bill to defendant regarding the rope lighting.

p.    On August 7, 2007, James Kaiser testified that Robert Penney asked Kaiser to create a stained glass picture for defendant as a housewarming gift.  Jeannie Penney made a down-payment of $1,200 and the remaining cost was paid by PENCO, Alaska.

q.    On November 8, 2006, Augie Paone testified that:

i.    All invoices for the remodel of defendant's home went to Robert Williams or David Anderson and VECO.

ii.    Allen, Paone, and Williams all had input on how billing would be done with regard to the remodel of defendant's home.

iii.    He would submit bills to Allen and/or VECO for review and that they would then be sent on to Catherine Stevens and that he did not send any bills directly to the Stevenses unless Allen or Williams confirmed the billing was correct.

iv.    He had a great deal of admiration for defendant and what he was doing for Alaska.

v.    He recalled sending one invoice directly to Catherine Stevens.

vi.    Hopefully the electricians and plumbers working on the renovation were being paid by defendant because he did not pay them.

vii.    The last invoice he produced for the remodel went to David Anderson.

viii.    He estimated the value of the electrical and plumbing work at the remodel to $10,000-$15,000 for each type of work and that he did not bill for that work.

ix.    Although he was never paid by defendant for the last work he performed at the remodel of defendant's home, Paone believed defendant never received the last bill for work during the renovation.

x.    David Anderson suggested that Paone may just have to not get paid for the last invoice related to the remodel of defendant's home.

xi.    He met with Allen to discuss payment for Paone's last invoice related to the remodel of defendant's home and that Allen said he would eventually take care of the issue.

xii.    Someone at VECO must have ultimately decided to put outstanding costs related to the remodel of defendant's home into invoices for Allen's own home remodel.

xiii.    He received payment for the outstanding costs from the remodel of defendant's home after billing those costs through Allen's home remodel months later.

xiv.    Allen's speech was impacted by his motorcycle accident and he did not know how else it affected Allen's brain.

-3-

CRM BOTTINI 030585

xv.    He wondered why the last outstanding invoice for approximately $13,000 was not simply sent to defendant because Paone believed defendant would pay the invoice.

xvi.    He opined that defendant might have mentioned to his friends a year or so before the remodel that he wanted to remodel his house and that he was going to spend $100,000 or $150,000 and Allen said he would run the project and make sure it did not cost over a certain amount. Paone further speculated that then the project cost more than Allen promised defendant it would cost and then there was a con. Paone further speculated that he believed Allen may not have wanted to tell defendant.

xvii.    He finally came to a conclusion that he would not get paid for a portion of his outstanding invoice related to the remodel of defendant's home and that he wanted to keep good records because he was concerned about what accusations might follow about the work he did on defendant's home.

xviii.    He has a great deal of admiration for defendant and that he felt everyone loves defendant.

xix.    He was comfortable with the way billing was handled for the remodel of defendant's home until he could not understand why he was not being paid for the last invoice.

xx.    Decision to have Paone's last invoice and additional work at defendant's home billed and paid through Allen's remodel of his home was attributable to David Anderson and that Williams and Anderson were really big alcoholics.

xxi.    He did not want to make a $13,000 contribution to anyone.

xxii.    Williams was drinking a lot and that he could smell alcohol on his breath.

xxiii.    He did what he could to make sure there was no harm anywhere, but noted that plumber and electricians were already there and the house was already jacked up.

xxiv.    He concentrated on record keeping to protect his business.

xxv.    Allen last spoke with him around a year prior to his grand jury testimony concerned that one of Paone's employees was speaking to the press. Paone said he laughed to himself, thinking that it was Allen who had two drunks for employees.

xxvi.    His personal opinion was that even though the project got out of hand, he did not personally think that anybody got any favors and that he thought defendant paid everything that went past his desk and "they" were doing him wrong by trying to do him good. Paone added that "they" were trying to show defendant respect and affection and that it was done in the wrong way. Paone further stated that if defendant knew that he had another $50,000 bill, he would have figured out a way to pay it.

xxvii.    He did not have an open line to defendant.

r.    On June 6, 2007, Robert Penney testified that Bill Allen oversaw the renovations at the Girdwood residence as a friend of defendant, and that Allen was going to

-4-

CRM BOTTINI 030586

help see that proper contractors were put in place.  Penney further testified that the Stevenses sent a check to Penland Development in the amount of $10,656.98, which represented the Stevenses reimbursement of certain construction material purchased on a Penland account at Spenard Builders.  Penney also testified that he gave a stained glass window to the Stevenses as a housewarming gift.  Penney further testified that, although he had not heard defendant complain about work that was performed on the house and was not aware of defendant saying anything was broken or not performed well, the project, overall, should have been done more quickly.  Penney also testified that he has never gotten a dime from defendant in any way.

s.    On June 1-2, 2007, Robert Persons testified that:

   i.    With regarding to a charter flight paid by VECO, defendant asked VECO for an invoice.
   ii.    Prior to the renovations, the chalet was falling down.
   iii.    Defendant told Persons that none of this would have happened if Allen had done what defendant asked of him.
   iv.    He noted the rope lighting as an example where Allen did more than what defendant wanted.
   v.    Defendant asked Allen to get a generator, hook it up, and send him a bill. Persons testified he did not know if the generator worked, and he hoped Allen had sent defendant an invoice.
   vi.    Catherine Stevens did not like the rope lighting, could not figure out how to turn them on, Persons was not sure whether they were ever on, Catherine Stevens does not like Allen, and did not like Allen putting lights all over the house and tree.
   vii.    He and defendant would have stopped Allen putting up lights, does not think defendant was there when Allen installed them, and was not sure Catherine Stevens was present either.
   viii.    Defendant did not know until recently that someone from VECO installed the lights, but defendant suspected VECO installed them.
   ix.    VECO left a tool chest at the chalet and defendant asked VECO to come get the tools.
   x.    Defendant will not accept complimentary meals at Persons' restaurant in Girdwood.
   xi.    He told defendant the house was falling apart, paint peeling, gutters falling, metal supports rusting.
   xii.    The roof was badly designed and that sheet rock in the garage had cracked from snow/ice falling off roof to garage.
   xiii.    David Anderson improperly performed the initial framing for the renovation and that the company that jacked up the house refused to set it down on the framing.

-5-

A-28

xiv.    David Anderson drinks too much, drinks all the time, and liked sit in his truck and drink whiskey.

xv.     He assumed that defendant was paying for services provided by Robert Williams, David Anderson, and Bill Allen.

xvi.    Catherine Stevens said she was taking out a mortgage to pay for the remodeling.

xvii.   A strange relationship existed between Mark Tyree, his very young daughter, and Bill Allen.

xviii.  He wrote in an e-mail to defendant that he was concerned that Allen, Anderson, and Williams had lied to the FBI.

xix.    Defendant told Persons that defendant was concerned about Anderson telling lies after Anderson had a falling out with Allen over Allen's girlfriend.

xx.     He thinks everybody that worked on house got paid and Catherine Stevens paid them.

xxi.    The work performed was not worth $140,000. Persons testified that Augie Paone told him that Allen told Paone that he had to eat the last invoice on the house, but that Catherine Stevens cut him a check for last payment. According to Persons, Paone said it took forever to get the last amount of money out of Allen.

xxii.   Allen did not want defendant to pay the labor on the Chugach sewer bill;

xxiii.  Roger Chan and Pete Leathard's view of what happened at VECO was different than Allen's.

xxiv.   "Old school'" means you do not tell lies about people and do not hurt your friends. Persons added that he and defendant are old school.

xxv.    All of Paone's invoices went to VECO for review.

t.      On February 13, 2008, George Walton testified he did not recall any specific conversations between himself and defendant in which the two discussed the renovations at the Girdwood Residence.

## 2.    **Potential Brady/Giglio In Agents' Rough Notes Or Formal Memoranda**

a.      On December 14, 2006, government agents interviewed Linda Croft. Croft stated that after certain plumbing work had been performed at defendant's residence in Girdwood, Alaska, Croft saw an e-mail from defendant to Allen advising Allen that defendant needed to pay the plumber.

b.      On August 31, 2006, government agents interviewed Pete Leathard. Leathard stated that VECO had performed small favors for defendant, but anything VECO or Bill Allen did for defendant (such as providing the services of an electrician at his residence) was reimbursed by defendant. Leathard further assumed that defendant reimburses everyone.

c.    [On September 1, 2006, government agents interviewed Robert Williams. Williams stated there were no formal plans for the addition at defendant's residence and that Williams sketched the plans for the addition based upon conversations with defendant.  Williams also stated that, although he was the general contractor on the project, he did not deal with the expenses.  Williams further stated the majority of the work on the property was completed by Christensen Builders, estimating that 99 percent of the work was done by Christensen Builders and the remaining portion performed by subcontractors.]

d.    Need to re-write.  On August 13, 2008, government agents interviewed David Anderson concerning an affidavit he signed on March 25, 2008.  The affidavit discusses immunity for Anderson, friends, and family members.  Anderson stated he signed the affidavit, the affidavit was drafted by Jerry Ward, and he felt pressured to sign it because of his relationship with Kirsten Deacon, the daughter of Jerry Ward.  Anderson also stated he was not forced to sign the affidavit.  Anderson further stated the contents of the affidavit were not completely accurate.  Anderson stated he believed he had previously told agents he did not want Kirsten Deacon and her family involved with his cooperation with the government, but admitted he was never promised or offered immunity for himself or any other person.  When discussing the names in the affidavit, Anderson stated that Jerry Ward put in all the names of people who were supposed to have received immunity.

When discussing the affidavit being inaccurate, Anderson stated he believes he could remove the inaccurate portions to make the affidavit accurate.  Anderson did not understand the implications of a false affidavit and how it could hurt his credibility.

e.    As noted in our letter dated August 25, 2008, Bill Allen was interviewed on July 16, 2008, concerning a target of an unrelated criminal investigation.  During the course of that interview, Allen was not truthful concerning financial benefits provided to an elected state public official.  The following day, Allen contacted a government agent and volunteered that he had not been truthful about this subject matter in an effort to protect a family member.

f.    Add in MBK's review of other 302/interview notes

## 3.    Local Investigations Of Bill Allen

In response to your request for additional information concerning the prior and pending local law enforcement investigations of Allen, the federal government has located in its possession, custody, and control, a formal memorandum and an Anchorage Police Department ("APD") report from an unrelated case that refers to Mr. Allen.  [add Jim's notes?]  According to these reports, in February 2004, an adult female made allegations to the APD concerning Mr.

-7-

CRM BOTTINI 030589

Allen.  The adult female alleged she had a sexual relationship with Mr. Allen while she was an adult, but believed that Allen had a contemporaneous sexual relationship with a 15 year-old female.  (This "other female" is one of the individuals disclosed in our letter to you dated August 25, 2008.)  The adult female alleged that during the course of her relationship with Allen, Allen provided her with things of value, including money, trips, housing, and a car, as well as paying for the adult female to attend an alcohol rehabilitation program.

The adult female further alleged that, after her relationship with Allen ended, she was contacted by an attorney for Allen and requested to sign a nondisclosure agreement that would have contained, in part, a statement that she had never had a sexual relationship with Allen.  The adult female suggested that the attorney offered her $5,000 in exchange for the statement, but she declined in part because she wanted more money.

On September 7, 2008, Allen was interviewed concerning these allegations.  Allen stated he did have a relationship with the adult female and he did pay her rent during their relationship.  Allen advised that the adult female was a prostitute.  Allen advised that after the relationship ended, the adult female and the adult female's mother began to demand money from him and threatened to go to the newspaper to expose their relationship.  Allen stated that the adult female also threatened to make statements concerning Allen's relationship with the "other female" referenced above.  Allen stated that the adult female demanded money in exchange for her not to make such statements to the media.  Allen refused to pay any money and considered her threats to be blackmail and/or extortion.  Allen hired a lawyer to address his belief that he was being blackmailed.  Allen denied ever offering to pay anyone money to make a false statement.

Given the foregoing allegation from the adult female, we are also providing you with some additional information that, as described below, is neither <u>Brady</u> nor <u>Giglio</u>.  In 2007, the government became aware of a suggestion that, a number of years ago, Allen asked the "other female" to make a sworn, false statement concerning their relationship.  After hearing that suggestion, the government conducted a thorough investigation and was unable to find any evidence to support it.  The investigation included:  (a) an inquiry to the "other female," who denied the suggestion; (b) an inquiry to Allen, who denied the suggestion; (c) a review of notes taken by a federal law enforcement agent during a 2004 interview of the "other female,"; and (d) a review of notes taken by a federal prosecutor during a 2004 interview of the "other female." ==[add Bambi's lawyer?]== Because the government is aware of no evidence whatsoever to support any suggestion that Allen caused the "other female" to make a statement under oath, neither <u>Brady</u> nor <u>Giglio</u> apply.

Finally, we note that during debriefs with the government, Allen stated that Bill Bittner, an attorney in Anchorage, once asked Allen to make a statement that the "other female" referenced above had extorted him and/or blackmailed him, for the purpose of benefitting one of Mr. Bittner's clients.  Allen stated that he told Mr. Bittner that any such allegations were false and refused to make the statement.

Very truly yours,

-8-

CRM BOTTINI 030590

William M. Welch II, Chief


_____

Brenda K. Morris
Principal Deputy Chief

Nicholas A. Marsh
Edward P. Sullivan
Trial Attorneys

Joseph W. Bottini
James A. Goeke
Assistant United States Attorneys

EXHIBIT G



**U.S. Department of Justice**

Criminal Division

_____

*Washington, D.C. 20530*

September 9, 2008

<u>BY ELECTRONIC MAIL</u>

Alex G. Romain, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005

EXHIBIT
Goeke 2
JH 1-8-10

Re:   <u>United States Senator Theodore F. Stevens</u>

Dear Mr. Romain:

As noted in several of our prior letters, and as set forth in certain of our briefs, the government has completed its review of agents' notes, formal memoranda, and grand jury transcripts for <u>Brady</u>/<u>Giglio</u> material.  We have also searched for additional documents in our possession, custody, and control concerning the prior and pending local law enforcement investigations of potential government witness Bill Allen.  The following information is being furnished to you in a manner consistent with our prior agreement.

Please note that the information set forth in this letter and the government's letter dated August 25, 2008, does not contain all potential impeachment material related to certain government witnesses.  As you know, the government has produced substantial discovery to defendant which may contain additional <u>Brady</u>/<u>Giglio</u> material.  This discovery also includes the documents voluntarily produced to us by defendant prior to his indictment.

Please also note that we believe that a significant portion of the information set forth below is not <u>Brady</u>/<u>Giglio</u> material.  We produce this information nonetheless in the continued spirit of compromise and cooperation.

1.   On December 7, 2006, David Anderson stated he was fired from VECO, and that he was paid $3,800 by the FBI for lodging, food, and gas expenses.  Anderson also admitted that he received approximately $30,000 from Allen and VECO around the time that Anderson was terminated from VECO.  Although Allen has stated that the payment was extorted by Anderson, Anderson stated that he believed the payment was part of a severance package.

2.   On November 8, 2006, Jack Billings stated it was his understanding that defendant was going to pay the repair to the boiler system, but Billings did not see a bill go to defendant.

3.   On February 9, 2007, Cecil Dale III stated he believed that a flaw in the remodeling may have caused the need for the snow melt system.

4.   On May 4, 2007, John David stated that miscoding can sometimes cause billing problems.

5.   On May 6, 2007, Robin Friend stated that David Anderson has been removed from a job for drinking and a terrible work record.

6.   On June 3, 2008, Justin Stiefel stated he performed consulting and polling work for Governor Frank Murkowski's re-election campaign. Stiefel stated he agreed with Rick Smith to have VECO pay a polling company for services performed by Stiefel and charged to the polling company. Stiefel stated this was done so that payments would not go directly from VECO to Stiefel. Stiefel further stated he never received any payment from VECO or the polling company.

7.   On June 7, 2007, Linda Carpenter stated that Catherine Stevens contacted her and asked for advice from KPMG regarding the best way to pay for certain improvements at the Girdwood residence. Carpenter stated that the Stevenses took out a $100,000 loan to pay for certain improvements. Carpenter further stated that the loan was paid off, but could not recall the date.

8.   On August 8, 2007, Larry Daniels stated that defendant asked Daniels to remove lights from a tree on the property, but to preserve them due to the on-going investigation. Daniels stated that defendant told Daniels to send him a bill for the removal of the lights from the tree, which Daniels did after receiving defendant's address in Washington, D.C. from James Helms.

9.   On June 6, 2007, Wendi Dow stated that defendant would ask for individual checks when eating with a group of the people at the Double Musky Inn, presumably to avoid violating the Senate Rules concerning gifts. Dow further stated that Bill Allen would pay the entire bill, however, including defendant's portion.

10.  On June 5, 2007, Charles Hart stated he performed repair work on a boiler at defendant's residence in Girdwood, Alaska. Hart stated he originally sent an invoice to VECO for the entire cost. However, he subsequently received a telephone call from Bill Allen who instructed Hart to split the bill in half. Pursuant to Allen's instructions, Hart sent VECO a bill for the labor and a bill to defendant for the material/parts. VECO paid the bill for labor.

11.  On June 6, 2007, Robert Penney stated that some construction materials for the Girdwood residence were purchased on a Penland Development account at Spenard Builders Supply, and that the Stevenses sent a check to Penland in the amount of $10,656.98. Penney further stated that, although he had not heard defendant complain about work that was performed on the house and was not aware of defendant saying anything was broken or not performed well, the project overall should have been done more quickly. Penney also stated that he has never gotten a dime from defendant in any way.

12. On December 14, 2006, Linda Croft stated that after certain plumbing work had been performed at the Girdwood residence, Croft saw an e-mail from defendant to Allen advising Allen that defendant needed to pay the plumber.

13. On August 31, 2006, Pete Leathard stated that VECO had performed small favors for defendant, which Leathard believed had been reimbursed by defendant. Leathard further assumed that defendant reimburses everyone.

14. On May 13, 2007, Chris Von Imhof stated that defendant always paid his share of meals when out to dinner.

15. On September 1, 2006, Robert Williams stated there were no formal plans for the addition at defendant's residence and that Williams sketched the plans for the addition based upon conversations with defendant. Williams also stated that, although he was the general contractor on the project, he did not deal with the expenses and did not recall reviewing Christensen Builders invoices. In a memorandum of interview from the same meeting, a federal law enforcement agent noted that Williams estimated that 99 percent of the work was done by Christensen Builders. In a subsequent interview, Williams stated that he did not recall ever saying that Christensen Builders performed 99 percent of the work, and that such a figure was inconsistent with what he knows to have occurred.

16. On August 13, 2008, David Anderson stated he signed an affidavit on March 25, 2008; the affidavit was drafted by Jerry Ward; Ward chose the individual names that would be included in the affidavit; Anderson felt pressured to sign the affidavit because of his relationship with Ward's daughter; the affidavit contains numerous false statements; and that he and the other individuals mentioned in the affidavit were not promised, offered, or actually given immunity.

17. From August 30, 2006 to the present, Allen has made the following statements:

   a. Allen stated that he believed that Rocky Williams and David Anderson had drinking problems.

   b. Allen stated that he was aware that defendant took out a loan to pay a contractor in connection with the renovations at defendant's residence in Girdwood, and that he knew that the contractor was Augie Paone with Christensen Builders.

   c. Allen stated that on at least two occasions defendant asked Allen for invoices for VECO's work at the Girdwood residence. Allen stated he never sent an invoice to defendant or caused an invoice to be sent to defendant. Allen stated that he believed that defendant would not have paid the actual costs incurred by VECO, even if Allen had sent defendant an invoice, because defendant would not have wanted to pay that high of a bill. Allen stated that defendant probably would have paid a reduced invoice if he had received one from Allen or VECO. Allen did not want to give defendant a bill partly because he felt that VECO's costs were higher

than they needed to be, and partly because he simply did not want defendant to have to pay.

d.      Allen stated that when he gave defendant a new king sized bed, defendant said he did not need a new bed but then commented that it was pretty good.

e.      Allen stated that defendant was careful about making sure he paid for some things such as his share of the bill when they went out to dinner, and that defendant also paid for his share of a charter flight.

f.      Allen stated that although defendant knew that Allen purchased and installed the Viking gas grill at the Girdwood residence, defendant once told Allen that defendant considered the grill Allen's property, not defendant's.

18.     The grand jury transcripts for Robert Persons and Augie Paone will be provided by separate cover tomorrow.

*   *   *

    In response to your request for additional information concerning the prior and pending local law enforcement investigations of Allen, the federal government has located in its possession, custody, and control information concerning a 2004 statement made to the Anchorage Police Department ("APD") and provided to the government in an unrelated, closed federal investigation.  In February 2004, an adult female alleged she had a sexual relationship with Allen while she was an adult, but believed that Allen had a contemporaneous sexual relationship with a 15 year-old female.  (This "other female" is one of the individuals disclosed in our letter to you dated August 25, 2008.)  The adult female alleged that during the course of her relationship with Allen, Allen provided her with things of value, including money, trips, housing, and a car, as well as paying for the adult female to attend an alcohol rehabilitation program.

    The adult female further alleged that, after her relationship with Allen ended, she was contacted by an attorney for Allen and requested to sign a nondisclosure agreement that would have contained, in part, a statement that she had never had a sexual relationship with Allen.  The adult female suggested that the attorney offered her $5,000 in exchange for the statement, but she declined in part because she wanted more money.  The adult female also alleged that Allen provided her with a trip outside Alaska for the purpose of preventing the adult female to testify in an unspecified proceeding.

    On September 7, 2008, Allen was interviewed concerning these allegations.  Allen stated he did have a relationship with the adult female and he did pay her rent during their relationship.  Allen advised that the adult female was a prostitute.  Allen advised that after the relationship ended, the adult female and the adult female's mother began to demand money from him and threatened to go to the newspaper to expose their relationship.  Allen stated that the adult female also threatened to make statements concerning Allen's relationship with the "other female" referenced above.  Allen stated that the adult female demanded money in exchange for her not to

make such statements to the media. Allen refused to pay any money and considered her threats to be blackmail and/or extortion. Allen hired a lawyer to address his belief that he was being blackmailed. Allen denied ever offering to pay anyone money to make a false statement, and denied ever causing anyone to leave the state of Alaska to prevent testimony in any type of proceeding.

Given the foregoing allegation from the adult female, we are also providing you with some additional information that, as described below, is neither Brady nor Giglio. In 2007, the government became aware of a suggestion that, a number of years ago, Allen asked the "other female" to make a sworn, false statement concerning their relationship. After hearing that suggestion, the government conducted a thorough investigation and was unable to find any evidence to support it. The investigation included: (a) an inquiry to the "other female," who denied the suggestion; (b) an inquiry to Allen, who denied the suggestion; (c) a review of notes taken by a federal law enforcement agent during a 2004 interview of the "other female,"; and (d) a review of notes taken by a federal prosecutor during a 2004 interview of the "other female." Because the government is aware of no evidence to support any suggestion that Allen asked the "other female" to make a false statement under oath, neither Brady nor Giglio apply.

Finally, we note that during debriefs with the government, Allen stated that Bill Bittner, an attorney in Anchorage, once asked Allen to make a statement that the "other female" referenced above had extorted him and/or blackmailed him, for the purpose of benefitting one of Mr. Bittner's clients. Allen stated that he told Mr. Bittner that any such allegations were false and refused to make the statement.

Very truly yours,

William M. Welch II, Chief

Brenda K. Morris
Principal Deputy Chief

Nicholas A. Marsh
Edward P. Sullivan
Trial Attorneys

Joseph W. Bottini
James A. Goeke
Assistant United States Attorneys

# EXHIBIT H

CRM BOTTINI 030460

**From:**   Goeke, James (USAAK)
**To:**     Sullivan, Edward;
           Bottini, Joe (USAAK);
**Subject:** Tyree
**Date:**   Monday, March 05, 2007 3:34:52 PM

Ed,

Here is information concerning the Bambi Tryee matter we discussed this morning.

Below are pertinent excerpts from briefing filed in United States v. Boehm, a case prosecuted in the District of Alaska during 2003-2004 in which I participated.  Bambi Tyree was a co-defendant in United States v. Boehm and eventually pled guilty sex trafficking and distribution of drugs to minors.  During a debrief of Tyree in anticipation of trial against Josef Boehm, Tyree stated that she once gave false sworn testimony in the context of a deposition when she was 15 years old.  According to Tyree, the deposition concerned, among other things, whether she had ever had sex with Bill Allen.  She stated to the government that she denied having sex with Allen during the deposition, but that her testimony had been false.  The government does not have a copy of the deposition.  At the time, Allen's attorney, James Gilmore refused to provide a copy of the deposition, claiming privilege.  The issue came before the court (Judge John Sedwick, who has reviewed numerous TIII applications in the current investigation) in the context of a motion in limine from the government.  As the below excerpts demonstrate, the defendant's view of the facts changed over time as to whether Tyree did or did not have sex with Allen, and consequently as to whether or not Tyree's statement was true or false.  Ultimately, the court ordered that the defendant in United States v. Boehm could inquire generically as to whether or not Tyree had made a false statement under oath and the underlying facts ultimately did not become public.  In the context of the current investigation, the government has not questioned Allen or Tyree:  (1) concerning Allen's relationship with Tyree; (2) concerning whether Allen asked Tyree to provide a deposition; and (3) concerning whether Allen asked to Tyree provide specific testimony at a deposition.  Accordingly, at this time we do not have any information from Allen concerning Tyree's previous statements to the government concerning her deposition.

Excerpt from United States' motion in limine (filed July 2004) in United States v. Boehm regarding testimony of Bambi Tyree:

During debriefings, Bambi Tyree admitted to giving a false

A-40

statement under oath when she was 15 years old.  This statement is not in the United States' possession.  However, Tyree identified the nature of the statement, which is as follows:  When Tyree was 15 years old, she had sex with Bill Allen, president of VECO and publisher of the "Voice of the Times" section in the Anchorage Daily News.  Tyree and Allen were introduced by Tyree's roommate, Lisa Moore.  Moore, who apparently knew of the untoward and illegal relationship, began blackmailing Allen, claiming that she would go to the police and newspapers and tell them that Allen had sex with Tyree.  Based on this threat, Allen asked Tyree to meet with his attorney, James Gilmore, and give a sworn statement stating that she never had sex with Allen.  Tyree did so.  The United States confirmed the existence of such statement from Mr. Gilmore.  Mr. Gilmore stated that this statement was work product, and he declined to provide it to the United States.

The United States is turning over this information to the defense pursuant to its obligations under Giglio v. United States, 405 U.S. 150 (1972).  The fact that Tyree gave a false statement under oath bears on her credibility.  However, the fact that Allen was the person who asked Tyree to swear to the statement is irrelevant to any issue in this case. . . .

Excerpt from United States' reply in United States v. Boehm to defendant's opposition to United States' motion in limine (reply filed August 2004):

Within his response, the defendant alleges that Bambi Tyree participated in a "scheme to blackmail" Bill Allen, president of VECO, with her roommate, Lisa Moore.  Further, that the "scheme" called for Tyree and Moore to visit with Allen at a hotel room and engage in sexual relations with each other in order to entice Allen into having sex with the underage Tyree.  The defendant then claims that Tyree had sex with Allen pursuant to the "scheme."  Tellingly, the defendant provides no support for the perpetration of such "scheme."

Indeed, Tyree will deny participation in any such scheme.  It appears that Tyree's roommate, Lisa Moore, was involved in such a scheme.   According to Moore and Tyree, Moore was working as a prostitute when she met Allen on a call.  Moore, who was 19 years old at the time, and Allen, began a relationship.   Moore introduced Tyree to Allen, who had sex with Tyree.  Moore became

jealous of Tyree's relationship with Allen and began blackmailing him, telling him that she would go to the authorities and tell them of Allen's relationship with the juvenile Tyree.  As a result, Allen convinced Tyree to give a false statement to his attorney to defend against any prospective criminal action. Tyree complied.

Not only will Tyree deny being part of Moore's scheme, but her participation in such a scheme is belied by common sense.  First, if it was part of Tyree's scheme to blackmail Allen based on their sexual encounter, why would she agree to give a statement under oath that such encounter never happened?  One would think that such a statement would completely undermine the reason Allen was being blackmailed.  Second, Tyree's admission to the United States that she gave false answers under oath did not serve any conceivable purpose of her own, nor did it benefit the United States.  Rather, it triggered the United States obligations under Giglio v. United States, 405 U.S. 150 (1972), creating impeachment material for the defense.  Indeed, had Tyree not admitted that she swore falsely concerning her relationship with Allen, this relationship would have no relevance whatsoever. . . .

Excerpt from United States' opposition to defendant's motion for reconsideration in United States v. Boehm (opposition filed October 2004):

The defendant alleges that the Court made factual and legal errors in assessing the defendant's position with respect to Ms. Tyree.  First, with respect to the averred factual error, the defendant has refined his position and now expresses the view that Tyree did not in fact have sex with Allen, but participated in a scheme to blackmail him based on a false sexual relationship.  Whether there was in fact a sexual relationship is irrelevant to the defendant's position; rather, the lynchpin of his argument appears to be Tyree's alleged participation in a scheme to blackmail.  Thus, the Court's decision should not be effected by whether or not a sexual relationship actually occurred.

. . .

The defendant proposes to challenge Tyree's credibility by showing that she participated in a scheme to blackmail Allen based on allegations that Tyree, a minor at the time and the alleged victim, had a sexual relationship with Allen.  Thus, the defendant

CRM BOTTINI 030463

wants to use this evidence to show that Tyree, now 23 and a co-defendant of Boehm, is falsely accusing him of having sexual relationships with minors, which she has pleaded guilty to facilitating.  Setting apart the obvious procedural and factual differences in the claims, and assuming, for the sake of argument, Tyree engaged in such a scheme to blackmail Allen, such attempted introduction of evidence falls under the auspices of three different Rules of Federal Evidence:   608(b), 404(b), and 403.  Under each rule, the defendant's proposed evidence is inadmissible. . . .

JAMES  A. GOEKE

Assistant U.S. Attorney
District of Alaska

(907) 271.3387
(907) 271.1500 (fax)

# EXHIBIT I

CRM BOTTINI 059454



# FAX TRANSMISSION

### UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUILDING U.S. COURTHOUSE, 222 W. 7th AVE., RM. C-253
ANCHORAGE, ALASKA 99513-7567
(907) 271-5071 [MAIN]
Fax: (907) 271-3224

**To:** NICK MARSH                          **Date:** 10|4|07

**Fax #:** 202-514-3003              **Pages:** 3   (including cover)

**From:** JOE BOTTINI

**Subject:** TYREE 302

**COMMENTS:**

LOOKS LIKE THIS INTERVIEW TOOK PLACE
ON 7/22/04.  IT SAYS THAT SHE SIGNED
THE AFFIDAVIT @ ALLEN'S REQUEST, BUT DOESN'T
SAY HE KNEW IT WAS FALSE — THE INFERENCE MAY
BE MADE BY **NOTICE TO RECIPIENT** THE WAY THIS IS
WRITTEN THOUGH.

The information contained in this facsimile is intended only for the individual or organization named above and may contain sensitive or privileged information.  If you are not the intended recipient, any dissemination or reproduction of this communication is prohibited.  If you have received this transmission in error, please notify us by telephone immediately so that we can arrange for the return of all documents transmitted.

Let's talk early tomorrow AM.

( J.B.

EXHIBIT
Goeke 24
JH 1·B·10

A-45

CRM BOTTINI 059455

OCT-04-2007  16:40        FBI ANCHORAGE                907 265 8400    P.01



# FBI FACSIMILE

## COVER SHEET

---

**PRECEDENCE**

☐ Immediate
☐ Priority
☒ Routine

**CLASSIFICATION**

☐ Top Secret
☐ Secret
☐ Confidential
☐ Sensitive
☒ Unclassified

Time Transmitted: _____
Sender's Initials: _____
Number of Pages: ____3____
(including cover sheet)

To: _USA Office_                          Date: _10/14/07_
      Name of Office

Facsimile Number: _271-1500_

Attn: _AUSA Joe Bottini_
        Name                    Room    Telephone

From: _Eckstin - FBI_
        Name of Office

Subject: _TYREE_

_____

_____

Special Handling Instructions: _____

_____

Originator's Name _Eckstin_          Telephone _382-2057_

Originator's Facsimile Number: _____

Approved: _____

Brief Description of Communication Faxed: _____

_____

_____

## WARNING

Information attached to the cover sheet is U.S. Government Property. If you are not the intended recipient of this information, disclosure, reproduction, distribution, or use of this information is prohibited (18.USC, § 641). Please notify the originator or the local FBI Office immediately to arrange for proper disposition.

A-46

CRM BOTTINI 059456

OCT-04-2007  16:40      FBI ANCHORAGE                907 265 8400    P.02

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   10/28/2004

      BAMBI TYREE, date of birth 12/17/1980, Social Security
Account Number 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, was interviewed at the SeaTac
Correctional Faciltiy in Seattle, Washington. Present with TYREE
was her attorney, Sue Ellen Tater. Also present was Assistant
United States Attorney, Frank Russo. TYREE provided the
following information:

      TYREE had sex with BILL ALLEN when she was 15 years
old. TYREE previously signed a sworn affidavit claiming she did
not have sex with ALLEN. TYREE was given the affidavit by
ALLEN's attorney, and she signed it at ALLEN's request. TYREE
provided false information on the affidavit because she cared
for ALLEN and did not want him to get into trouble with the law.

      With respect to JOSEF BOEHM, TYREE reported that, among
other things, she would bring BOEHM girls, with whom BOEHM would
have sex. One of the girls TYREE knows BOEHM had sex with was
SALLEY PURSER, as TYREE had sex with BOEHM and PURSER together.

      "REDMAN"(known to law enforcement as LEONIDAS JONES)
has been staying at BOEHM's condominium with KIRK GRANDSTAFF.
TYREE heard from JESSICA HOUSER that REDMAN is receiving large
sums of money from BOEHM. After BOEHM went to jail, REDMAN and
GRANDSTAFF starting bringing some of the girls who might testify
against BOEHM back to the condo and getting them "high." TYREE
heard that BOEHM wanted "SIERRA"(known to law enforcement as
SIERRA ROBERTS) to stay at the condo and stay around "JERRY
STAR" so she would not testify against him.

      TYREE was shown a photograph of STACY THOMPSON, Alaska
Driver's License(ADL) Number 6640441. TYREE identified the
person in the picture as "CRAZY STACY." TYREE stated this female
had sex with BOEHM and may have gotten pregnant by him. She is a
drug user.

      TYREE was shown a photograph of JAMES VINCENT
BLOMFIELD, ADL Number 5911930. TYREE identified the person in
the picture as "VINCE BLOMFIELD." At one point TYREE dated
BLOMFIELD. His family owns a real-estate business, but BLOMFIELD
once told TYREE that he made his money from selling drugs. Over
the course of a three week period, TYREE and BLOMFIELD spent

Investigation on   07/22/04     at  Seattle, Washington

File #  305C-AN-13699                      Date dictated   not dictated

by   SA John Eckstein

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

A-47

CRM BOTTINI 059457

OCT-04-2007  16:40      FBI ANCHORAGE                    907 265 8400    P.03

FD-302a (Rev. 10-6-95)

305C-AN-13699

Continuation of FD-302 of _____ , On __07/22/04__ , Page __2__

$100,000 dollars on drugs and other items. LESLIE WILLIAMS has
sold BLOMFIELD drugs before. On one occasion, BLOMFIELD gave
WILLIAMS $15,000 dollars, and WILLIAMS used this money to
purchase a large amount of drugs. BLOMFIELD and his brother,
JOHN BLOMFIELD, have "Hells Angels" connections.

TYREE was shown a photograph of VINCENT LIBERTINO, and
TYREE identified the person depicted in the photograph as
"VINNIE from the Bronx." TYREE has seen VINNIE at BOEHM's house
"now and then." TYREE stated that he is a "thief" and drug
dealer.

TYREE was shown a photograph of JAY WHALEY JR., and
TYREE identified the person in the picture as "LINLIE." TYREE
stated that LINLIE was an "associate" of BOEHM, and he dated
SALLEY PURSER. He would drop PURSER off at BOEHM's house so she
could be with BOEHM, and LINLIE made money from BOEHM for doing
this.

TYREE reported that BOEHM consumed a lot of viagra
pills. Some of the pills had been prescribed to him by a
physician. However, BOEHM consumed more than his legitimate
prescriptions, and thus BOEHM purchased viagra from anyone who
would sell it to him. BOEHM would have is viagra prescriptions
filled at the Carr's pharmacy, and TYREE would often go with him
to pick up the pills. "PETE CALDERON" (known to law enforcement
as PEDRO CALDERON) would give viagra pills to TYREE, who in turn
gave the pills to BOEHM. "AL BOLLING" also supplied BOEHM with
viagra.

TOTAL P.03

CRM BOTTINI 059465



# FAX TRANSMISSION

**UNITED STATES DEPARTMENT OF JUSTICE**
FEDERAL BUILDING U.S. COURTHOUSE, 222 W. 7th AVE., RM. C-253
ANCHORAGE, ALASKA 99513-7567
(907) 271-5071 [MAIN]
Fax: (907) 271-3224

To: NICK MARCH          Date: 10/6/07

Fax #: 202-514-3003     Pages: 5 (including cover)

From: BOTTINI / GOEKE

Subject: TYREE ISSUES

COMMENTS:

NAM — THIS WAS IN SOME OF THE
BRIEFING U.S. SUBMITTED IN BOEHM —

## NOTICE TO RECIPIENT

The information contained in this facsimile is intended only for the individual or organization named above and may contain sensitive or privileged information. If you are not the intended recipient, any dissemination or reproduction of this communication is prohibited. If you have received this transmission in error, please notify us by telephone immediately so that we can arrange for the return of all documents transmitted.

985

CRM BOTTINI 059466

*GOVT BRIEFING FILED IN BOEHM CASE*

COMES NOW the United States and requests an advance ruling from the Court pertaining to impeachment evidence pertaining to Bambi Tyree, as well as to preclude cross-examination of Bambi Tyree and her sister, Tia Tyree, regarding a drug-related arrest that occurred approximately 8 years ago.

### False Swearing

During debriefings, Bambi Tyree admitted to giving a false statement under oath when she was 15 years old. This statement is not in the United States' possession. However, Tyree identified the nature of the statement, which is as follows: When Tyree was 15 years old, she had sex with Bill Allen, president of VECO and publisher of the "Voice of the Times" section in the Anchorage Daily News. Tyree and Allen were introduced by Tyree's roommate, Lisa Moore. Moore, who apparently knew of the untoward and illegal relationship, began blackmailing Allen, claiming that she would go to the police and newspapers and tell them that Allen had sex with Tyree. Based on this threat, Allen asked Tyree to meet with his attorney, James Gilmore, and give a sworn statement stating that she never had sex with Allen. Tyree did so. The United States confirmed the existence of such statement from Mr. Gilmore. Mr. Gilmore stated that this statement was work product, and he declined to provide it to the United States.

The United States is turning over this information to the defense pursuant to its obligations under Giglio v. United States, 405 U.S. 150 (1972). The fact that

CRM BOTTINI 059467

Tyree gave a false statement under oath bears on her credibility.  However, the fact

that Allen was the person who asked Tyree to swear to the statement is irrelevant

to any issue in this case.  Therefore, the United States asks the Court to limit

inquiry to the fact that Tyree gave a false statement under oath when she was 15

years old.  Upon information and belief, defense counsel intends to question Tyree

about her relationship with Allen, which also should be precluded as irrelevant

and in violation of Rule 412.

To be clear, the United States does not have any interest in protecting Allen

from what he did.  Indeed, he may still face charges for statutory rape.  However,

the United States is concerned about the potential distraction introduction of such

evidence may create.  Because Allen is a well-known figure in the community,

there is a danger of "the sideshow taking over the circus."  The trial of the instant

case is about Boehm, whether he traded drugs for sex with girls, whether he ran a

crackhouse, and related issues.  Certainly the credibility of witnesses is relevant.

Sexual relationships that witnesses had before they joined the conspiracy are not.

Thus, the relevance of Allen's name is substantially outweighed by the confusion

of the issues and the waste of time it would result in.  Accordingly, the Court

should preclude inquiry into Tyree's relationship with Allen pursuant to Fed. R.

Evid. 403.

Ms. Tyree has adult criminal convictions for Driving with license suspended

CRM BOTTINI 059468

and for giving false information, both in 2003.  The United States seeks to

preclude defense from asking about the Driving with license suspended

conviction.  Ms. Tyree also has five juvenile adjudications.  Four of these

adjudications occurred during 1994, when Ms. Tyree was 13 years old: two assault

misdemeanors and two Burglary in the First Degree felonies.  Given that these

adjudications occurred nearly 10 years ago, if not over 10 years, the United States

submits that inquiry and cross examination about these juvenile adjudications

would not contribute to "a fair determination of the issue of guilt or innocence" in

this matter.  Fed. R. Evid. 609(d).  The other adjudication is for a drug related

felony, which does not bear on credibility, committed in 1997.

In addition, in several conversations with the government, counsel for

defendant has alluded to an arrest of Tyree when Tyree was a juvenile.  Ms. Tyree

was arrested at the Anchorage airport, along with her sister Tia Tyree, and charged

with possession of cocaine.  The case against Tyree was later dismissed.  Thus, the

United States moves for a pre-trial ruling precluding defense counsel from

inquiring about the circumstances of this arrest, as it is neither a conviction nor is

the character of the alleged acts probative of Ms. Tyree's credibility.  See Fed. R.

Evid. 608(b).    SEDWICK GRANTED THIS REQUEST

Impeachment of Tia Tyree

Finally, Tia Tyree, Bambi's sister, may be a witness for the United States at

CRM BOTTINI 059469

trial.  Tia Tyree was arrested at the same time as Bambi Tyree, and was convicted

in federal court of a felony drug crime.  She was represented by Mr. Weidner,

defendant's current lawyer, in that case.  The United States asks for a ruling

pursuant to Fed. R. Evid. 609(a) to preclude the questioning of Tia Tyree

regarding the underlying facts of this conviction.  Pursuant to Fed. R. Evid.

609(a), the defendant should only be allowed to question Tia Tyree regarding the

fact that she has a conviction for a drug felony.  In addition, the government

brings to the Court's and Mr. Weidner's attention his prior representation of a

probable witness, so that any problems this may create can be discussed at the

court's pretrial hearing.

     RESPECTFULLY submitted this 17th day of May, 2004, at Anchorage,

Alaska.

                      TIMOTHY M. BURGESS
                      United States Attorney

                      FRANK V. RUSSO
                      Assistant U.S. Attorney

I declare under penalty of perjury that a true and correct
copy of the foregoing was sent to the following counsel of
record on, May 17, 2004 via:

Philip Weidner, Esq
Kevin Fitzgerald, Esq.
Rex. L. Butler

     (X) Fax

Executed at Anchorage, Alaska, on May ___ , 2004.

EXHIBIT J

## Goeke, James (USAAK)

| | |
|---|---|
| **From:** | Goeke, James (USAAK) |
| **Sent:** | Sunday, September 07, 2008 8:16 PM |
| **To:** | Marsh, Nicholas (CRM); Bottini, Joe (USAAK); Sullivan, Edward (CRM); Morris, Brenda (CRM); Kepner, Mary Beth (FBI); Joy, Chad E. (FBI); Welch, William (CRM) |
| **Subject:** | RE: BA disclosure |

I have reviewed the Boehm files in storage.  Besides the APD reports we have already dealt with, I found the following:

- Notes of mine dated 4-15-04 from a debrief of Bambi wherein I wrote "Lisa Moore w/Bill Allen"

- Notes of mine dated 4-01-04 from a debrief of Bambi wherein I wrote "Car from Bill Allen; Bill didn't like around Joe; met through Lisa Moore; For Bill called escort service, gave girl Angel Gross; at this time Bambi staying with Lisa Moore; Lisa tried to bring Allen to Bambi; Lisa and another tried to blackmail; helped when fount out locked out." Several pages later in the same notes I wrote "Bill Allen" with no further explanation, the notes before this entry relate to Boehm and the notes after relate to a hotel room where Bambi stayed with Boehm in 2003.

- I found multiple other notes from debriefs of Bambi on other dates with no reference to Bill Allen.  When all of these notes were taken, I did not know who Bill Allen was and did not care.

- A transcript taken by one of Boehm's defense investigators of an interview with James Vincent Blomfield wherein he states he is a former boyfriend of Bambi and that Bambi would talk Allen. He stated that Bambi's father knew she was dating Allen, that he was at Bambi's house at Christmas and there were presents from the whole family from Allen, that Allen had bought Bambi's sister a car and that he had the impression "they had something on Bill Allen, because it didn't add up."  He says he met Bambi when she was 18 and that she told him she was 21.  He met her when he was "on third party for a felony, and pegged her as a party girl."  He says that Bambi stole $25,000 from him. Bambi admitted this during the sentencing hearing for Boehm (that hearing lasted 10 days).  He said she would "knock him out with something".   He said Bambi "was always throwing Bill in my face."  He claimed that Bambi's father "literally told me under his own words that he had met Bill and that Bill had told him that he was dating his daughter."  He said he remembered Bambi's sister saying "Nobody can get Bill any more except Dad – you know, during this Christmas thing, so it almost seemed to me that they had – and I can't be specific because I don't know, but it's like they had something on him, like they were blackmailing him or something."  He said that Bambi said she had had sex with Allen.  She said she would get money and clothes from Allen.  He recalled Allen bailing her out of jail once.  He said there "was no question she had a relationship with Bill Allen."  He said that Bambi told him the relationship with Allen began when she was 14 or 15 and that is what she had told Blomfield and that her "dad told me that."  He also assumed that a prostitute named Twyla may have also blackmailed Allen.  He said that Bambi's father was a plumber by trade and that he had contracts.  He said that Bambi had a black volkswagon that Allen bought for her when she was 16 and that it had a "note" on it for $8000.  He said that Allen had paid for the car and then for her to go to a beauty school.

  I believe Blomfeld has an extensive criminal history.

- Copies of the government's motions – that we have previously discussed at length – referencing the defendant's attempt to cross examine Bambi regarding Allen from the Boehm case wherein the government stated through a motion in limine, reply, and response to a motion for reconsideration before a trial date in fall 2004 (that did not occur after a guilty plea) that Bambi signed a false affidavit at Allen's direction.  The defendant wanted to assert that Boehm was a victim of Bambi and that he should be able to claim that was the case because he believed Allen was also a victim of Bambi (never mind that Allen denies this).  I did not draft these motions, but signed a response to a defense motion to reconsider on the topic "for Frank Russo".  These motions are under seal in the Boehm case.  That case went to around docket number 700 or more and was often at a pace similar

1

A-55

CRM GOEKE 078273

to the one we are experiencing now.  On this topic, as we have discussed this at length in the past, I recall Bambi stating during a prep session before Boehm's sentencing in spring 2005 that the idea to make a statement was hers, that Allen did not ask her to lie, and that the decision to lie was a decision she made when she met with the attorney.  As a result, we asked Allen whether he ever asked anyone to lie under oath and similar questions before Kott and he denied that he had done so.  After the Kott trial, we found out about the 302 that MBK just sent around yesterday regarding Bambi from a 7/22/04 interview in Seattle.  I did not participate in the interview of Bambi in Seattle related in the 302, did not recall that it had even occurred, and did not know that a 302 existed that could be read to suggest that Tyree signed an affidavit at Allen's request that contained false material.  Bambi was not my witness at sentencing.  As a result of learning of the 302 after Kott, we interviewed Bambi , found that the AUSA's notes from that meeting state "at the request of [then with "Bill" crossed out"] Bambi's idea", and went to PRAO.  Bambi's attorney also told me that she had recalled Bambi describing the situation as I recalled it.  PRAO then said we had no disclosure obligation because there was in essence nothing to disclose.

Let's discuss whether any of this new stuff above merits further disclosure.

For what it's worth, at a minimum, based on the foregoing, I think we add language along the lines of:

Allen stated that at some point, he told the "other female" about the blackmail/extortion attempts and that she then asked to speak to Allen's lawyer.  Allen stated that he did not ask the "other female" to speak to his lawyer, did not ask the other female to lie, and is not aware of what the other female told his lawyer.  The government has also interviewed the "other female" and she stated that she met with the attorney and the content of the document was created solely by her with the help of the attorney.

I note, though, a minor point, that Bambi's 302 on this point says that the idea to meet with the lawyer was hers and Allen's.

I think it is particularly important to add that we interviewed Bambi on this topic because Bittner was apparently one of Boehm's civil attorneys.  Accordingly, we have to assume that they will claim that the government is failing to disclose that Bambi made a false statement at Allen's direction.  While we all know that we have investigated that issue in detail and that both Allen and Bambi deny that such a thing occurred, we should put W&C on effective notice that both Allen and Bambi deny that Allen asked Bambi to make a false statement.  Then any such allegations that the government is suppressing anything can be more easily dealt with in front of the Court.  Joe and I spoke about this today and he agrees with this approach.

I realize that we have beaten this topic to death, but please bear with me.  Because I was involved in both cases and then also charged the woman in a federal drug case who is the apparent accuser of Allen in the new APD investigation, I am keen to make sure our disclosure is as accurate as possible.

JAMES A. GOEKE
Assistant U.S. Attorney
District of Alaska

(907) 271-3387

**From:** Goeke, James (USAAK)
**Sent:** Sunday, September 07, 2008 2:17 PM
**To:** Marsh, Nicholas (CRM); Bottini, Joe (USAAK); Sullivan, Edward (CRM); Morris, Brenda (CRM); Kepner, Mary Beth (FBI); Joy, Chad E. (FBI); Welch, William (CRM)
**Subject:** RE: BA disclosure

2

CRM GOEKE 078274

'I think we need to keep something in along the lines of:

Allen stated that at some point, he told the "other female" about the blackmail/extortion attempts and that she then asked to speak to Allen's lawyer. Allen stated that he did not ask the "other female" to speak to his lawyer and is not aware of what the other female told his lawyer.

It doesn't have to be precisely that language, but I think it should be stated.

**From:** Marsh, Nicholas (CRM)
**Sent:** Sunday, September 07, 2008 1:10 PM
**To:** Goeke, James (USAAK); Bottini, Joe (USAAK); Sullivan, Edward (CRM); Morris, Brenda (CRM); Kepner, Mary Beth (FBI); Joy, Chad E. (FBI); Welch, William (CRM)
**Subject:** BA disclosure

I took a first crack at streamlining the Allen *Giglio* disclosure (see below).  Please take a read and let me know your thoughts.  Thanks, Nick

In response to your request for additional information concerning the prior and pending local law enforcement investigations of Allen, the federal government has located in its possession, custody, and control, a formal memorandum and an Anchorage Police Department report from an unrelated case that refers to Mr. Allen. According to these reports, in February 2004, an adult female made allegations to the Anchorage Police Department concerning Mr. Allen.  The adult female alleged that she had a sexual relationship with Mr. Allen while she was an adult, but that she believed that Allen had a contemporaneous sexual relationship with a 15 year-old female.  (The "other female" is one of the individuals disclosed in our August 25, 2008, letter to you.) The adult female alleged that during the course of her relationship with Allen, Allen provided her with things of value, including money, trips, housing, and a car, as well as paying for the adult female to attend an alcohol rehabilitation program.

The adult female further alleged that, after her relationship with Allen ended, she was contacted by an attorney for Allen and requested to sign a nondisclosure agreement that would have contained, in part, a statement that she had never had a sexual relationship with Allen.  The adult female suggested that the attorney offered her $5,000 in exchange for the statement, but that she declined in part because she wanted more money.

On September 7, 2008, Allen was interviewed concerning these allegations.  Allen stated that he did have a relationship with the adult female and that he did pay her rent during their relationship.  Allen advised that the adult female was a prostitute.  Allen advised that after the relationship ended, the adult female and the adult female's mother began to demand money from him and threatened to go to the newspaper to expose their relationship.  Allen stated that the adult female also threatened to make statements concerning Allen's relationship with the "other female" referenced above.  Allen stated that the adult female demanded money in exchange for her not to make such statements to the media.  Allen refused to pay any money and considered her threats to be blackmail and/or extortion.  Allen hired a lawyer to address his belief that he was being blackmailed.  Allen denied ever offering to pay anyone money to make a false statement.

Allen further stated that Bill Bittner, an attorney in Anchorage, once asked Allen to make a statement that the "other female" referenced above had extorted him and/or blackmailed him.  Allen stated that he told Mr. Bittner that any such allegations were false.

3

EXHIBIT K

CRM030882

| | |
|---|---|
| **From:** | Marsh, Nicholas |
| **To:** | Goeke, James (USAAK); "Bottini, Joe (USAAK)"; Sullivan, Edward; Morris, Brenda; Welch, William; |
| **Subject:** | RE: Alternate version of 608(b) motion |
| **Date:** | Thursday, August 14, 2008 9:31:05 AM |

My thoughts on this, for what they're worth:

I absolutely agree re: fed involvement in state investigation of Allen.

I vote to include Rick in the MIL re: convictions.

I think we should not file a MIL on the alcohol abuse because, after thinking about it, I think we're going to lose the motion big-time.  The cases on sexual deviancy and narcotics use are all great, but it seems to me that excessive alcohol use bears on the witness' memory and perception.

Either way, I think we should remove Dave from all pleadings because we're not going to call him in a million years.

If we had something to turn over re: the alleged subornation of perjury, I would obviously vote yes to doing so.  But given that we have nothing to turn over -- not even an independent allegation, just a mistake in a brief that's inconsistent with the brief writer's notes -- I don't think we have any disclosure to make, much less a disclosure obligation.

If we were to make a disclosure, I think it would be something like "another unrelated prosecutor mistakenly suggested in a sealed filing that Allen suborned perjury, but the prosecutor's notes directly contradict the suggestion, and subsequent investigation by the government revealed no evidence of Allen taking any steps whatsoever to suborn perjury."  And when I read that, it seems like to me we shoudn't be making any disclosure at all.  But I absolutely defer to the collective on this one.

-----Original Message-----
From: Goeke, James (USAAK) [mailto:James.Goeke@usdoj.gov]
Sent: Thursday, August 14, 2008 4:15 AM
To: Bottini, Joe (USAAK); Sullivan, Edward; Marsh, Nicholas; Morris, Brenda; Welch, William
Subject: Re: Alternate version of 608(b) motion

As I sit here rearranging my cancelled flights after 3+ hours on the tarmac with a toddler, for what it's worth, I vote to include Rick and include Dave in the MIL.  I also vote to make some disclosure of the rumored procurement of a false

CRM030883

statement from Bambi by Bill in our Giglio letter along with a denial of the false assertion of federal help with the state's suspended sex investigation of Bill. I think Joe is right, the rumor about an alleged false statement is out there (could be repeated in an APD report from the recent reopened investigation for instance). We did our due diligence, and both parties deny that Bill procured the statement, therefore previous statements by the govt in the Boehm case to the contrary were an eroneous assumption. And I know this has been all dealt with by PRAO at least twice, but nonetheless, shouldn't we front the issue out and not have W&C suggesting to the DC court that we held something back. With the Alaska cases, Judge Sedwick handled Bambi's case, and had notice of the issues and context and there was no suggestion at that time that Bill's plea included federal help with any state investigation. Here the court does not have Judge Sedwick's background in both cases and there is now a false suggestion made after the Alaska trials that the govt helped Bill with the suspended state investigation. So, at the end of the day, the false statement issue coupled with the false suggestion that the govt helped Bill on the state investigation as part of his plea makes me vote to get out in front of both issues and make some mention of both the false suggestion of federal help with the state investigation and the rumored false statement procurement in our Giglio letter.

JAG

.

----- Original Message -----
From: Bottini, Joe (USAAK)
To: Sullivan, Edward (CRM); Goeke, James (USAAK); Marsh, Nicholas (CRM); Morris, Brenda (CRM); Welch, William (CRM)
Sent: Thu Aug 14 02:24:10 2008
Subject: Alternate version of 608(b) motion


Here's an alternate version adding Rick Smith into the mix under the theory that if we add him to the motion to exclude prior convictions, why not throw him in with the "no personal vices" crowd – given that Rick is a stone alcoholic and everyone appears to know it.

Granted, it's unlikely that we call him at trial, but it's possible. If anyone thinks that is too disingenous, then we can leave him out. Not much heartburn about that.

Other than that, nice job to Ed and whoever else at PIN helped to flesh this out. It looks good.

CRM030884

The big question:  This obviously does not front out the rumored procurement of the false statement from Bambi by Bill.  Their response to this will possibly develop how much they know about that.  Do we notice them up in the Giglio disclosure letter about this issue??  I worry that if we don't make some mention of it – passing mention of it as a rumor which we investigated and disproved - they may respond to the MIL and raise it – thus possibly making it look like we potentially tried to hide something.   Completely aware of what  PRAO says, but do we run that risk?  Just don't want to run afoul of Emmet G. over this.

JWB <<US 608(b) motion.v2.wpd>>

# EXHIBIT L

CRM GOEKE 079582



**U.S. Department of Justice**

*Criminal Division*
Public Integrity Section

*Washington, DC   20850*

August ___, 2008

_____, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005

Re:   United States v. Theodore F. Stevens
      No. 08-CR-231 (EGS)

Dear Mr. _____:

   This letter addresses the disclosure of potential impeachment material relating to certain potential government witnesses.  The following information - as well as the attachments to this letter - are provided to you in that regard.

### BILL J. ALLEN:

#### Prior Criminal History

   As we noted in our Motion *in Limine* to Exclude Prior Criminal Convictions of Prospective Government Witnesses (filed on August 14, 2008), Mr. Allen's criminal history records indicate that he was arrested some 40 years ago in Alaska for the following offenses:

| | |
|---|---|
| Shoplifting (misdemeanor), Ak. Stat. § 11.46.150 | 11/11/1968 |
| Petty Larceny (misdemeanor), Ak. Stat. § 11.46.150 | 11/11/1968 |

   These records (a copy of which are attached at Attachment 1) do not show any disposition following arrest, and it is therefore quite possible that these were simply arrests not resulting in any subsequent prosecution or actual criminal convictions.[1]

---

[1] It is Allen's recollection that he was not prosecuted for these charges.

1

CRM GOEKE 079583

On May 7, 2007, Allen pleaded guilty to three separate felony offenses in the United States District Court for the District of Alaska: Conspiracy to Commit Extortion Under Color of Official Right, Bribery, and Honest Services Fraud in violation of 18 U.S.C. § 371; Bribery Concerning Programs Receiving Federal Funds in violation of 18 U.S.C. § 666(a)(2); and Conspiracy to Impair and Impede the Internal Revenue Service, in violation of 18 U.S.C. § 371. Those guilty pleas were entered pursuant to a written plea agreement with the United States. A copy of Allen's plea agreement paperwork is attached hereto as Attachment 1.

Allen is presently awaiting sentencing on these convictions.

### Prior False Statements to the Government

Bill Allen was recently interviewed concerning a target of an unrelated criminal investigation. During the course of that interview, Allen was not truthful concerning financial benefits provided to an elected state public official. The following day, Allen contacted that government agent and volunteered that he had not been truthful about this subject matter in an effort to protect a family member.

### Investigation Involving Allegations of Sexual Misconduct

As we disclosed in our Motion *in Limine* to Exclude Inflammatory, Impermissible Cross-examination, (filed under seal on August 14, 2008), the government is aware that Allen has previously been the subject of a criminal investigation conducted by the Anchorage Police Department (APD) regarding allegations that he engaged in a sexual relationship with a juvenile female approximately ten years ago. As we noted in our filing, Allen has not been charged with any criminal offense stemming from this investigation and it was our understanding that the investigation – which was briefly reopened this year – was again recently closed or suspended.

On August 20, 2008, the government learned that there is another pending investigation by the Anchorage Police Department into similar allegations involving Allen.

As we also noted in our filing, the government is aware of a rumor that the United States Attorney's Office in the District of Alaska played some role in the earlier investigation of Allen being suspended by APD due to Allen's status as a cooperating witness. Such allegations are completely baseless and untrue. The initial sexual misconduct investigation involving Allen was suspended by the Anchorage Police Department *two years* before he was contacted by the government regarding the public corruption investigation.

The government has learned that Allen has provided financial benefits to the individual who was the subject of the earlier investigation as well as to family members of the subject. The government is also aware that there are allegations that Allen has provided financial benefits in the past to the subject of the pending investigation.

2

*"The government is also aware that the female subject of the earlier investigation has stated that she made a false statement regarding the nature of her relationship with Allen. The subject of the earlier investigation is emphatic that she made the false statement on her own initiative and Allen denies that he caused her to make the statement."*

### Rumors of Excessive Alcohol Use

The government is also aware of rumors concerning excessive alcohol use by Allen. While Allen may have appeared to have been intoxicated during some of the conversations intercepted by the government during the period of electronic surveillance, the government is unaware of any chronic excessive alcohol use by Allen.

### RICHARD L. SMITH:

### Prior Criminal History

As we noted in our Motion *in Limine* to Exclude Prior Criminal Convictions of Prospective Government Witnesses (filed on August 14, 2008), Mr. Smith's criminal history records indicate that he has been arrested for the following offenses:

| | |
|---|---|
| DWI (misdemeanor), Ca. Veh. Code 23152(b) | 12/23/1969 |
| DWI (misdemeanor), *[Washington State Code cite]* | 10/26/1972 |

These records (a copy of which are attached at Attachment 3) do not show any disposition following arrest, and it is therefore possible that these arrests did not result in any subsequent prosecution or actual criminal convictions.[2]

On May 7, 2007, Smith pleaded guilty to three separate felony offenses in the United States District Court for the District of Alaska: Conspiracy to Commit Extortion Under Color of Official Right, Bribery, and Honest Services Fraud in violation of 18 U.S.C. § 371; Bribery Concerning Programs Receiving Federal Funds in violation of 18 U.S.C. § 666(a)(2); and Conspiracy to Impair and Impede the Internal Revenue Service, in violation of 18 U.S.C. § 371. Those guilty pleas were entered pursuant to a written plea agreement with the United States. A copy of Smith's plea agreement paperwork is attached hereto as Attachment 4.

Smith is presently awaiting sentencing on these convictions.

---

[2] It is Smith's recollection that he was convicted in the 1969 DWI case, but was not prosecuted after arrest in the 1972 incident.

3

**Rumors of Excessive Alcohol Use**

The government is also aware of rumors concerning excessive alcohol use by Smith. Smith may have an alcohol dependency issue.

## DAVID A. ANDERSON

### Prior Criminal History

David Anderson's criminal history records (copy attached at Attachment 5) show the following criminal history for Anderson:

| | |
|---|---|
| Failing to Give Information of Accident (misdemeanor),[3] Ak. Stat. § 28.35.110(b) | 7/12/1987 |
| Driving Without License (misdemeanor), Ak. Stat. § 28.15.011 | 2/1/1989 |
| Reckless Driving (misdemeanor), Ak. Stat. § 28.35.030 | 6/7/2005 |

### Prior False Sworn Statement

The government recently learned that Anderson signed an affidavit, dated March 25, 2008, which contained false statements relating to government agents allegedly granting immunity to Anderson, as well as to several of Anderson's friends and family members (as well as family members of his friends) for any criminal acts occurring within the last 10 years . Anderson has explained that he did not prepare the affidavit, but has acknowledged that he knew it contained false statements when he signed it.

### Other Criminal Conduct

During the course of the public corruption investigation, the government has discovered that Anderson appears to have been involved in an illegal  "conduit contribution" scheme involving employees of VECO Corporation who were reimbursed or otherwise compensated by the corporation to cover individual campaign contributions which they had made.

---

[3] The criminal history records show that Anderson received a suspended imposition of sentence for this conviction and that it was later set aside.

4

**Rumors of Excessive Alcohol Use**

The government is also aware of rumors concerning excessive alcohol use by Anderson and it is possible that Anderson may have been medically treated in the past for an alcohol dependency issue.

## RICHARD B. WILLIAMS

### Prior Criminal History

Richard B. ("Rocky") Williams' criminal history records (copy attached at Attachment 6) show the following criminal history for Williams:

| | |
|---|---|
| Manslaughter/Other - Neg. (felony), Ak. Stat. § 11.41.120 | 8/14/1985 |
| Failure to Assist/Aid (felony), Ak. Stat. § 28.35.060 | 6/9/1986 |
| DWI (misdemeanor), Ak. Stat. § 28.35.030 | 6/22/1999 |

### Rumors of Excessive Alcohol Use

The government is also aware of rumors concerning excessive alcohol use by Williams and it is possible that Williams may have an alcohol dependency issue.

## WITNESSES GRANTED USE IMMUNITY

During the investigation, the following prospective government witnesses were granted "use immunity". Copies of any relevant use immunity letter agreements are attached at Attachments ___ - ___.[4]

**- JACK BILLINGS**

**- CHERYL BOOMERSHINE**

---

[4] The Allen and Smith plea agreement documents address the "use immunity" issues. See, "Cooperation Agreement" filed as a sealed "Second Addendum" to each of their respective Plea Agreements. Copies attached.

5

CRM GOEKE 079587

- JUSTIN STIEFEL[5]

- BILL J. ALLEN

- RICHARD L. SMITH

- *BARBARA FLANDERS*


Very truly yours,

WILLIAM WELCH, II
Chief, Public Integrity Section

_____

BRENDA MORRIS
Deputy Chief, Public Integrity Section
NICHOLAS A. MARSH
EDWARD P. SULLIVAN
Trial Attorneys
Public Integrity Section
U.S. Department of Justice

JOSEPH W. BOTTINI
JAMES A. GOEKE
Assistant U.S. Attorneys
District of Alaska

---

[5] During the course of the investigation, the government independently learned that Stiefel had engaged in criminal conduct. Stiefel has not been promised immunity from prosecution for this conduct.

6

EXHIBIT M

CRM BOTTINI 027428

**From:** Morris, Brenda
**To:** Marsh, Nicholas; Sullivan, Edward;
**Subject:** RE: Emailing: Brady-Giglio letter
**Date:** Friday, August 22, 2008 1:41:49 PM

I agree, but let me finish playing with it and I'll send it back around to you two. Thanks Ed.

Brenda K. Morris
Principal Deputy
Public Integrity Section
(202) 514-1439 - Direct
(202) 514-3003 - Facsimile

-----Original Message-----
From: Marsh, Nicholas
Sent: Friday, August 22, 2008 1:40 PM
To: Sullivan, Edward; Morris, Brenda
Subject: RE: Emailing: Brady-Giglio letter

Great, but I strongly believe that the highlighted paragraph should be deleted. We should not revisit the Bambi non-subornation of perjury stuff. We have nothing to turn over, we have neither evidence nor an allegation that Allen directed her to lie, we have investigated this till the end of time, and we have been blessed by PRAO twice. There is simply no reason for us to revisit it.

-----Original Message-----
From: Sullivan, Edward
Sent: Friday, August 22, 2008 1:11 PM
To: Morris, Brenda; Marsh, Nicholas
Subject: Emailing: Brady-Giglio letter

Guys -- I cleaned up Joe's draft letter.
The message is ready to be sent with the following file or link attachments:

Brady-Giglio letter

Note: To protect against computer viruses, e-mail programs may prevent sending or receiving certain types of file attachments. Check your e-mail security settings to determine how attachments are handled.

EXHIBIT N

CRM GOEKE 087255

**From:** Goeke, James (USAAK)
**To:** Sullivan, Edward; Bottini, Joe (USAAK); Marsh, Nicholas;
Kepner, Mary Beth (FBI); Joy, Chad E. (FBI); Morris, Brenda;
**Subject:** RE: Emailing: Romain 9-8-08
**Date:** Sunday, September 07, 2008 6:25:59 PM

With regard to Allen, I think we need to add something along the lines of:

Allen stated that at some point he told the "other female" about the blackmail/extortion attempts by the adult female and that the other female then asked to speak to Allen's lawyer.  Allen stated that he did not ask or direct the "other female" to speak to his lawyer and is not aware of what the other female told his lawyer.

It doesn't have to be precisely that language, but I think something along those lines should be included.

-----Original Message-----
From: Sullivan, Edward (CRM)
Sent: Sunday, September 07, 2008 2:15 PM
To: Goeke, James (USAAK); Bottini, Joe (USAAK); Marsh, Nicholas (CRM);
Kepner, Mary Beth (FBI); Joy, Chad E. (FBI); Morris, Brenda (CRM)
Subject: Emailing: Romain 9-8-08

Here's the current version of the Brady/Giglio letter.  Several of the items are not Brady or Giglio in my mind and, thus, we should go through them one by one to determine which ones get dropped.  We also probably want to revise the Anderson 302 description.  It's too much as currently stated.

Thanks.  Ed

EXHIBIT O

CRM GOEKE 087439

| | |
|---|---|
| **From:** | Goeke, James (USAAK) |
| **To:** | Morris, Brenda; Marsh, Nicholas; Sullivan, Edward; Welch, William; Bottini, Joe (USAAK); |
| **Subject:** | RE: Tyree |
| **Date:** | Monday, September 08, 2008 4:34:24 PM |

Is this conference call still on?

---

**From:** Morris, Brenda (CRM)
**Sent:** Monday, September 08, 2008 8:38 AM
**To:** Goeke, James (USAAK); Marsh, Nicholas (CRM); Sullivan, Edward (CRM); Welch, William (CRM); Bottini, Joe (USAAK)
**Subject:** RE: Tyree

Can we all meet / telephone conference at 4:00 EST?  I know Joe is traveling, but I'd like to get Bill in on the conversation.

Brenda K. Morris
Principal Deputy
Public Integrity Section
(202) 514-1439 - Direct
(202) 514-3003 - Facsimile

---

**From:** Goeke, James (USAAK) [mailto:James.Goeke@usdoj.gov]
**Sent:** Monday, September 08, 2008 12:30 PM
**To:** Marsh, Nicholas; Sullivan, Edward; Morris, Brenda; Welch, William; JBottini@usa.doj.gov
**Subject:** FW: Tyree
**Importance:** High

Here's an email with excerpts from the briefing in Boehm.  I'll have the notes scanned and sent via pdf separately.

---

**From:** Goeke, James (USAAK)
**Sent:** Thursday, October 04, 2007 1:15 PM
**To:** Nicholas Marsh (Nicholas.Marsh@usdoj.gov)
**Subject:** FW: Tyree

---

**From:** Goeke, James (USAAK)
**Sent:** Monday, March 05, 2007 11:34 AM

CRM GOEKE 087440

**To:** Sullivan, Edward (Edward.Sullivan@usdoj.gov); Bottini, Joe (USAAK)
**Subject:** Tyree

Ed,

Here is information concerning the Bambi Tryee matter we discussed this morning.

Below are pertinent excerpts from briefing filed in United States v. Boehm, a case prosecuted in the District of Alaska during 2003-2004 in which I participated.  Bambi Tyree was a co-defendant in United States v. Boehm and eventually pled guilty sex trafficking and distribution of drugs to minors.  During a debrief of Tyree in anticipation of trial against Josef Boehm, Tyree stated that she once gave false sworn testimony in the context of a deposition when she was 15 years old.  According to Tyree, the deposition concerned, among other things, whether she had ever had sex with Bill Allen.  She stated to the government that she denied having sex with Allen during the deposition, but that her testimony had been false.  The government does not have a copy of the deposition.  At the time, Allen's attorney, James Gilmore refused to provide a copy of the deposition, claiming privilege.  The issue came before the court (Judge John Sedwick, who has reviewed numerous TIII applications in the current investigation) in the context of a motion in limine from the government.  As the below excerpts demonstrate, the defendant's view of the facts changed over time as to whether Tyree did or did not have sex with Allen, and consequently as to whether or not Tyree's statement was true or false.  Ultimately, the court ordered that the defendant in United States v. Boehm could inquire generically as to whether or not Tyree had made a false statement under oath and the underlying facts ultimately did not become public.  In the context of the current investigation, the government has not questioned Allen or Tyree:  (1) concerning Allen's relationship with Tyree; (2) concerning whether Allen asked Tyree to provide a deposition; and (3) concerning whether Allen asked to Tyree provide specific testimony at a deposition.  Accordingly, at this time we do not have any information from Allen concerning Tyree's previous statements to the government concerning her deposition.

Excerpt from United States' motion in limine (filed July 2004) in United States v. Boehm regarding testimony of Bambi Tyree:

> During debriefings, Bambi Tyree admitted to giving a false statement under oath when she was 15 years old.  This statement is not in the United States' possession.  However, Tyree identified the nature of the statement, which is as follows:  When Tyree was 15 years old, she had sex with Bill Allen, president of VECO and publisher of the "Voice of the Times" section in the Anchorage Daily News.  Tyree and Allen were introduced by Tyree's roommate, Lisa Moore.  Moore, who

CRM GOEKE 087441

apparently knew of the untoward and illegal relationship, began blackmailing Allen, claiming that she would go to the police and newspapers and tell them that Allen had sex with Tyree.  Based on this threat, Allen asked Tyree to meet with his attorney, James Gilmore, and give a sworn statement stating that she never had sex with Allen.  Tyree did so.  The United States confirmed the existence of such statement from Mr. Gilmore.  Mr. Gilmore stated that this statement was work product, and he declined to provide it to the United States.

The United States is turning over this information to the defense pursuant to its obligations under Giglio v. United States, 405 U.S. 150 (1972).  The fact that Tyree gave a false statement under oath bears on her credibility.  However, the fact that Allen was the person who asked Tyree to swear to the statement is irrelevant to any issue in this case. . . .

Excerpt from United States' reply in United States v. Boehm to defendant's opposition to United States' motion in limine (reply filed August 2004):

Within his response, the defendant alleges that Bambi Tyree participated in a "scheme to blackmail" Bill Allen, president of VECO, with her roommate, Lisa Moore.  Further, that the "scheme" called for Tyree and Moore to visit with Allen at a hotel room and engage in sexual relations with each other in order to entice Allen into having sex with the underage Tyree.  The defendant then claims that Tyree had sex with Allen pursuant to the "scheme."  Tellingly, the defendant provides no support for the perpetration of such "scheme."

Indeed, Tyree will deny participation in any such scheme.  It appears that Tyree's roommate, Lisa Moore, was involved in such a scheme.  According to Moore and Tyree, Moore was working as a prostitute when she met Allen on a call.  Moore, who was 19 years old at the time, and Allen, began a relationship.   Moore introduced Tyree to Allen, who had sex with Tyree.  Moore became jealous of Tyree's relationship with Allen and began blackmailing him, telling him that she would go to the authorities and tell them of Allen's relationship with the juvenile Tyree.  As a result, Allen convinced Tyree to give a false statement to his attorney to defend against any prospective criminal action. Tyree complied.

Not only will Tyree deny being part of Moore's scheme, but her participation in such a scheme is belied by common sense.  First, if it was part of Tyree's scheme to blackmail Allen based on their sexual

CRM GOEKE 087442

encounter, why would she agree to give a statement under oath that such encounter never happened?  One would think that such a statement would completely undermine the reason Allen was being blackmailed.  Second, Tyree's admission to the United States that she gave false answers under oath did not serve any conceivable purpose of her own, nor did it benefit the United States.  Rather, it triggered the United States obligations under Giglio v. United States, 405 U.S. 150 (1972), creating impeachment material for the defense.  Indeed, had Tyree not admitted that she swore falsely concerning her relationship with Allen, this relationship would have no relevance whatsoever. . . .

Excerpt from United States' opposition to defendant's motion for reconsideration in United States v. Boehm (opposition filed October 2004):

> The defendant alleges that the Court made factual and legal errors in assessing the defendant's position with respect to Ms. Tyree.  First, with respect to the averred factual error, the defendant has refined his position and now expresses the view that Tyree did not in fact have sex with Allen, but participated in a scheme to blackmail him based on a false sexual relationship.  Whether there was in fact a sexual relationship is irrelevant to the defendant's position; rather, the lynchpin of his argument appears to be Tyree's alleged participation in a scheme to blackmail.  Thus, the Court's decision should not be effected by whether or not a sexual relationship actually occurred.

> . . .

> The defendant proposes to challenge Tyree's credibility by showing that she participated in a scheme to blackmail Allen based on allegations that Tyree, a minor at the time and the alleged victim, had a sexual relationship with Allen.  Thus, the defendant wants to use this evidence to show that Tyree, now 23 and a co-defendant of Boehm, is falsely accusing him of having sexual relationships with minors, which she has pleaded guilty to facilitating.  Setting apart the obvious procedural and factual differences in the claims, and assuming, for the sake of argument, Tyree engaged in such a scheme to blackmail Allen, such attempted introduction of evidence falls under the auspices of three different Rules of Federal Evidence:   608(b), 404 (b), and 403.    Under each rule, the defendant's proposed evidence is inadmissible. . . .

JAMES A. GOEKE

CRM GOEKE 087443

Assistant U.S. Attorney

District of Alaska

(907) 271.3387

(907) 271.1500 (fax)

EXHIBIT P

| | |
|---|---|
| **From:** | Goeke, James (USAAK) |
| **To:** | Morris, Brenda; Marsh, Nicholas; Sullivan, Edward; Welch, William; Bottini, Joe (USAAK); |
| **Subject:** | RE: Tyree |
| **Date:** | Monday, September 08, 2008 12:45:31 PM |

Sure.  I think Joe's plane leaves at 9:30 AK time so he will be in the air, but said he can call in when he hits Minneapolis.

**From:** Morris, Brenda (CRM)
**Sent:** Monday, September 08, 2008 8:38 AM
**To:** Goeke, James (USAAK); Marsh, Nicholas (CRM); Sullivan, Edward (CRM); Welch, William (CRM); Bottini, Joe (USAAK)
**Subject:** RE: Tyree

Can we all meet / telephone conference at 4:00 EST?  I know Joe is traveling, but I'd like to get Bill in on the conversation.

Brenda K. Morris
Principal Deputy
Public Integrity Section
(202) 514-1439 - Direct
(202) 514-3003 - Facsimile

**From:** Goeke, James (USAAK) [mailto:James.Goeke@usdoj.gov]
**Sent:** Monday, September 08, 2008 12:30 PM
**To:** Marsh, Nicholas; Sullivan, Edward; Morris, Brenda; Welch, William; JBottini@usa.doj.gov
**Subject:** FW: Tyree
**Importance:** High

Here's an email with excerpts from the briefing in Boehm.  I'll have the notes scanned and sent via pdf separately.

_____
**From:** Goeke, James (USAAK)
**Sent:** Thursday, October 04, 2007 1:15 PM
**To:** Nicholas Marsh (Nicholas.Marsh@usdoj.gov)
**Subject:** FW: Tyree

_____
**From:** Goeke, James (USAAK)

CRM GOEKE 087295

**Sent:** Monday, March 05, 2007 11:34 AM
**To:** Sullivan, Edward (Edward.Sullivan@usdoj.gov); Bottini, Joe (USAAK)
**Subject:** Tyree

Ed,

Here is information concerning the Bambi Tryee matter we discussed this morning.

Below are pertinent excerpts from briefing filed in United States v. Boehm, a case prosecuted in the District of Alaska during 2003-2004 in which I participated.  Bambi Tyree was a co-defendant in United States v. Boehm and eventually pled guilty sex trafficking and distribution of drugs to minors.  During a debrief of Tyree in anticipation of trial against Josef Boehm, Tyree stated that she once gave false sworn testimony in the context of a deposition when she was 15 years old. According to Tyree, the deposition concerned, among other things, whether she had ever had sex with Bill Allen.  She stated to the government that she denied having sex with Allen during the deposition, but that her testimony had been false. The government does not have a copy of the deposition.  At the time, Allen's attorney, James Gilmore refused to provide a copy of the deposition, claiming privilege.  The issue came before the court (Judge John Sedwick, who has reviewed numerous TIII applications in the current investigation) in the context of a motion in limine from the government.  As the below excerpts demonstrate, the defendant's view of the facts changed over time as to whether Tyree did or did not have sex with Allen, and consequently as to whether or not Tyree's statement was true or false.  Ultimately, the court ordered that the defendant in United States v. Boehm could inquire generically as to whether or not Tyree had made a false statement under oath and the underlying facts ultimately did not become public.  In the context of the current investigation, the government has not questioned Allen or Tyree:  (1) concerning Allen's relationship with Tyree; (2) concerning whether Allen asked Tyree to provide a deposition; and (3) concerning whether Allen asked to Tyree provide specific testimony at a deposition.  Accordingly, at this time we do not have any information from Allen concerning Tyree's previous statements to the government concerning her deposition.

Excerpt from United States' motion in limine (filed July 2004) in United States v. Boehm regarding testimony of Bambi Tyree:

> During debriefings, Bambi Tyree admitted to giving a false statement under oath when she was 15 years old.  This statement is not in the United States' possession.  However, Tyree identified the nature of the statement, which is as follows:  When Tyree was 15 years old, she had sex with Bill Allen, president of VECO and publisher of the "Voice of the Times" section in the Anchorage Daily News.  Tyree and Allen

were introduced by Tyree's roommate, Lisa Moore.  Moore, who apparently knew of the untoward and illegal relationship, began blackmailing Allen, claiming that she would go to the police and newspapers and tell them that Allen had sex with Tyree.  Based on this threat, Allen asked Tyree to meet with his attorney, James Gilmore, and give a sworn statement stating that she never had sex with Allen.  Tyree did so.  The United States confirmed the existence of such statement from Mr. Gilmore.  Mr. Gilmore stated that this statement was work product, and he declined to provide it to the United States.

The United States is turning over this information to the defense pursuant to its obligations under Giglio v. United States, 405 U.S. 150 (1972).  The fact that Tyree gave a false statement under oath bears on her credibility.  However, the fact that Allen was the person who asked Tyree to swear to the statement is irrelevant to any issue in this case. . . .

Excerpt from United States' reply in United States v. Boehm to defendant's opposition to United States' motion in limine (reply filed August 2004):

Within his response, the defendant alleges that Bambi Tyree participated in a "scheme to blackmail" Bill Allen, president of VECO, with her roommate, Lisa Moore.  Further, that the "scheme" called for Tyree and Moore to visit with Allen at a hotel room and engage in sexual relations with each other in order to entice Allen into having sex with the underage Tyree.  The defendant then claims that Tyree had sex with Allen pursuant to the "scheme."  Tellingly, the defendant provides no support for the perpetration of such "scheme."

Indeed, Tyree will deny participation in any such scheme.  It appears that Tyree's roommate, Lisa Moore, was involved in such a scheme.  According to Moore and Tyree, Moore was working as a prostitute when she met Allen on a call.  Moore, who was 19 years old at the time, and Allen, began a relationship.   Moore introduced Tyree to Allen, who had sex with Tyree.  Moore became jealous of Tyree's relationship with Allen and began blackmailing him, telling him that she would go to the authorities and tell them of Allen's relationship with the juvenile Tyree.  As a result, Allen convinced Tyree to give a false statement to his attorney to defend against any prospective criminal action. Tyree complied.

Not only will Tyree deny being part of Moore's scheme, but her participation in such a scheme is belied by common sense.  First, if it

CRM GOEKE 087297

was part of Tyree's scheme to blackmail Allen based on their sexual encounter, why would she agree to give a statement under oath that such encounter never happened?  One would think that such a statement would completely undermine the reason Allen was being blackmailed.  Second, Tyree's admission to the United States that she gave false answers under oath did not serve any conceivable purpose of her own, nor did it benefit the United States.  Rather, it triggered the United States obligations under Giglio v. United States, 405 U.S. 150 (1972), creating impeachment material for the defense.  Indeed, had Tyree not admitted that she swore falsely concerning her relationship with Allen, this relationship would have no relevance whatsoever. . . .

Excerpt from United States' opposition to defendant's motion for reconsideration in United States v. Boehm (opposition filed October 2004):

The defendant alleges that the Court made factual and legal errors in assessing the defendant's position with respect to Ms. Tyree.  First, with respect to the averred factual error, the defendant has refined his position and now expresses the view that Tyree did not in fact have sex with Allen, but participated in a scheme to blackmail him based on a false sexual relationship.  Whether there was in fact a sexual relationship is irrelevant to the defendant's position; rather, the lynchpin of his argument appears to be Tyree's alleged participation in a scheme to blackmail.  Thus, the Court's decision should not be effected by whether or not a sexual relationship actually occurred.

. . .

The defendant proposes to challenge Tyree's credibility by showing that she participated in a scheme to blackmail Allen based on allegations that Tyree, a minor at the time and the alleged victim, had a sexual relationship with Allen.   Thus, the defendant wants to use this evidence to show that Tyree, now 23 and a co-defendant of Boehm, is falsely accusing him of having sexual relationships with minors, which she has pleaded guilty to facilitating.  Setting apart the obvious procedural and factual differences in the claims, and assuming, for the sake of argument, Tyree engaged in such a scheme to blackmail Allen, such attempted introduction of evidence falls under the auspices of three different Rules of Federal Evidence:   608(b), 404 (b), and 403.   Under each rule, the defendant's proposed evidence is inadmissible. . . .

JAMES A. GOEKE

CRM GOEKE 087298

Assistant U.S. Attorney

District of Alaska

(907) 271.3387

(907) 271.1500 (fax)

EXHIBIT Q

CRM GOEKE 007011

```
00001
 1          IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF ALASKA
 3 INVESTIGATION RE:        )
 4                   )
 5 POLITICAL CORRUPTION        )
 6 _____)
 7
 8             THE TESTIMONY OF
 9             ROBERT B. WILLIAMS
10             BEFORE THE GRAND JURY
11             * * * * *
12
13
14 JAMES GOEKE, ASSISTANT UNITED STATES ATTORNEY
15 EDWARD P. SULLIVAN, TRIAL ATTORNEY, DOJ
16 NICHOLAS A. MARSH, TRIAL ATTORNEY, DOJ
17
18
19             * * * * *
20
21
22             Anchorage, Alaska
23             November 7, 2006
24             3:12 p.m.
25
```

CRM GOEKE 007055

00045



22 Q    Okay.  I'd like to go back to the Girdwood project for a
23      minute.  Were you ever involved in any aspect of the
24      billing process for this project?
25 A    I would pick up the billings from Augie on a monthly

CRM GOEKE 007056

00046
1       basis, and as -- I didn't go through each one
2       individually, but I would check to make sure that people
3       were basically there, and that basically everything
4       looked fine, and then I turned them in to Veco.
5   Q    Okay.  When you would get these bills, tell us what you
6       recall them looking like?
7   A    Usually there would be a cover letter, they'd be in a
8       large manilla envelope.  Augie would have back-up
9       invoices for some of it, some time cards.  Usually there
10      was a cover sheet that laid out most of what was in the
11      packet.
12  Q    Okay.  And after Augie gave you these bills, what
13      generally did you do with them?
14  A    I took them to the Veco main office and either turned
15      them in to the gal at the front desk, or if Bill was in
16      the office, I would go in and see him and tell him what
17      was going on and report in.
18  Q    And just to be clear, when you say Bill, you're referring
19      to?
20  A    Bill Allen, the owner of Veco.
21  Q    Do you remember the name of the woman with whom you
22      dropped off these packets sometimes?
23  A    Sometimes if there was nobody in the office, I would
24      leave them with the front desk.  The girl there was
25      Billie.  I've known her forever.  I only know her by

CRM GOEKE 007057

00047
1      Billie.
2  Q    After the -- after you dropped these bills off at Veco,
3        whether it was to the front desk person or to Bill, do
4        you know what happened to them after that?
5  A    To the best of my knowledge, they got sent down to
6        Washington, to the Senator.
7  Q    Okay.  Were you involved ever in any of those bills being
8        sent?
9  A    I never mailed them, no.
10 Q    Okay.  Sir, I think you indicated that you knew an
11       individual named Bob Persons, is that correct?
12 A    Yes, I do.
13 Q    Did you ever give any of the bills associated with this
14       project to Bob Persons?
15 A    No, I did not.
16 Q    Mr. Williams, during the time that this project was going
17       on, from when you first got involved to when it was done,
18       tell us about the conversations that you had with Senator
19       Ted Stevens?  How many did you have, first of all?
20 A    Probably not more than three or four, maybe five at the
21       most.  The most memorable thing I remember him saying at
22       any of them is he liked the work that was being done, but
23       as long as long as we kept Catherine happy, he would be
24       happy, so.....
25 Q    And, sir, do you know who he meant when he said

CRM GOEKE 007058

00048
1      Catherine?
2  A    His wife.....
3  Q    And.....
4  A    .....Catherine Stevens.
5  Q    Catherine Stevens.  Do you recall when that conversation
6      took place?
7  A    No, I do not.
8  Q    Okay.
9  A    I believe the house was already framed up at the time,
10      and we were talking more about colors and that sort of
11      thing, and the finishing touches.
12 Q    Okay.  Do you recall any other conversations you had with
13      Senator Stevens about this -- about the house project?
14 A    Nothing substantial.  He'd come down every once in a
15      while and take a look at what was going on.  I think he
16      may have come down a few times when I wasn't there, but
17      he seemed to be happy with the work, and that was good.
18 Q    Do you know whether or not during the time that you were
19      doing the work on this house, whether the Senator knew
20      that you were an employee of Veco?
21 A    Yes, he did.
22 Q    Okay.  And why do you think that?
23 A    Well, the first time I ever met the Senator was at a
24      fundraising event for some of the Republican people, and
25      I believe it was at Mark Allen's house.

CRM GOEKE 007084

00074



24          GRAND JUROR:  Mr. Williams, you said that when
25 you were -- when you picked up the invoices from Augie, you

CRM GOEKE 007085

00075
1 didn't go through each one, but you went through some of them and
2 it looked like there was a cover letter, a manilla envelope,
3 back-up invoices.  You took them to the main office.  You gave
4 them either to the girl or Bill.  And then when they asked you
5 what happened with them, you thought they were mailed to
6 Washington to.....
7 A     Senator Stevens.
8          GRAND JUROR:  .....Senator Stevens?
9 A     Yes.
10          GRAND JUROR:  Why -- what would make you think
11 that, if you didn't do it yourself?
12 A     Because it was my understanding that one of the reasons
13      that -- when I talked to -- with Bill and Ted and we got
14      Augie involved, that Augie would be paid by Ted
15      directly., and that Ted liked that way.
16          GRAND JUROR:  Okay.  Thank you.
17          MR. GOEKE:  Any other questions from any other
18 members of the grand jury?  Yes?  Yes, ma'am, in the back.
19          GRAND JUROR:  While you were building and
20 renovating these homes, were you on Veco's time and dollar?
21 A     Yes, I was.

# EXHIBIT R

CRM GOEKE 001846

FD-302 (Rev. 10-6-95)

-1-

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription   09/14/2006

      ROBERT BURNETTE WILLIAMS, a.k.a. ROCKY WILLIAMS, born August 15, 1950, social security account number 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, home address 1200 W. Dimond Boulevard, Space 203, Anchorage, Alaska, home telephone 907-522-3812, cellular telephone 907-244-6016, was interviewed at DENNY'S RESTAURANT on Benson and Denali in Anchorage, Alaska.  After being advised of the identities of the interviewing agents and the nature of the interview, WILLIAMS provided the following information:

      WILLIAMS started working for VECO during the EXXON VALDEZ oil spill.  WILLIAMS later worked for VECO in the ANCHORAGE TIMES office.  At some point, WILLIAMS became friends with BILL ALLEN.  ALLEN recognized WILLIAMS' diverse knowledge and abilities related to general contracting and remodeling. ALLEN had WILLIAMS remodel MARK ALLEN's home and many other homes of BILL ALLEN's various girlfriends.  BILL ALLEN's home was originally a trapper's cabin on a fox farm.  WILLIAMS became BILL ALLEN's "go-to guy."  ALLEN also utilized WILLIAMS for his knowledge of computers.  The last VECO project that WILLIAM'S worked on was the "trading bay project."  BILL ALLEN was nice before his motorcycle accident; however, his disposition changed.  WILLIAMS currently visits ALLEN about every six months to say hello.

      WILLIAMS knew TED STEVENS from fundraisers and because WILLIAMS moved furniture from CATHERINE STEVENS' mother's house to TED STEVENS' Girdwood home (STEVENS' home).  The project to remodel STEVENS' home was initially a small project but later turned into a big project, lasting six to nine months.

      BILL ALLEN and TED STEVENS came up with the idea to "jack up" STEVENS' home four feet after the Kenai Classic. ALLEN and STEVENS kept talking and the project continued to grow, which made STEVENS more concerned about VECO Corporation doing all of the work.  About this time, STEVENS decided he wanted to get a contractor that STEVENS could pay.  WILLIAMS suggested they hire AUGIE PAONE, of CHRISTIANSON BROTHERS, as the contractor.  PAONE was used previously by WILLIAMS when VECO was remodeling a VECO office.  PAONE brought two workers to help him with the STEVENS' home project, MIKE LNU and two other

Investigation on   09/14/2006        at   Anchorage, Alaska

File #  194A-AN-13620-87  194A-AN-13620-BALLEN;     Date dictated  09/14/2006
       194A-AN-13620-TSTEVENS

by   SA CHAD E JOY/ce
     SA MARY BETH KEPNER

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

CRM GOEKE 001847

FD-302a (Rev. 10-6-95)

194A-AN-13620-G; 194A-AN-13620-BALLEN;

Continuation of FD-302 of ___ROBERT BURNETTE WILLIAMS_____ , On 09/14/2006 , Page ___2___

laborers.  PAONE and his workers did the framing, windows, panel
siding, painting, and finish work.  PAONE did the roofing along
with WILLIAMS.  PAONE poured the foundation for the garage.
PAONE talked to STEVENS approximately four times during the
course of construction.  WILLIAMS was the "go-between" with
PAONE, STEVENS, and ALLEN.

DAVE ANDERSON, BILL ALLEN's nephew, welded the posts
for the upper deck and did the stairs on the side of STEVENS'
home.  ANDERSON was an excellent welder.  All the steel used was
from VECO.  Although PAONE performed a sizable portion of the
work, the remaining material and labor was provided by VECO.
WILLIAMS installed the Pergo flooring in STEVENS' home.  DICK
REDMOND performed the grading.  REDMOND is deceased but was
STEVENS friend forever.  BOB PERSONS tore off the old plywood
deck.  An electrician from VECO set the new panel and performed
all the wiring on the newly added downstairs addition.  MARK
TYREE performed all the plumbing necessary.  TYREE is deceased.

When shown a recent color photo of the front of
STEVENS' home, WILLIAMS advised a bottom deck was added since
his work on STEVENS' home.  The pitch of the roof was faulty
causing problems when it snowed.  WILLIAMS estimated the cost to
"jack up" STEVENS' home was approximately $2,500 - $3,000.
After the house was jacked up, a VECO engineer created the
plans/blueprints after-the-fact for structural integrity.  There
were no inspections by inspectors and WILLIAMS did not recall
having any building permits.  The kitchen in the original
portion of the home was remodeled.  A staircase to the second
level kitchen was constructed and the kitchen countertops and
cabinets were replaced.

WILLIAMS estimated the total construction costs on
STEVENS' home was approximately $240,000, to include all labor
and material.  Later in the interview, WILLIAMS estimated the
total cost to be between $280,000 - $300,000.

WILLIAMS had a VECO truck that he used.  It was white
with a number on it.  WILLIAMS could not recall if the truck had
a VECO emblem.  WILLIAMS was never asked to hide the VECO truck.
STEVENS knew that ANDERSON and WILLIAMS were VECO employees.

Near the end of the STEVENS' home remodel project,
WILLIAMS received a $2,000 check and two airline tickets from
TED and CATHERINE STEVENS as a tip.  WILLIAMS was pleasantly

CRM GOEKE 001848

FD-302a (Rev. 10-6-95)

194A-AN-13620-G; 194A-AN-13620-BALLEN;

Continuation of FD-302 of ___ROBERT BURNETTE WILLIAMS___ , On 09/14/2006 , Page __3__

surprised by the gift.  TED STEVENS told WILLIAMS he really
appreciated his work.  CATHERINE STEVENS really liked the
remodel.  WILLIAMS did not know whether ANDERSON or PAONE
received a tip from the STEVENS.

WILLIAMS went to the FLY-BY-NIGHT CLUB in early
September 2006.  TED STEVENS and BOB PERSONS were both at the
club.  WILLIAMS talked to both STEVENS and PERSONS but not about
STEVENS' home or about recent events involving the FBI.
WILLIAMS talked to PERSONS about family issues, and about
STEVENS' and ALLEN's past trip to the Paris Air Show.

While working for VECO, WILLIAMS installed a new air
conditioner in RAMONA BARNES home, patched her roof and built a
ramp.  BARNES is now deceased.  WILLIAMS recalled setting a
boiler for RICK HALFORD.  PETE KOTT installed hardwood floors in
ALLEN's home.

# EXHIBIT S

CRM GOEKE 001849

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    09/28/2006

ROBERT BURNETTE WILLIAMS, a.k.a. ROCKY WILLIAMS, born August 15, 1950, social security account number 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, home address 1200 W. Dimond Boulevard, Space 203, Anchorage, Alaska, home telephone 907-522-3812, cellular telephone 907-244-6016, was interviewed at the FBI field office in Anchorage, Alaska.  After being advised of the identities of the interviewing agents and the nature of the interview, WILLIAMS provided the following information:

The remodel of the residence of TED STEVENS in Girdwood, Alaska (Ted's Home) began around July 2000. Initially, WILLIAMS gave ALLEN and STEVENS the projected cost for a new deck and to redo the roof, to "dress it up."  The initial cost was estimated at approximately $25,000 - $30,000. Around August 2000, Ted's Home was jacked up.

Before Ted's Home was jacked up, STEVENS met with WILLIAMS, BOB PERSONS, and ALLEN.  WILLIAMS recommended they use AUGIE PAONE as a contractor.  STEVENS liked the idea of having someone to pay because it was "over the limit."  WILLIAMS advised they needed a general contractor, not VECO, because VECO wasn't in the business of building residential homes and a general contractor could do the job better.  ALLEN wanted VECO to do all the work.

DAVE ANDERSON arranged the company used to jack up the home, which may have been BROWNS.  The company used was not available right away but when they became available, they utilized four or five workers that knocked blocks and used approximately four hydraulic jacks.  WILLIAMS, ANDERSON, and possibly BILL ALLEN were present during the jacking of Ted's Home.  WILLIAMS believed all household goods in Ted's Home stayed in the house during the jack-up.

PAONE used VERN LNU, MIKE LNU, and one other part-time person that was not around much.  PAONE and his crew did most of the framing and sheeting for the walls and floor joists. SPENARD BUILDERS SUPPLY or ARCTIC BUILDERS SOURCE may have provided the materials for the framing and sheeting.  PAONE did the handrail on the top exterior deck.  PAONE and his crew also

Investigation on   09/28/2006          at  Anchorage, Alaska

File #  194A-AN-13620-61  194A-AN-13620-BALLEN;     Date dictated   09/28/2006
        194A-AN-13620-TSTEVENS
by      SA CHAD E JOY/cejcb
        SA MICHAEL THORESON

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

CRM GOEKE 001850

FD-302a (Rev. 10-6-95)

194A-AN-13620-G; 194A-AN-13620-BALLEN; 194A-AN-13620-TSTEVENS

Continuation of FD-302 of   ROBERT BURNETTE WILLIAMS                , On 09/28/2006  , Page    2

filled in the floors and did the interior walls.  PAONE provided
WILLIAMS with monthly billing packets.  WILLIAMS would provide
the bills to JAN SINGYKE, who was ALLEN's secretary.  If SINGYKE
was not available, WILLIAMS would provide the billing packets to
BILLIE LNU, a female VECO receptionist.  WILLIAMS assumed the
invoices were mailed to STEVENS in Washington D.C.

The plumbing was performed by MARK TYREE.  The wiring
was done by a male VECO employee.  The garage excavation and
foundation was done by REDMOND.  REDMOND also did the driveway.
Some of PAONE's people helped with the insulation.  WILLIAMS did
not help with the insulation.  WILLIAMS was unsure who did the
sheetrocking.

WILLIAMS dealt with the logistics of the project,
carried most of the material down to Ted's Home, utilizing a
VECO truck.  The truck was a one-ton white truck with a ladder
rack.  WILLIAMS installed the pergo floor in the upstairs.  The
pergo flooring was purchased from CRAIG PRIEST of CLASSIC
FLOORING.  The cost was approximately $1,000.

PAONE had the countertops and cabinets installed.  The
cabinets may have come from SPENARD BUILDERS SUPPLY.  The
countertops came from a company located on Arctic Spur Road.
The countertop material was nicer than stone but not Corian.
PAONE may have subcontracted the countertops installation to the
company that provided the countertop material.  WILLIAMS was
unsure what flooring material was used in the kitchen, it may
have been vinyl.

ANDERSON was always talking on the telephone dealing
with family stuff.  ANDERSON was like a coordinator.  ANDERSON
also set the steel that was used in Ted's Home.  PAONE
subcontracted with TRUTANIC TILE AND STONE to tile the bathrooms
upstairs and downstairs.  STIPE TRUTANIC, a.k.a. "STEVE," was
the point of contact.

The garage was completed when it started to snow,
around October 31, 2000.  The interior walls were tongue and
groove material.  MIKE LNU and VERN LNU installed that material.
Final fixtures were installed; however, WILLIAMS was unsure if
new kitchen appliances were installed.

Approximately Christmas time, ANDERSON and WILLIAMS
went to CATHERINE STEVENS's mother's home, FNU BUCKLEY, to

CRM GOEKE 001851

FD-302a (Rev. 10-6-95)


194A-AN-13620-G; 194A-AN-13620-BALLEN; 194A-AN-13620-TSTEVENS


Continuation of FD-302 of    ROBERT BURNETTE WILLIAMS              , On 09/28/2006  , Page    3

obtain and transport a very large truckload of bunk beds, rolled
up carpets, and other miscellaneous items.

        During all the construction/remodel of Ted's Home,
CATHERINE STEVENS would routinely leave long handwritten lists
of to-dos for WILLIAMS to take care of.  CATHERINE was present
at the home before they put the colors on the walls and the
shellac on the wood.  TED STEVENS was present at the home at
least four times when WILLIAMS was present.  TED would look
around at all the work being done and would say, "just keep
Catherine happy and I'll be happy."

        BOB PERSONS helped rip off the old deck.  He also would
walk by the home each morning and night, walking a loop.
WILLIAMS would eat at the DOUBLE MUSKY two or three times each
week.  The restaurant opened at 5:00 p.m.  ANDERSON ate at the
restaurant often too.  On one occasion, all the workers at
there.

        WILLIAMS estimates that PAONE's bill for remodeling
Ted's Home was approximately $200,000.  WILLIAMS worked for VECO
the entire time he worked on Ted's Home.  WILLIAMS was paid
$18.50 per hour and worked between 15 and 30 hours each week for
approximately 10 weeks.

        The remodel of Ted's Home took approximately nine
months to complete.  This timeline was gauged from when WILLIAMS
recalls the planning began to when the work ended.  WILLIAMS
never did anything else on Ted's Home after Christmas 2000.

        WILLIAMS took photos of the various stages of the
construction/remodel.  One copy went to BOB PERSONS, who then
sent copies via the Internet to TED STEVENS.  All the other
photos taken went to BILL ALLEN.

        A custom stain glass window was donated as a gift from
BOB PENNY to STEVENS.  The window was installed on Ted's Home.

        When TED STEVENS gave WILLIAMS the check for $2,000,
WILLIAMS accepted it but then gave it back via donations to
STEVENS' campaign in either $500 or $1,000 increments over a
four-year period.

        WILLIAMS was shown a copy of a check he wrote, dated
01/25/2001 to CATHERINE STEVENS for $2,000.  The memo line

CRM GOEKE 001852

FD-302a (Rev. 10-6-95)

194A-AN-13620-G; 194A-AN-13620-BALLEN; 194A-AN-13620-TSTEVENS

Continuation of FD-302 of    ROBERT BURNETTE WILLIAMS            , On 09/28/2006  , Page    4

stated, "Doors/Heater/Insert." WILLIAMS recalled that BILL
ALLEN wanted to buy these used materials from CATHERINE STEVENS
and ALLEN did not carry a checkbook so he told WILLIAMS to write
her a check. WILLIAMS believes he was reimbursed by ALLEN at a
later date. The material was taken to Anchor Point for a
daughter of PEGGY GERHARDSON. WILLIAMS advised that WILLIAMS
would have never paid that much money for the materials because
they weren't worth that much.

WILLIAMS drew a rough sketch of STEVENS'S Girdwood
home. This sketch is attached hereto and made apart hereof.

August 22, 2006 was the date when WILLIAMS saw and
talked with TED STEVENS, BILL LNU (who runs the ALASKA AIR
TRANSPORTATION MUSEUM), and BOB PERSONS at the FLY BY NIGHT
CLUB.

CRM GOEKE 001853



CRM GOEKE 001854



CRM GOEKE 001855

