IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |   |
|---|---|---|
| | : | |
| | : | |
| In Re SPECIAL PROCEEDINGS | : | Misc. No. 09-0198 (EGS) |
| | : | |
| | : | |

MEMORANDUM OPINION

Pending before the Court are two motions to permanently
seal from public disclosure the Report to the Honorable Emmet G.
Sullivan of Investigation Conducted Pursuant to the Court's
April 7, 2009 Order ("Mr. Schuelke's Report" or "Report").[1]  For
the reasons discussed herein, the Court **DENIES** the motions and
**ORDERS** that Mr. Schuelke shall provide an unredacted version of
this Memorandum Opinion to each of the attorneys who received
copies of the Report, pursuant to the Court's November 21, 2011
Order and the executed Confidentiality Agreement.  It is further
**ORDERED** that Mr. Schuelke file his Report on the public docket
on March 15, 2012, after the subject attorneys are afforded an

---

[1] In addition to the two motions, two individuals or entities
filed objections to publicly disclosing Mr. Schuelke's Report,
and one entity filed a memorandum in support of publicly
releasing the Report, but these individuals and entities did not
specifically move the Court for their requested relief.
Nevertheless, as discussed *infra* Part I.B., the Court has
considered and will address all arguments made in opposition to
and in support of public disclosure, regardless of whether they
were made by motion, memorandum, or notice.  As also discussed
*infra* Part I.B., the Department of Justice and two of the
subject attorneys filed pleadings indicating that they do not
oppose release of the Report.

opportunity to submit their comments or objections to Mr.
Schuelke by no later than March 8, 2012.  Mr. Schuelke shall
include any such submissions as addenda to the published Report.
It is further **ORDERED** that when the Report is made public, the
individuals who are subject to the Confidentiality Agreement as
a condition to having access to the Report shall be released
from that Confidentiality Agreement.  It is further **ORDERED** that
on March 15, 2012, all pleadings related to Mr. Schuelke's
Report and filed in response to the Court's November 21, 2011
Order shall be unsealed and placed on the public docket.
Finally, it is further **ORDERED** that on March 15, 2012, an
unredacted version of this Memorandum Opinion shall be placed on
the public docket.[2]

To deny the public access to Mr. Schuelke's Report under
the circumstances of this case would be an affront to the First
Amendment and a blow to the fair administration of justice.  In
July 2008, attorneys in the *Public* Integrity Section of the
Department of Justice indicted a *public* official for allegedly
failing to report gifts on his *public* disclosure forms.  The
attorneys then tried the defendant in the most *public* manner

---

[2] Because this Memorandum Opinion references information that is
currently under seal, the Court has made limited redactions to
this Opinion.  In view of the Court's decision to publicly
release Mr. Schuelke's Report and the various pleadings
discussed herein on March 15, 2012, the Court will also post an
unredacted version of this Memorandum Opinion on that date.

possible, and when they obtained a guilty verdict, they held a press conference to proclaim victory to the *public*.  As a result of that verdict, the *public* official lost his bid for re-election, which tipped the balance of power in the United States Senate.

Meanwhile, in the face of serious and mounting allegations of prosecutorial misconduct throughout the trial and post-trial proceedings, the attorneys repeatedly represented to the Court and to the *public* that there was no wrongdoing and no cause to question the integrity of either the indictment or the verdict. Only when faced with uncontroverted evidence that the attorneys had committed *Brady* violations[3] did the government come before the Court and publicly move to dismiss the indictment and vacate the verdict.  And only at that point did the government seek to turn this *public* proceeding into a private one, assuring the Court that it would investigate the prosecutors internally through its confidential Office of Professional Responsibility process.

The U.S. Court of Appeals for the District of Columbia Circuit has said, following Supreme Court precedent, that First Amendment access to criminal proceedings "serves an important function of monitoring prosecutorial or judicial misconduct." *Washington Post v. Robinson*, 935 F.2d 282, 288 (D.C. Cir. 1991)

---

[3] *Brady v. Maryland*, 373 U.S. 83 (1963).

(citations omitted).  Mr. Schuelke's five-hundred-page Report concludes that "the investigation and prosecution of Senator Stevens were permeated by the systematic concealment of significant exculpatory evidence which would have independently corroborated [his] defense and his testimony, and seriously damaged the testimony and credibility of the government's key witness."  Mr. Schuelke's Report at 1.

It is not an overstatement to say that the dramatic events during and after the *Stevens* trial, and particularly the government's decision to reverse course and move to vacate the verdict, led to a continuing national public discourse on prosecutorial misconduct and whether and what steps should be taken to prevent it.  Withholding the Report from the public and leaving the public with only the information from the trial and immediate post-trial proceedings would be the equivalent of giving a reader only every other chapter of a complicated book, distorting the story and making it impossible for the reader to put in context the information provided.  The First Amendment, the public, and our system of justice demand more.

## I.    Introduction

### A.    The Court's November 21, 2011 Order

On April 7, 2009, in response to a series of allegations and confirmed instances of prosecutorial misconduct during and following the five-week trial of U.S. Senator Theodore F.

Stevens ("the *Stevens* trial"), the Court appointed Henry F. Schuelke, III, to investigate and prosecute such criminal contempt proceedings as may be appropriate against the six Department of Justice attorneys responsible for the prosecution of Senator Stevens ("the subject attorneys"). *See* Order Appointing Henry F. Schuelke, *United States v. Stevens*, No. 08-cr-231 (D.D.C. Apr. 7, 2009) ("April 7, 2009 Order").

On November 21, 2011, the Court issued an Order indicating, *inter alia*, that Mr. Schuelke had informed the Court that his investigation was concluded and had submitted a five-hundred-page report to the Court *in camera*. Order Regarding Report of Henry F. Schuelke, III, and Setting Forth Instructions for Further Proceedings at 12 ("November 21, 2011 Order"). The Court's Order went on to note that based on their exhaustive investigation, Mr. Schuelke and his esteemed colleague, Mr. William B. Shields, had concluded that the investigation and prosecution of Senator Stevens were "permeated by the systematic concealment of significant exculpatory evidence which would have independently corroborated [his] defense and his testimony, and seriously damaged the testimony and credibility of the government's key witness." *Id.* at 3 (citing Mr. Schuelke's Report at 1). The Court then concluded:

> While providing the public with the full results of
> Mr. Schuelke's investigation has been and remains the
> Court's intent, in view of the Amended Protective

> Order entered in these proceedings on December 13,
> 2009, and this Circuit's holding in *In re North*, 16
> F.3d 1234 (D.C. Cir. 1994), the Court has determined
> that Mr. Schuelke's complete report should not be made
> public at least until the Department of Justice has
> had the opportunity to review the report. The Court
> has further determined that it is appropriate to
> afford the subject attorneys and Senator Stevens's
> attorneys the opportunity to review the report, under
> the terms and conditions set forth [in the Order].
> The Court will then consider any objections to making
> Mr. Schuelke's Report public[.]

*Id.* at 7.

## B.   The Pleadings Filed in Response to the Court's November 21, 2011 Order

In response to the Court's November 21, 2011 Order, the

Department of Justice filed a Motion to File On Public Docket

the Notice of Department of Justice Regarding Materials

Referenced in Mr. Schuelke's Report.  The Court granted that

motion on January 9, 2012.  The Department of Justice's Notice

advised the Court that it "does not intend to file a motion

regarding Mr. Schuelke's report" and that "[t]he government does

not contend that there is any legal prohibition on the

disclosure of any references in Mr. Schuelke's report to grand

jury material, court authorized interceptions of wire

communications, or any sealed pleadings or transcripts that have

now been unsealed."  Notice of Dep't of Justice Regarding

Materials Referenced in Mr. Schuelke's Report, at 1-2 ("DOJ

Notice").  In addition, the Department of Justice informed the

Court that it was not asserting any deliberative process or

attorney-work product privilege with respect to the information contained in Mr. Schuelke's Report. *Id.* at 2.

Each of the six subject attorneys filed notices, motions and/or memoranda of law in response to the Court's November 21, 2011 Order.[4]  Two of the subject attorneys informed the Court that they either agree or do not object to the public release of the Report. *See* Brenda Morris Concurs with the Court's Intent, as Stated in its November 21, 2011 Order, to Release the Full Report ("Morris Submission") *and* Sealed Notice filed by William M. Welch II ("Welch Notice").  Two of the subject attorneys filed motions to seal the Report. *See* Motion to Permanently Seal the Report filed by Edward P. Sullivan ("Sullivan Motion") *and* Motion Opposing Public Release of Report by Henry F. Schuelke, III filed by Nicholas Marsh ("Marsh Motion"). Finally, two of the subject attorneys filed notices or memoranda opposing release of the Report. *See* Joseph W. Bottini's Submission in Response to the Court's November 21, 2011 Order ("Bottini Submission") *and* Memorandum of Law Opposing Publication of the Schuelke Report filed by James Goeke ("Goeke Memorandum").  These four pleadings opposing release raise overlapping objections and arguments against publicly releasing

---

[4] One of the subject attorneys, Nicholas Marsh, died on September 26, 2010, while Mr. Schuelke's investigation was ongoing.  A pleading was filed on behalf of Mr. Marsh's estate, which the Court will refer to as Mr. Marsh's pleading.

the Report, and the Court will therefore analyze and discuss
them collectively as the "opposing attorneys'" pleadings and/or
arguments.[5]  Specifically, the opposing attorneys argue that
(1) because Mr. Schuelke's investigation was a "grand jury-
style" investigation, it should be bound by the grand jury
secrecy rules and precedent, particularly where, as here, the
investigating body is not indicting or recommending criminal
prosecution (and therefore the allegations will not be subject
to adversarial proceedings); (2) the Court should not follow the
D.C. Circuit's approach to releasing the Independent Counsel's
report in *In re North*, 16 F.3d 1234 (D.C. Cir. 1994) ("*North*"),
or, if the Court does follow that approach, the Court should
conclude that the factors identified in that case do not weigh

---

[5] This is not to say that the pleadings are equally comprehensive
or that each of the opposing attorneys made all of the same
arguments.  *Compare, e.g.*, the twenty-two-page Sullivan Motion
(including extensive case law and analysis) and thirteen-page
Marsh Motion (including considerable case law and analysis) *with*
the two-page Bottini Submission (citing no legal authority) and
the four-page Goeke Memorandum (citing three cases with little
to no analysis).  Although four of the six subject attorneys
noted their opposition to releasing the Report, only two of them
strenuously object and raise legal bases for withholding the
Report from the public.  Nevertheless, because the general
objections to publicly releasing the Report are common to each
of the pleadings and all four opposing attorneys seek the same
relief, *i.e.*, keeping the Report from the public, the Court will
consider the pleadings collectively.  It is important to make
clear, however, that at times the Court is attributing all of
the arguments made to all four of the opposing attorneys, where
in most instances the argument, and certainly any analysis, were
in reality only proffered by one and sometimes two of the
opposing attorneys.

in favor of releasing Mr. Schuelke's Report; and (3) there is no
First Amendment right of access to Mr. Schuelke's Report. *See,
e.g.*, Sullivan Motion at 6, 12, 17; Marsh Motion at 5, 8, 10-11.

Finally, one entity filed a memorandum urging the Court to
release the Report (1) in view of the highly public nature of
the *Stevens* trial, the First Amendment right to access these
proceedings and the common law right to access judicial records;
and (2) because if the Court were to consider the *North* factors,
those factors weigh heavily in favor of release. *See* Memorandum
in Support of Public Access to Mr. Schuelke's Report filed by
Williams & Connolly LLP ("Stevens Memorandum").[6,7]

Upon careful consideration of the various points and
authorities raised for and against public disclosure of Mr.
Schuelke's Report, the relevant statutory and case law, the
entire record in the *Stevens* proceedings, and the highly unique
circumstances present in this case, and for the reasons
discussed below, the Court concludes that (1) the public has an
overriding and compelling right to access the Report, and that

---

[6] Senator Stevens died on August 9, 2010, while Mr. Schuelke's
investigation was ongoing.  The attorneys at Williams & Connolly
who represented Senator Stevens throughout the *Stevens*
proceedings filed a pleading, which the Court will refer to as
Senator Stevens's pleading.

[7] In addition to the pleadings already discussed, one individual
or entity filed a motion to modify Mr. Schuelke's Report. *See*
Motion for Modifications to Report filed by Bill J. Allen.  That
motion was later withdrawn.  Notice of Bill J. Allen Regarding
Mr. Schuelke's Amended Report.

right is protected by the First Amendment; (2) Mr. Schuelke's investigation differed in significant respects from a grand jury proceeding and is not bound by the grand jury secrecy rules, and moreover the reasons underlying the secrecy of grand jury proceedings are for the most part not relevant in this case; and (3) the D.C. Circuit's approach in *North* is instructive, and the factors identified in that case as relevant to determining whether to publicly release a special prosecutor's report overwhelmingly counsel in favor of publicly releasing the Report under these circumstances. Accordingly, the Court will order Mr. Schuelke to file his Report on the public docket. In order to address any claimed prejudice to the subject attorneys, however, the Court will first afford them another opportunity to submit objections or comments to Mr. Schuelke to be published as addenda to the Report, similar to the process followed in *North* and subsequent cases.[8]

---

[8] The Court notes that at least two of the opposing attorneys imply in their pleadings that they were not "invited" to comment on the substance of the Report. *See* Marsh Motion at 11 ("We do not understand the Court's order to invite comments on the substance of the report and we do not undertake that effort here."); Goeke Memorandum at 3 ("While we understand that the Court's November 21, 2011 Order did not invite Mr. Goeke and the other government attorneys to rebut the substance of the Schuelke Report . . . ."). The Court's November 21, 2011 Order, however, specifically and explicitly provided that opportunity. *See* November 21, 2011 Order at 10-11 ("It is further ORDERED that any other individual seeking to withhold from the public information contained in Mr. Schuelke's Report shall file a motion under seal, and, if appropriate, *any comments or factual*

## II.  Discussion

### A.  The First Amendment Right of Access to Judicial Proceedings

The First Amendment to the United States Constitution provides the public with a right of access to judicial proceedings where (i) "the place and process have historically been open to the press and general public"; and (ii) "public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise Co. v. Sup. Ct. of Cal. ("Press-Enterprise II")*, 478 U.S. 1, 8 (1986); *see also Press-Enterprise Co. v. Sup. Ct. of Cal. ("Press-Enterprise I")*, 464 U.S. 501, 505-10 (1984); *Globe Newspaper Co. v. Sup. Ct. for Norfolk Cnty.*, 457 U.S. 596, 605-06 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573-74 (1980).

### 1.  Criminal Trials – Including the *Stevens* Trial – Have Historically Been Open to the Public

#### a.  Relevant Case Law

The right of access is not limited to the criminal trial itself, but extends to many pre- and post-trial documents and proceedings. *See, e.g.*, *Press-Enterprise II*, 478 U.S. at 10-13 (First Amendment right of access to adversarial pre-trial preliminary hearings); *Press-Enterprise I*, 464 U.S. at 510-11

---

*information regarding the Report*, by no later than January 6, 2012, and shall provide the basis and nature of the relief sought.") (emphasis added).

(First Amendment right to access *voir dire* proceedings); *United States v. Ignasiak*, Nos. 09-10596, 09-16005, and 10-11074, 2012 WL 149314, *15-16 (11th Cir. Jan. 19, 2012) (First Amendment right of access to government's post-trial pleading revealing impeachment information of one of its key witnesses where government argued that the witness's privacy interest justified keeping the information under seal); *In re Search Warrant for Secretarial Area Outside Office of Gunn*, 855 F.2d 569, 573 (8th Cir. 1988) (First Amendment right of access to documents supporting search warrants); *Applications of Nat'l Broad. Co. v. Presser*, 828 F.2d 340, 344-45 (6th Cir. 1987) (First Amendment right of access to pretrial documents); *CBS, Inc. v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 765 F.2d 823, 825-26 (9th Cir. 1985) (First Amendment right of access to post-trial documents regarding potential sentence reduction); *Associated Press v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 705 F.2d 1143, 1145 (9th Cir. 1983) (First Amendment right of access to pretrial documents); *In re Access to Jury Questionnaires*, No. 10-SP-1612, 2012 WL 140425, *4-5 (D.C. Jan. 19, 2012) (First Amendment right of access to written juror questionnaires).

Although First Amendment access to criminal proceedings is not absolute, the standard to overcome the presumption of openness is a demanding one:

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.  The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Press-Enterprise I*, 464 U.S. at 510; *see also United States v. Brice*, 649 F.3d 793, 796-97 (D.C. Cir. 2011) (assuming without deciding that the First Amendment affords access to material witness proceedings but upholding trial court's closure of the proceedings, where opening such proceedings would reveal "private and painful" information related to then-juvenile victims' physical and mental health, constitute a "grotesque invasion of the victims' privacy[,]" and trial court made finding that no alternatives to closure could protect the compelling privacy interests).

**b.    The Public Nature of the *Stevens* Trial**

As noted above, criminal trials have historically been open to the public.  *See, e.g.*, *Globe Newspaper Co.*, 457 U.S. at 603-06; *Richmond Newspapers*, 448 U.S. at 564-74.  The *Stevens* trial was certainly no exception.  In fact, recognizing from the outset the significant public interest in the case, the Court took extensive steps to ensure that members of the public and the media had access to all aspects of the proceedings.[9]  *See*,

---

[9] The Supreme Court has recognized that the public may obtain its access to judicial proceedings through the media.  *See Richmond*

*e.g.*, Order, *Stevens*, No. 08-231 (Sept. 19, 2008) (setting aside reserved seats in the courtroom for members of the public and the media as well as providing an "overflow" courtroom with live audio and video transmittal of the proceedings).

The public's interest in and right to access the *Stevens* trial was not merely a theoretical one.  Rather, the trial received nearly unprecedented media coverage.  By the Court's estimation, for the 25 days of trial (including jury selection and deliberation), a total of 51 stories about the *Stevens* case ran in the front sections of the *Washington Post* and the *New York Times*.  It is important to note, as the memorandum filed by Williams and Connelly points out, that this media attention was welcomed and even fostered by the prosecutors.  *See* Stevens Memorandum at 1-2.  The government issued a press release on the day it indicted Senator Stevens, and Matthew Friedrich, the Acting Assistant Attorney General for the Criminal Division, held a press conference to proclaim the news.  *See* Press

---

*Newspapers*, 448 U.S. at 572-73 ("Instead of acquiring information about trials by firsthand observation or by word of mouth from those who attended, people now acquire it chiefly through the print and electronic media.  In a sense, this validates the media claim of functioning as surrogates for the public.  While media representatives enjoy the same right of access as the public, they often are provided special seating and priority of entry so that they may report what people in attendance have seen and heard.  This 'contribute[s] to public understanding of the rule of law and to comprehension of the functioning of the entire criminal justice system . . . .'" (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 587 (1976) (Brennan, J., concurring in judgment))).

Release, U.S. Dep't of Justice, U.S. Senator Indicted on False
Statement Charges (July 29, 2008), *available at*
http://www.justice.gov/opa/pr/2008/July/08-crm-668.html (last
visited Feb. 6, 2012); *Senator Ted Stevens Indictment*, C-Span
Video Library (July 29, 2008), http://www.c-
spanvideo.org/program/280113-1 (accessed by searching "Ted
Stevens Indictment" and limiting the date range to July 29,
2008) (last visited Feb. 6, 2012).  The Department of Justice
posted each day's trial exhibits on its website.  On the day of
the verdict, Mr. Friedrich stood with the trial team outside the
courthouse and pronounced to the television cameras that "[t]he
Department is proud of this team, not only for this trial, but
for the investigation that led to it."  Senator Stevens Verdict
News Conference Tr. at 00:03:23, C-Span Video Library (Oct. 27,
2008), http://www.c-spanvideo.org/appearance/554818464 (last
visited Feb. 6, 2012).

The public's interest in the *Stevens* trial did not end
after the verdict, nor did this Court's efforts to protect that
interest.  Two months after the verdict, when the government
sought to seal a complaint alleging prosecutorial misconduct
filed by the FBI agent who had co-led the investigation of
Senator Stevens, the Court issued an opinion concluding that the
public had a First Amendment right to access the FBI agent's
post-trial complaint and the government's pleadings related

thereto.  *See United States v. Stevens*, Crim. No. 08-231 (EGS),
2008 WL 8743218, *8 (D.D.C. Dec. 19, 2008).  Following the D.C.
Circuit's decision in *Washington Post v. Robinson*, the Court
specifically found that access to the agent's complaint and any
resulting proceedings would be likely to serve the important
function of monitoring prosecutorial misconduct, especially
where motions made during the trial raised the same or similar
allegations as those in the agent's complaint, and the complaint
specifically included allegations of such misconduct.  *Id.*
(citing *Robinson*, 935 F.2d at 288).  As discussed *infra*, the
same conclusion applies to Mr. Schuelke's Report.

       **c.   Mr. Schuelke's Report is Related to the *Stevens*
            Trial**

     The opposing attorneys argue that there is no First
Amendment right of access to Mr. Schuelke's Report because it is
an investigative document and there is no "unbroken,
uncontradicted history" of access to such reports, which are the
equivalent of grand jury materials to which the First Amendment
does not provide a right of access.  *See* Sullivan Motion at 20-
21; Marsh Motion at 10.  The opposing attorneys' arguments based
on grand jury secrecy are discussed *infra* Part II.B.  As for
their contention that the First Amendment does not provide

access to the Report because it is an investigatory document

unrelated to the *Stevens* trial, that argument is misplaced.[10]

Mr. Schuelke's Report relates and pertains to the *Stevens*

prosecution, as did the FBI agent's post-trial complaint

alleging prosecutorial misconduct in the investigation and trial

of Senator Stevens.  Rather than moving to dismiss the

indictment with prejudice, had the government filed a notice or

other pleading with the Court informing the Court that the

government had discovered post-trial that the prosecution team

had committed additional *Brady* violations, the Court would have

held an evidentiary hearing or otherwise taken steps to learn

the extent of the misconduct and determine whether sanctions or

other remedies, including criminal contempt proceedings, were

---

[10] Nor is it significant that the clerk's office created a
miscellaneous case number for filings in these contempt
proceedings.  This administrative act has no bearing on whether
the Report is a judicial document relating to the *Stevens* case,
which, of course, it is.  In fact, this is precisely the
position taken by two of the subject attorneys in the Court of
Appeals when they appealed this Court's decision related to a
finding of civil contempt. *See In re Contempt Finding in United
States v. Stevens*, Case No. 10-5372 (D.C. Cir.), Motion to
Include District Court Docket in *United States v. Stevens*, 08-
cr-231 (D.D.C.), in the Record on Appeal ("Following its
decision to hold Appellants in contempt, the District Court
created a separate docket, *In re Contempt Finding in United
States v. Stevens*, 09-mc-273-EGS (D.D.C.), for further contempt
proceedings, which did not include entries for orders, filings,
and transcripts that are at the heart of the contempt finding. .
. .  Only by including the docket entries in *United States v.
Stevens* can this Court have ready access to all of the
information necessary to render a full and fair decision in this
appeal.").  The D.C. Circuit affirmed this Court's decision on
December 9, 2011.  663 F.3d 1270 (D.C. Cir. 2011).

appropriate.   The public would certainly have enjoyed a First

Amendment right of access to those proceedings, under the well-

established precedent discussed above.   However, in view of the

government's unopposed motion to dismiss the indictment and

because Senator Stevens had a liberty interest at stake, it

would have been inappropriate to defer ruling on the

government's motion in order to embark on such proceedings.

     Accordingly, during a public hearing on the government's

motion held in the *Stevens* case, the Court appointed Mr.

Schuelke to investigate and prosecute any criminal contempt

proceedings as may be appropriate.   *See* Transcript of Hearing

46:12 – 47:15, *Stevens*, No. 08-231 (April 7, 2009) ("April 7,

2009 Tr.").   In appointing Mr. Schuelke, the Court explicitly

stated that "the Court has an obligation to determine what

happened here and respond appropriately, and I intend to do so."

*Id.* 47:20-22.   The Court also made clear that the public would

have access to that information.   *See id*. 46:9-11. ("This court

has an independent obligation to ensure that any misconduct is

fully investigated and addressed in an appropriate public

forum.").   Only after appointing Mr. Schuelke did the Court

grant the government's motion to dismiss.   *Id.* 48:17-20.

     After a highly publicized trial and months of post-trial

proceedings during which the prosecution team repeatedly denied

any wrongdoing and zealously defended the guilty verdict it had

obtained, the opposing attorneys cannot now circumvent the First

Amendment and any public accountability by relying on the

government's eleventh-hour motion to dismiss the indictment with

prejudice.[11]   The First Amendment right of access "serves an

important function of monitoring prosecutorial or judicial

misconduct."  *Robinson*, 935 F.2d at 288 (citing *Press-Enterprise*

*II*, 478 U.S. at 8; *Globe Newspaper Co.*, 457 U.S. at 605-06).

That includes a right of access to Mr. Schuelke's Report under

the circumstances of this case.

>    **2.   Access to Mr. Schuelke's Report Will Play a Significant Positive Role in Informing the Public Regarding Criminal Trials in General and the *Stevens* Case in Particular**

The second step in the First Amendment analysis, whether

access to the proceeding or document will play a significant

role in informing the public regarding the matter at issue, is

also satisfied here.  As the Court stated during the April 7,

2009 hearing on the government's motion to dismiss the

indictment, this was a case with many "dramatic and

unfortunately many shocking and disturbing moments."  April 7,

2009 Tr. at 3:14-16. Frequently during the trial, the Court was

---

[11] In fact, just two months before the government's dramatic move
to dismiss the indictment, the prosecution team told the Court
that there was no need for any post-trial discovery and that
"the government is confident that [its response to the
Defendant's post-trial motions] will resolve the need for
further inquiry into the allegations as they relate to the trial
and the convictions of the Defendant."  *See* Gov't's Proposed
Scheduling Order at 1, *Stevens* (Feb. 6, 2009).

presented with persuasive arguments by the defense that the case should be dismissed or a mistrial declared because of prosecutorial misconduct.  *See, e.g.*, Senator Stevens's Mot. to Dismiss Indictment or for Mistrial, *Stevens*, No. 08-231 (Sept. 28, 2008); Def.'s Emergency Mot. to Dismiss Case or for Mistrial Due to Gov't's Continuing *Brady* Violations, *Stevens* (Oct. 2, 2008); Def.'s Mot. to Dismiss Case or for Mistrial Due to Gov't's Failure to Comply with Fed. R. Crim. Proc. 16(a)(1)(E), *Stevens* (Oct 8, 2008).

In response to those arguments, the subject attorneys repeatedly responded that the mistakes were "unintentional," "inadvertent," and/or "immaterial."  For example, when the government failed to produce the exculpatory grand jury testimony of prospective government witness Rocky Williams, the prosecutors claimed that the testimony was immaterial.  *See* Gov't's Opp'n to Def.'s Mot. to Dismiss or for New Trial, *Stevens* (Sept. 29, 2008).  When the government sent Mr. Williams back to Alaska without first advising the defense or the Court, the prosecutors asserted that they were acting in "good faith."  Trial Transcript, Oct. 2, 2008, p.m., at 42.  When government counsel told the Court that the government's key witness, Bill Allen, had not been re-interviewed the day before the hearing on its *Brady* disclosures, this was a "mistaken understanding."  Gov't's Opp'n to Def.'s Motion to Dismiss Due to Alleged

Misconduct at 15 (Oct. 6, 2008).  When the government failed to turn over exculpatory statements from Dave Anderson, another government witness, the prosecutors claimed that the statements were immaterial.  Trial Transcript, Oct. 8, 2008, p.m. at 58, 62, 64, 67.  When the government failed to turn over a grand jury transcript containing exculpatory information, the prosecutors claimed that it was "inadvertent."  Trial Transcript, Oct. 6, 2008, p.m. at 95.  When the government used "business records" that the government knew to be false, the prosecutors said that it was unintentional.  Trial Transcript, Oct. 8, 2008, p.m. at 76.  When the government failed to produce the bank records of Bill Allen and then surprised the defense at trial with Bill Allen's check, it claimed that this, too, was immaterial to the defense.  Trial Transcript, Oct. 8, 2008, a.m. at 3.

Notwithstanding mounting evidence to the contrary, the Court accepted the prosecutors' representations and declined to dismiss the case or declare a mistrial (though the Court did take other steps to ameliorate the prejudice to the defense).  Had the Court known of the misconduct and the information concealed by the government, as documented in the Schuelke Report, those decisions would have been different.

As the Court noted in its November 21, 2011 Order, Mr. Schuelke and Mr. Shields found that the investigation and

prosecution of Senator Stevens were "permeated by the systematic concealment of significant exculpatory evidence which would have independently corroborated [his] defense and his testimony, and seriously damaged the testimony and credibility of the government's key witness." *See* Nov. 21, 2011 Order at 3 (quoting Mr. Schuelke's Report at 1).  Mr. Schuelke and Mr. Shields found that at least some of this concealment was willful and intentional, and related to many of the issues raised by the defense during the course of the *Stevens* trial.  In addition, they found evidence of concealment and misconduct previously unknown to the Court and to the defense, even after the government moved to dismiss the indictment.  For these reasons, access to the Report would certainly play a positive role in informing the public of the flaws in the criminal trial of Senator Stevens.[12]

---

[12] It is also significant to this analysis that the information revealed as a result of the government's motion to dismiss the indictment and vacate the verdict in the *Stevens* case, and this Court's decision to appoint Mr. Schuelke to investigate the subject attorneys, had dramatic implications for two other individuals convicted by the Public Integrity Section as part of the "Polar Pen Investigation" of Alaska political corruption. Peter Kott, former Speaker of the Alaska House of Representatives, and Victor H. Kohring, a former member of the Alaska House of Representatives, had been convicted and were serving prison sentences on bribery and extortion-related charges when the government moved to dismiss the *Stevens* case and the Court appointed Mr. Schuelke.  Because of these events, in April 2009, Mr. Kott and Mr. Kohring moved for release from

Moreover, access to the Report will also play a positive role in the public's understanding of the Court's decision with respect to criminal contempt proceedings in this case.  As noted in the Court's November 21, 2011 Order, despite his findings of significant, widespread, and at times intentional misconduct, Mr. Schuelke is not recommending any prosecution for criminal contempt.  *See* Nov. 21, 2011 Order at 4.  This is because in order to prove criminal contempt beyond a reasonable doubt under 18 U.S.C. § 401(3), the contemnor must disobey an order that is sufficiently "clear and unequivocal at the time it is issued." *Traub v. United States*, 232 F.2d 43, 47 (D.C. Cir. 1955).  Mr. Schuelke concluded that no such order existed in this case.

---

custody and for disclosure of all *Brady* material in their own cases.  In June 2009, the government uncovered *Brady* material in both cases and asked the Ninth Circuit to remand the cases to the District Court of Alaska and to immediately release Kott and Kohring on personal recognizance.  The Ninth Circuit granted the requested relief.  *See* Order, *U.S. v. Kohring*, Case No. 08-30170 (9th Cir. June 10, 2009) Doc. No. 41; Order, *U.S. v. Kott*, Case No. 07-30496 (9th Cir. June 10, 2009) Doc. No. 59.  In March 2011, the Ninth Circuit found that information suppressed by the government in both cases was favorable and material to the defense and that the prosecution violated *Brady* and *Giglio v. United States*, 405 U.S. 150 (1972).  The Court of Appeals vacated the convictions and remanded the cases to the District Court for new trials.  *See United States v. Kohring*, 637 F.3d 895 (9th Cir. 2011); *United States v. Kott*, 423 F. App'x 736 (9th Cir. 2011).  On October 21, 2011, both men pleaded guilty and were sentenced to time served.  Richard Mauer, *Corruption Trials Ended; Kott, Kohring Plead Guilty, Sentenced to Time Served*, Anchorage Daily News (Oct. 22, 2011).

Rather, the Court accepted the repeated representations of the subject prosecutors that they were familiar with their discovery obligations, were complying with those obligations, and were proceeding in good faith. *See* Nov. 21, 2011 Order at 4-5. Having appointed Mr. Schuelke to "investigate and prosecute" criminal contempt proceedings as appropriate, the Court accepts his findings and conclusions. The public can neither understand the basis for Mr. Schuelke's findings and conclusions, however, nor the basis for the Court's decision to accept those findings and conclusions, without access to the Report.

Further, it is not insignificant to the analysis of the public's right of access to Mr. Schuelke's Report that the public bore the cost not only of the *Stevens* trial and post-trial proceedings, which resulted in the government seeking permission to dismiss the indictment with prejudice and vacate the verdict, but also the costs associated with Mr. Schuelke's investigation, and the costs associated with the subject attorneys' legal representation throughout that investigation. *See, e.g.*, Joe Palazzo, *A Long Career Near the Spotlight But Rarely In It*, MAIN JUSTICE (July 17, 2009), http://www.mainjustice.com/2009/07/17/a-long-career-near-the-spotlight-but-rarely-in-it/ (noting that the federal judiciary was paying Mr. Schuelke for the investigation (at a "fraction" of his usual rate) and also paying the lawyers representing the

subject attorneys); Brad Heath, *Taxpayers Pay to Defend Prosecutors in Ted Stevens Case*, USA TODAY, Feb. 2, 2012.

It would be a disservice to the public to require the public to bear these costs, only to deny it the right to access the previously undisclosed facts relevant to the public trial of Senator Stevens and uncovered by Mr. Schuelke's investigation. In fact, the government recently made a similar argument in successfully opposing a defendant's motion to seal a consent judgment. *See* Plaintiff's Memorandum of Points and Authorities in Opposition to the Defendant's Motion to Seal Document, *United States v. Harry L. Thomas*, 06-cv-497 (DAR), Doc. No. 30, at 2-3 ("Since this debt involves guarantees by the United States paid on the original promissory notes, it involves the public funds used to pay the guarantees. The public must have access to the information it needs to appraise the Government's work in protecting and preserving these public funds and in implementing the public policy behind guaranteed student loans.").

Finally, access to the Report will play a significant role in the public's understanding of criminal trials and safeguard against future prosecutorial misconduct, considerations the courts have consistently found weigh heavily in favor of the right of access. *See, e.g.*, *Press-Enterprise II*, 478 U.S. at 12 (stating that public access to criminal proceedings, particularly those where no jury is present, provides a

"safeguard against the corrupt or overzealous prosecutor");
*Globe Newspaper Co.*, 457 U.S. at 606 ("Public scrutiny of a
criminal trial enhances the quality and safeguards the integrity
of the factfinding process, with benefits to both the defendant
and to society as a whole."); *Richmond Newspapers*, 448 U.S. at
569 (finding that open criminal trials "discouraged [ ] the
misconduct of participants"); *Robinson*, 935 F.2d at 288 ("The
first amendment protects public access to [] court proceedings .
. . and serves an important function of monitoring prosecutorial
or judicial misconduct." (citations omitted)).

The *Stevens* case has come not only to symbolize the dangers
of an overzealous prosecution and the risks inherent when the
government does not abide by its discovery obligations, but it
has also been credited with changing the way other courts,
prosecutors, and defense counsel approach discovery in criminal
cases.  *See, e.g.*, Amanda Coyne*, Could Botched Ted Stevens
Prosecution Prompt Federal Legal System Reform?*, Alaska Dispatch
(Nov. 28, 2011), *available at*
http://www.alaskadispatch.com/article/could-botched-ted-stevens-
prosecution-prompt-federal-legal-system-reform (recognizing
attention the *Stevens* case has received in Washington, D.C., and
around the country); David Ingram, *Ted Stevens Became a Symbol
for Prosecutorial Misconduct*, The Blog of Legal Times (Aug. 10,
2010, 4:22 PM), http://legaltimes.typepad.com/blt/2010/08/ted-

stevens-became-a-symbol-for-prosecutorial-misconduct.html

(noting that *Stevens* has drawn "national attention to the

obligations of prosecutors to turn over exculpatory evidence");

*DLA Piper's Zeidenberg on Prosecutorial Misconduct, Stevens and

Lindsey*, 25 CORP. CRIME REPORTER 48 (Dec. 13, 2011), *available at*

http://corporatecrimereporter.com/zeidenberg12132011.htm

(stating that judges are taking allegations of prosecutorial

misconduct more seriously as a result of *Stevens*); Carrie

Johnson, *Court Ruling Reignites Debate Over Sharing Evidence*,

NPR (Jan. 12, 2012), *available at*

http://www.npr.org/2012/01/12/145102823/court-ruling-reignites-

debate-over-sharing-evidence ("Ever since the Ted Stevens

fiasco, there have been a lot of nervous people in the Justice

Department — all worried about the consequences of making a bad

decision.").

In revealing what happened in the *Stevens* case, Mr.

Schuelke's Report sheds significant light on these important

issues.

> **3.    The Opposing Attorneys Have Made No Showing of a
>        Compelling Interest that Necessitates Closure, Nor
>        Have They Shown that No Alternatives to Closure Will
>        Adequately Protect Any Such Interest**

As noted *supra*, the First Amendment right of access to

criminal proceedings is not absolute, but the presumption of

openness is overcome only by a compelling interest and a showing

that no alternatives to closure can adequately protect that
interest.  *See Press-Enterprise I*, 464 U.S. at 510.   The
opposing attorneys have made no such showing in this case.
While objecting generally to release of the Report as unfair and
prejudicial to the opposing attorneys' privacy and reputational
interests, those attorneys have not specified any compelling
interest that would meet their high burden to justify keeping
the Report under seal.[13]   *See, e.g.*, *Press-Enterprise II*, 478
U.S. at 14-15 (holding that state interest in preventing
inflammation of public opinion against defendant, and informing
potential jurors of exculpatory information wholly inadmissible
at the actual trial, did not justify closing preliminary
hearing); *Globe Newspaper Co.*, 457 U.S. at 607-10 (concluding
that state interests in protecting minor victims of sex crimes
from trauma and embarrassment and in encouraging victims to come
forward and testify did not justify mandatory rule closing
criminal trials during testimony of such minor victims);
*Richmond Newspapers*, 448 U.S. at 580-81 (holding state interest
in completing trial proceedings for defendant, who had been
tried four times, in part because prospective jurors were
exposed to extensive media coverage, insufficient to close trial

---

[13] Nor have any of the opposing attorneys contended that the
Report is factually inaccurate, with the exception of Mr.
Bottini, who asserted that the Report "contains inaccuracies"
but identified none.   Bottini Submission at 2.

proceedings); *Robinson*, 935 F.2d at 290-92 (finding state interests in maintaining secrecy of grand jury proceedings, not compromising ongoing criminal investigation, and protecting safety of defendant and his family did not justify sealing plea agreement when defendant's involvement in case, and ongoing cooperation with police, were already within the public knowledge); *cf. Brice*, 649 F.3d at 796-97 (assuming without deciding that First Amendment affords access to material witness proceedings but upholding trial court's closure of the proceedings, where opening such proceedings would reveal "private and painful" information related to then-juvenile victims' physical and mental health, constitute a "grotesque invasion of the victims' privacy[,]" and trial court made finding that no alternatives to closure could protect the compelling privacy interest (internal citation and quotation marks omitted)).

Here, the identity of the subjects was known from the outset of the investigation, the matters under investigation were largely known to the public from the outset and arose from the subject attorneys' conduct during the proceedings in a highly-publicized criminal trial, and some of the subject attorneys have themselves made statements to the media regarding Mr. Schuelke's investigation.  Under these circumstances, the opposing attorneys have not established an interest sufficiently

compelling to justify withholding the Report.[14]   Moreover, as
discussed below, the opposing attorneys' arguments that the
First Amendment right of access is inapplicable because Mr.
Schuelke's investigation was akin to a grand jury proceeding are
unavailing.

    **B.   The Nature of the Schuelke Investigation**

    The opposing attorneys' principal argument against publicly
releasing Mr. Schuelke's Report is that the investigation
conducted by Mr. Schuelke was "substantially the same as a grand
jury proceeding and should be bound by the same secrecy rules
governing grand jury investigations."  Sullivan Motion at 6; *see
also* Marsh Motion at 5; Goeke Memorandum at 1.  The opposing
attorneys maintain that the reasons underlying the grand jury
secrecy rules are equally applicable to Mr. Schuelke's
investigation and that it would be unfair and prejudicial to the
subject attorneys to release the Report when those attorneys
will have no opportunity to challenge the Report's findings in
an adversarial proceeding.  *See, e.g.*, Sullivan Motion at 8-12;
Marsh Motion at 11; Goeke Memorandum at 3.  The Court will
discuss each of these arguments in turn.

---

[14]   Having concluded that the public has a First Amendment right
of access to Mr. Schuelke's Report, the Court need not determine
whether there is also a common law right of access to the Report
as a judicial document.  Stevens Memo at 6-8.

1.    **Grand Jury Secrecy**

Grand jury secrecy is a long-established principle central
to our criminal justice system.  *See, e.g.*, *Douglas Oil Co. v.
Petrol Stops Northwest*, 441 U.S. 211, 219 n.9 (1979) ("Since the
17th century, grand jury proceedings have been closed to the
public, and records of such proceedings have been kept from the
public eye.  The rule of grand jury secrecy was imported into
our federal common law and is an integral part of our criminal
justice system." (internal citations omitted)).  The reasons for
such secrecy are also well-established.

> First, if preindictment proceedings were made public,
> many prospective witnesses would be hesitant to come
> forward voluntarily, knowing that those against whom
> they testify would be aware of that testimony.
> Moreover, witnesses who appeared before the grand jury
> would be less likely to testify fully and frankly, as
> they would be open to retribution as well as to
> inducements.  There also would be the risk that those
> about to be indicted would flee, or would try to
> influence individual grand jurors to vote against
> indictment.  Finally, by preserving the secrecy of the
> proceedings, we assure that persons who are accused
> but exonerated by the grand jury will not be held up
> to public ridicule.

*Douglas Oil*, 441 U.S. at 219.  For these reasons, Federal Rule
of Criminal Procedure 6(e)(2)(B) prohibits disclosure of
"matter[s] occurring before the grand jury."

The opposing attorneys' reliance on this principle falters,
however, because (a) Mr. Schuelke's investigation was not
conducted as part of a grand jury proceeding; (b) Rule 6(e) does

not apply to Mr. Schuelke's investigation; and (c) the reasons underlying the need for grand jury secrecy are largely inapplicable to Mr. Schuelke's investigation and the resulting Report.

### a.   Mr. Schuelke's Investigation Did Not Include a Grand Jury Proceeding and Differed in Important Respects from a Grand Jury Proceeding

The Fifth Amendment to the United States Constitution provides in part that no person can be charged with a "capital, or otherwise infamous" crime without a presentment or indictment of a Grand Jury.[15]   Federal Rule of Criminal Procedure 6 governs the grand jury process, including summoning and discharging the grand jurors, the requisite number of grand jurors, who may be present when the grand jury is in session, who may be present when the grand jury is voting, and the requirements and exceptions to grand jury secrecy.   Federal grand juries are summoned by the United States District Court for a particular district, and they are administered by that court, which receives any indictments the grand jury returns.   Fed. R. Crim. P. 6.   Grand jurors take an oath, typically administered by the chief judge of the district court to which the grand jury was summoned.   *See, e.g.*, *U.S. v. Williams*, 504 U.S. 36, 47 (1992).

---

[15] An individual can waive her right to an indictment by grand jury, in which case a prosecutor can file with the court a charging document known as an "Information," which need not be approved or even presented to a grand jury.   Fed. R. Crim. P. 7(b).

This Court appointed Mr. Schuelke during the *Stevens* case to "investigate and prosecute such criminal contempt proceedings as may be appropriate" against the subject attorneys, pursuant to Federal Rule of Criminal Procedure 42(a)(2).[16]  April 7, 2009 Order.  Neither Mr. Schuelke, Mr. Shields, nor any of the individuals or subjects appeared before a grand jury in relation to Mr. Schuelke's investigation.  *See* Declaration of Henry F. Schuelke, III ("Schuelke Decl.") ¶ 4.

At least one of the opposing attorneys relies on *In re Special Proceedings*, 373 F.3d 37 (1st Cir. 2004), for the argument that Mr. Schuelke's investigation was "substantially the same" as a grand jury proceeding.  Sullivan Motion at 6.  In *In re Special Proceedings*, the U.S. Court of Appeals for the

_____

[16] Rule 42(a)(2) provides that the court "must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney."  Fed. R. Crim. P. 42(a)(2).  Where, as here, the government attorneys are involved or possible subjects of the prosecution, the court may choose to appoint a non-government attorney.  *See, e.g.*, *In re Special Proceedings*, 373 F.3d 37, 43 (1st Cir. 2004) (upholding district court's decision to appoint non-government attorney under Fed. R. Crim. P. 42(a)(2) where the district court had "multiple reasons for concern about having the government handle the matter[,]" including that the prosecution was a potential source of the leak being investigated in the contempt proceeding); *see also Young v. United States ex rel. Vuitton Et Fils S.A.*, 481 U.S. 787, 800-01 (1987) ("While contempt proceedings are sufficiently criminal in nature to warrant the imposition of many procedural protections, their fundamental purpose is to preserve respect for the judicial system itself.  As a result, courts have long had, and must continue to have, the authority to appoint private attorneys to initiate such proceedings when the need arises.").

First Circuit concluded with little discussion or analysis that the "principal reasons for grand jury secrecy" applied with equal force to the special prosecutor's investigation, and that "[w]hat the special prosecutor is currently doing is sufficiently like what a grand jury would do to make the analogy decisive."  373 F.3d at 47.

That case is of limited relevance here, however.  As an initial matter, the Court notes that the First Circuit's conclusion about the analogy between the special prosecutor and the grand jury was in the context of a discussion of "an ancillary matter" before that court, *i.e.*, whether to unseal four documents and a deposition transcript.[17]  *Id.* at 46. Second, and more importantly, the First Circuit's decision was made during an *ongoing* investigation, where the need for secrecy is more compelling.  *See id*. at 46-47.  Finally, the investigation in that case focused on finding the source of a leak that violated the district court's protective order, and the scope and subjects of the investigation may not have been publicly known or even known to the subjects themselves, requiring a greater level of secrecy.  *See id*. at 40-41.  In

---

[17] The principal issue before the court in *In re Special Proceedings* was a subject's challenge to the district court's appointment of a private attorney, rather than a government attorney, to prosecute contempt proceedings.  As discussed *supra* n.16, the Court of Appeals rejected the subject's multiple arguments and affirmed the district court's appointment of a non-government attorney.

this case, Mr. Schuelke's investigation has concluded.
Moreover, the scope and subjects of the investigation have
always been publicly known and, as discussed *infra* Part
II.B.1.c, the reasons underlying grand jury secrecy, including
the two reasons cited by the First Circuit in *In re Special
Proceedings*, *i.e.*, "to protect the innocent against unfair
publicity and to prevent tampering or escape by targets[,]" 373
F.3d at 47, are largely inapplicable to the unique circumstances
in this case.

In the present case, not only was Mr. Schuelke's
investigation completely unrelated to and unaffiliated with any
grand jury, it also differed in many significant ways from the
grand jury process.  For example, although Mr. Schuelke was
authorized by the Court to subpoena witnesses, none of the
subjects was subpoenaed; rather they appeared for deposition
voluntarily.  Schuelke Decl. ¶ 3.  Moreover, whereas witnesses
in the grand jury are not permitted to have their counsel
present in the grand jury, each of the subjects and other
witnesses deposed in this case was represented by counsel, and
counsel not only appeared with their client at the deposition,
but also were permitted freely to ask questions during the
depositions.  *See* Schuelke Decl. ¶ 3.  Significantly, and unlike
many grand jury investigations, the subjects here were provided
with the same underlying documents and information made

35

available by the Justice Department to Mr. Schuelke, who adopted an open-file discovery policy.  *See* Schuelke Decl. ¶ 2.

Finally, not only were the subjects of Mr. Schuelke's investigation publicly known from the outset – indeed, they were announced in open court, named in the Court's Order appointing Mr. Schuelke, and widely covered in the media – but the subjects knew from the outset that the Court intended to make public Mr. Schuelke's findings; in fact, the public's right to know of any misconduct during the *Stevens* case was the impetus for appointing Mr. Schuelke.  *See* April 7, 2009 Tr. 46:7-11 ("[T]he events and allegations in this case are too serious and too numerous to be left to an internal investigation that has no public accountability.  This court has an independent obligation to ensure that any misconduct is fully investigated and addressed in an appropriate public forum."); April 7, 2009 Order (identifying subjects); *see also* Neil A. Lewis, *Tables Turned on Prosecution in Stevens Case*, N.Y. TIMES, Apr. 8, 2009, at A1 (detailing Judge Sullivan's order to conduct an external investigation and naming its subjects); James Oliphant, *Ted Stevens' Charges Dismissed as Judge Excoriates Prosecutors*, L.A. TIMES, Apr. 8, 2009; Del Quentin Wilber*, Judge Orders Probe of Attorneys in Stevens Case; Prosecutor Misconduct Alleged in Former Senator's Trial*, WASH. POST, Apr. 8, 2009, at A01.

b.   **Rule 6(e) Does Not Apply to Mr. Schuelke's Investigation**

Federal Rule of Criminal Procedure 6(e) requires grand jury secrecy with certain exceptions.[18]  Because the rule governs grand jury proceedings, it does not apply to Mr. Schuelke's investigation.  Nevertheless, the opposing attorneys argue that because the investigation was "like" a grand jury proceeding, the secrecy rules should apply.  At least one opposing attorney cites to *In re Sealed Case 00-5116*, 237 F.3d 657 (D.C. Cir. 2004), for support.  *See* Sullivan Motion at 7, n.3.  This argument is unpersuasive.  In *In re Sealed Case 00-5116*, the D.C. Circuit considered whether an investigation by the FEC had to be handled under seal.  *See* 237 F.3d at 661-62.  The court looked to the FEC's statutory enforcement scheme and concluded:

> The plain language of these provisions and the overall purpose and structure of the statutory scheme create a strong confidentiality interest analogous to that protected by Federal Rule of Criminal Procedure 6(e)(6).  In both contexts, secrecy is vital "to protect [an] innocent accused who is exonerated from

---

[18] The exceptions in the Rule providing for when grand jury information may be made public are not exclusive.  *See, e.g.*, *In re Kutler*, 800 F. Supp. 2d 42, 45 (D.D.C. 2011) ("Consistent with this principle, it has been the initiative of courts—through the exercise of their inherent authority regarding grand jury records—that has shaped the development of Rule 6(e).  Since its adoption by the Supreme Court in 1944, the rule has been amended to reflect 'subsequent developments wrought in decisions of the federal courts.'  These amendments confirm that courts' ability to order the disclosure of grand jury records has never been confined by Rule 6(e)'s enumerated exceptions." (citation omitted)).

disclosure of the fact that he has been under investigation."

*Id.* at 667 (citations omitted).

In this case, there is no such statutory or regulatory enforcement scheme requiring confidentiality.  Moreover, as discussed *supra*, the subjects of the investigation, the fact that they were under investigation, and the matters and scope of the investigation have been widely publicized from the outset.

 Next, the opposing attorneys argue that the protective orders entered by this Court during Mr. Schuelke's investigation provide for confidentiality of the discovery material produced by the Department of Justice during the investigation, including pre-existing grand jury material covered by Rule 6(e), and therefore Mr. Schuelke's Report "contains the equivalent of grand jury material prohibited from disclosure by grand jury secrecy rules."  Sullivan Motion at 8; *see also* Marsh Motion at 7, 10.  Fatal to the opposing attorneys' argument, however, are the facts that (a) the Protective Orders entered by the Court at the request of the Department of Justice provided the Department of Justice – not the subject attorneys – certain protections with respect to the material it was producing to Mr. Schuelke and to the subject attorneys; and (b) in response to the Court's November 21, 2011 Order directing the Department of Justice pursuant to the Amended Protective Order to file a motion if it

believed "any of the Material(s) or sealed pleadings or transcripts identified by Mr. Schuelke in his Report should be withheld from the public," the Department of Justice:

> [A]dvise[d] the court that it does not intend to file a motion regarding Mr. Schuelke's report. The government does not contend there is any legal prohibition on the disclosure of any references in Mr. Schuelke's report to grand jury material, court-authorized interceptions of wire communications, or any sealed pleadings or transcripts that have now been unsealed. Moreover, in order to be as cooperative as possible with Mr. Schuelke's investigation, the Department did not withhold any information from Mr. Schuelke on the basis of a privilege belonging to the government, such as the deliberative process or attorney-work product privilege, and therefore asserts no such privilege now with respect to the information contained in Mr. Schuelke's report.

DOJ Notice at 1-2 (citing Fed. R. Crim. P. 6(e)(3)(E)(i); 18 U.S.C. § 2517(2)) (footnote omitted).

Accordingly, release of the Report does not violate any legal or procedural rules requiring confidentiality or secrecy.

### c. The Reasons Underlying Grand Jury Secrecy are Largely Inapplicable to Mr. Schuelke's Investigation

As cited previously, the reasons for grand jury secrecy are well established:

> First, if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements. There also would be the risk that those about to be indicted would flee, or would try to

> influence individual grand jurors to vote against
> indictment.  Finally, by preserving the secrecy of the
> proceedings, we assure that persons who are accused
> but exonerated by the grand jury will not be held up
> to public ridicule.

*Douglas Oil*, 441 U.S. at 218-19.

These reasons are largely inapplicable to Mr. Schuelke's

investigation.  First, the subjects in this matter are all

government attorneys, and each of them knew or had reason to

know what witnesses Mr. Schuelke would likely be interviewing or

deposing, most of whom were other government attorneys or

employees.  As for the non-subject witnesses, because the

subjects and scope of the investigation were publicly known from

the outset and the investigation itself was the source of

considerable media attention, any hesitation to "come forward

voluntarily" could not be alleviated by secrecy.

Second, because the subjects are government attorneys, as

were most of the other witnesses, the Court assumes that the

risk that these individuals would be "less likely to testify

fully and frankly" or that they would be "open to retribution as

well as to inducements" is minimal, regardless of the level of

secrecy afforded by Mr. Schuelke's investigation.  Similarly,

the risk that the subjects might flee seems remote (in fact, the

subjects remain attorneys employed by the Department of

Justice), as does the risk that they would try to influence Mr.

Schuelke or Mr. Shields to recommend against prosecution.

Moreover, Mr. Schuelke and Mr. Shields are both well-respected attorneys with a wealth of experience, including prosecutorial experience, and highly unlikely to be susceptible to any such attempts to influence their decisions in this matter.[19]

The final factor, protecting the accused from "public ridicule," is discussed below, though it is worth noting here that the public has been well aware of the identity of the subjects from the outset.

### 2.   Potential Prejudice to the Subject Attorneys

The opposing attorneys argue that grand juries may not accuse a person of criminal misconduct unless they return a valid indictment, and that grand juries may not issue reports or presentments if the investigation does not lead to an indictment.  *See* Sullivan Motion at 9-10 (citing authorities). Because Mr. Schuelke and Mr. Shields are not recommending that

---

[19] Mr. Schuelke served in the Judge Advocate General's Corps, U.S. Army, including as a Military Judge in the U.S. Army Judiciary.  Mr. Schuelke is also a former Assistant United States Attorney for the District of Columbia, and has served as Special Counsel to the U.S. Senate Committee on Foreign Relations, Special Counsel to the U.S. Senate Select Committee on Ethics, a member of this court's Committee on Grievances, and currently serves as Special Counsel to the District of Columbia Commission on Judicial Disabilities and Tenure.  He has practiced white-collar criminal defense for thirty-two years. Mr. Shields served as an Assistant District Attorney in the New York County District Attorney's Office, and later as a Special Assistant Attorney General in New York, where he led investigations and prosecutions of health care fraud.  Mr. Shields has practiced white-collar criminal defense for twenty-four years.

the subject attorneys be prosecuted for criminal contempt, the opposing attorneys contend that the Report should remain sealed, based on the same reasons that grand juries are prohibited from issuing reports in cases where there is no indictment.

As the opposing attorneys point out, there are compelling reasons to prohibit grand juries from issuing reports in cases where there will not be an indictment. *See* Sullivan Motion at 9-10; Marsh Motion at 11.  For example, grand juries are not adversarial proceedings, nor are they governed by the rules of evidence, so the grand jury can "hear any rumor, tip, hearsay, or innuendo it wishes, in secret, with no opportunity for cross-examination." *In re Grand Jury Proceedings, Special Grand Jury 89-2 (Rocky Flats Grand Jury)*, 813 F. Supp. 1451, 1463 (D. Colo. 1992) (citation omitted).  Moreover, "[t]he grand jury is not required to hear or consider evidence which would exonerate a target of an investigation, and the fairness of its methods is unreviewable." *Id.*  Finally, as two opposing attorneys argue, "a report issued by a non-indicting grand jury making accusations against an uncharged individual causes the individual to suffer public stigma and reputational damage without affording the individual any meaningful opportunity to rebut the allegations."  Sullivan Motion at 10; *see also* Marsh Motion at 11-12.

The Court is not insensitive to this issue and recognizes that Mr. Schuelke is not recommending criminal contempt proceedings.  Nevertheless, the unique circumstances of this case are distinct from the concerns expressed by the opposing attorneys and the *Rocky Flats* court, and any claimed prejudice to the subject attorneys is further addressed by the Court's decision to permit the subject attorneys to submit comments for publication with the Report.[20]

First, although Mr. Schuelke's investigation was not an adversarial proceeding, the subject attorneys were represented by counsel, who were permitted and did ask questions during the depositions of their clients.  *See* Schuelke Decl. ¶ 3.  The subjects were also provided access to the underlying evidence and therefore had the opportunity to, and did, present defenses.

---

[20] One of the opposing attorneys argues that the Report should be permanently sealed because Rule 42 does not authorize or contemplate such a report.  *See* Sullivan Motion at 21, n.10. That argument is unpersuasive.  Rule 42 and the case law authorize the Court to appoint a non-government attorney to prosecute criminal contempt proceedings if it is in the interest of justice.  *See Young*, 481 U.S. at 800-01; *In re Special Proceedings*, 373 F.3d at 43.  The purpose of the Rule is to "preserve respect for the judicial system itself." *Young*, 481 at 800.  It seems incongruous that the Rule would authorize the court to appoint such an attorney but not permit the attorney to meaningfully report back to the court after investigating the matter at issue.  Such a result would be inconsistent with the Rule's purpose to "preserve respect for the judicial system itself."  A detailed written report is all the more appropriate in a complex case such as this, requiring review of more than 150,000 pages of documents, numerous depositions, and extensive research.

*See Id.* ¶ 2.  In fact, this is evident from the deposition testimony excerpted at length in the Report.  Moreover, while Mr. Schuelke's investigation was not specifically governed by the rules of evidence, given the nature and scope of the investigation and its subjects, as well as Mr. Schuelke and Mr. Shields' experience investigating, prosecuting and defending criminal matters, *see supra* n.19, there should be no concern regarding their inclination to consider or be susceptible to "rumor, tip, hearsay, or innuendo."[21]  In addition, as is clear from his Report, Mr. Schuelke did consider evidence favorable to the subjects of his investigation, and drew certain conclusions based on that evidence.  Releasing Mr. Schuelke's Report will actually subject the "fairness of [his] methods" to review. *Rocky Flats*, 813 F. Supp. at 1463.

Finally, the need to guard against any public stigma and reputational damage in releasing the Report is diminished by the unique circumstances of this case.  Here, both the issues under investigation and the subjects of the investigation have been known and widely publicized from the outset, as they stemmed from very public proceedings.  The subjects were also on notice from the outset that the Court intended the results of the investigation to be public because the Court announced that

---

[21] The Report makes abundantly clear that its findings and conclusions are based exclusively on the documentary record and witness testimony.

intent during the April 7, 2009 hearing when it appointed Mr. Schuelke.  April 7, 2009 Tr. at 46:7-11 ("[T]he events and allegations in this case are too serious and too numerous to be left to an internal investigation that has no public accountability.  This court has an independent obligation to ensure that any misconduct is fully investigated and addressed in an appropriate public forum.").  In fact, at least some of the subject attorneys themselves have made statements to the press about the investigation.  *See, e.g.*, Mike Scarcella, *Judge: Ted Stevens Investigation Reveals Prosecutorial Misconduct*, THE BLOG OF LEGAL TIMES (Nov. 21, 2011, 11:57 AM), http://legaltimes.typepad.com/blt/2011/11/judge-ted-stevens-investigation-reveals-proseuctorial-misconduct.html; Mike Scarcella, *Appeals Court Backs Civil Contempt Ruling in Ted Stevens Case*, THE BLOG OF LEGAL TIMES (Dec. 9, 2011 4:57 PM), http://legaltimes.typepad.com/blt/2011/12/appeals-court-backs-civil-contempt-ruling-in-ted-stevens-case.html.

Moreover, it is significant that two of the six subject attorneys either do not oppose and/or favor publicly releasing the Report.  In addition, all of the subject attorneys work for the Department of Justice and were investigated by the Department's Office of Professional Responsibility ("OPR"), presumably regarding the same conduct investigated by Mr. Schuelke, and the Department of Justice has reviewed Mr.

Schuelke's Report.[22]   Accordingly, the subject attorneys'
employer is already aware of the information in the Report, and
therefore any argument that they will suffer professional damage
from release of the Report is speculative.

Nevertheless, in order to address any claimed prejudice
that could result from releasing the Report when its findings
will not be subjected to an adversarial proceeding, the Court
will afford the subject attorneys another opportunity to submit
comments on the Report. *See supra* n.8.  Those comments shall be
published with the Report, to enable the public to consider the
subject attorneys' comments simultaneously with the Report.
This is in keeping with the process followed by the D.C. Circuit
in *In re North* and subsequent cases, where there were similar
concerns about publicly releasing a report containing

---

[22] The Court notes that while the government promised, both in
its April 1, 2009 Motion to Dismiss and at the April 7, 2009
hearing, to share the results of its OPR investigation at least
with the Court, if not the public, the Court has yet to either
see that report or be invited to see that report. *See* Mot. of
the United States to Set Aside Verdict and Dismiss Indictment
With Prejudice at 2, *Stevens* (Apr. 1, 2009); April 7, 2009 Tr.
at 14:24-15:3.  The Attorney General has, however, recognized
the very public nature of the *Stevens* case and its aftermath.
*Oversight of the U.S. Department of Justice: Hearing before the
Senate Judiciary Comm.*, Webcast at 66:00 - 66:10 (Nov. 8, 2011),
http://www.judiciary.senate.gov/hearings/hearing.cfm?id
=9b6937d5e931a0b792d258d9b32d21a8 (last visited Feb. 2, 2012),
("I want to share as much of [the OPR report] as we possibly can
given the very public nature of that matter and the very public
nature of the decision I made to dismiss the case[.]").

allegations that would not be subjected to an adversarial process.  *See North*, 16 F.3d at 1236, 1241; *see also In re Cisneros*, 426 F.3d 409, 413-14 (D.C. Cir. 2005); *In re Espy*, 259 F.3d 725, 729 (D.C. Cir. 2001).

### C.    The D.C. Circuit's Decision in *In re North*

In the case of *In re North*, the D.C. Circuit considered whether to publicly release the Independent Counsel's report on the Iran-Contra investigation.  16 F.3d 1234.  To be clear, the expired Independent Counsel statute is obviously not directly applicable to this case.  Nevertheless, the Circuit's analysis in *North* is instructive.  In *North*, as here, the court was faced with objections to publicly releasing the Independent Counsel's report based on arguments that (1) it was unfair to release a report raising allegations of wrongdoing when those allegations would not be tested by an adversarial process; and (2) the report contained grand jury material subject to Federal Rule of Criminal Procedure 6(e)'s secrecy requirements.  As discussed *supra* Part II.B., those are the same arguments raised by the subject attorneys opposed to releasing Mr. Schuelke's Report.

In the final analysis, and not without reservations, the *North* court determined that the report should be released, with the inclusion of an appendix consisting of comments from persons named in the report.  16 F.3d at 1241.  The court reached that determination after weighing four factors, and it later used the

same framework and reached the same or similar conclusions in two subsequent cases involving whether to release reports by two other Independent Counsel.  *See id.* at 1240-41; *Cisneros*, 426 F.3d at 413-14; *Espy*, 259 F.3d at 729-30.

This Court has already determined, as discussed *supra* Part II.A, that the First Amendment right of access compels disclosure of Mr. Schuelke's Report.  A brief discussion of the factors set forth in *North*, however, demonstrates that those factors also overwhelmingly weigh in favor of disclosure.  Those factors are:

> (1) whether the subjects of the investigation have already been disclosed to the public; (2) whether the subjects do not object to the filings being released to the public; (3) whether the filings contain information which is already publicly known[;] and (4) whether the [c]ourt filings consist of legal or factual rulings in a case which should be publicly available to understand the court's rules and precedents or to follow developments in a particular matter.

*North*, 16 F.3d at 1240; *see also Cisneros*, 426 F.3d at 413; *Espy*, 259 F.3d at 729.

### 1. Whether the Subjects of the Investigation Have Already Been Disclosed to the Public

This factor obviously requires little discussion or analysis.  As discussed throughout, the subject attorneys were named in the Court's public order appointing Mr. Schuelke, have been identified in any number of articles regarding the

investigation, and several have made statements to the media themselves about Mr. Schuelke's investigation.

### 2.  Whether the Subjects Do Not Object to the Filings Being Released to the Public

As previously noted, four of the six subject attorneys oppose releasing Mr. Schuelke's Report – though the degree and extent of their opposition varies. *See supra* n.5.  One of the subject attorneys, on the other hand, "welcomes" release of the Report, and the sixth subject attorney does not oppose release. *See* Morris Submission; Welch Notice.  It is not possible, nor would it be appropriate under the unique circumstances in this case, to release only those portions that relate to the non-opposing attorneys. *See, e.g.*, *North*, 16 F.3d at 1240 ("Movants seeking release and movants opposing are the subjects of accounts as intertwined and inseparable as fibers within the strands of a woven rope.").  Accordingly, while this factor independently might weigh against release, it is heavily outweighed by the other factors under *North* and for all of the reasons discussed previously in this decision.

### 3.  Whether the Filings Contain Information Which is Already Publicly Known

This factor weighs heavily in favor of disclosure.  Not only does the Report relate to representations made and actions taken by the subject attorneys during and leading up to the highly-publicized *Stevens* trial, it also reveals underlying

49

facts that counter or contradict some of those actions and

representations.  In other words, withholding the Report leaves

the public in some cases with only the wrong or misleading

information.[23]  *See North*, 16 F.3d at 1240 ("Not only is the

information widely known, it is widely known incorrectly.").

> **4.    Whether the Court Filings Consist of Legal or Factual Rulings In a Case Which Should Be Publicly Available to Understand the Court's Rules and Precedents or to Follow Developments in a Particular Matter**

Finally, this factor also weighs heavily in favor of

disclosure.[24]  Again, the extent to which the media and the

---

[23] Merely by way of example, these include revelations that Rocky Williams believed that his time was being included in the Christensen bills, which supported the defense's contention that the Senator and Mrs. Stevens believed they were paying for the VECO employee's time in the Christensen bills; the prosecutors dismissed this argument made by the defense while concealing the favorable statements made by Williams.  Similarly, the prosecutors made a number of representations to the Court regarding Bill Allen and Bambi Tyree that are now known to be false.  The Court made a number of rulings based on these misrepresentations, including limiting the defense's ability to cross-examine Allen about those issues.  In addition, the government notified Allen's attorney just before trial that an active state investigation into Allen's sex with minors had "merit," and Allen's counsel informed the government that Allen would assert his Fifth Amendment privilege if asked about these matters.  The government concealed all of this from the defense and from the Court.  And of course, there are the revelations in the Report regarding the "CYA" testimony.  Withholding Mr. Schuelke's Report under these circumstances leaves the public with incomplete and inaccurate information about the matters involved in the *Stevens* trial and uncovered by Mr. Schuelke's investigation.

[24] Curiously, one opposing attorney argues that because Mr. Schuelke's Report contains "substantial allegations of

public followed the developments in the *Stevens* trial is nearly

unprecedented.  As the Court said in its November 21, 2011

Order,

> The public availability of the results of Mr.
> Schuelke's Report will facilitate the public's
> understanding of the Court's rulings in the *Stevens*
> case and the constitutional and procedural
> requirements inherent in our criminal justice system,
> and will better enable the public to follow and place
> in context the developments in the *Stevens* case, all
> of which, again, were widely publicized at the time.

November 21, 2011 Order at 12.

Moreover, as discussed *supra*, the *Stevens* trial and its

aftermath have led to an ongoing national dialogue regarding the

constitutional and procedural requirements – or lack thereof –

that protect defendants in the criminal justice system.  *See,*

*e.g.*, Mike Scarcella, *Divided on Discovery; A Bare Majority of*

*Judges Would Impose Stricter Rules on Prosecutors*, NATIONAL LAW

JOURNAL, Mar. 14, 2011 (explaining that *Stevens* led to a call for

---

'concealment and serious misconduct that was previously
unknown,'" the Report "could not possibly help explain the
Court's rulings in *United States v. Stevens* or assist the public
in following developments in a trial that ended in 2008."  Marsh
Motion at 10 (quoting the Court's November 21, 2011 Order).  In
other words, the opposing attorney appears to argue that because
the information was concealed from the defense and the public
long enough for the government to move to dismiss the indictment
(upon discovery by new Department of Justice attorneys that some
of the information previously withheld from the defense by the
subject attorneys would at least require a new trial), the
evidence of that concealment and misconduct could never have a
bearing on what occurred in the *Stevens* trial and should never
come to light.  The Court finds this argument utterly devoid of
merit.

the Judicial Conference Criminal Rules Committee to reconsider expanding prosecutors' discovery obligations; according to a survey by the Federal Judicial Center, 51 percent of federal and magistrate judges favor changing Federal Rule of Criminal Procedure 16 to require the disclosure of all exculpatory information to the defense); American Bar Association, *Select Committee Report on the ABA Annual Meeting* 14 (Sept. 2, 2011), *available at* http://www.americanbar.org/groups/leadership/2011_annual_house_m tg_docs.html (follow "Select Committee Report (September 7, 2011)" hyperlink) (noting approval by ABA House of Delegates of Criminal Committee Resolution 105D, urging governments to adopt formal disclosure rules requiring prosecutors to disclose exculpatory evidence to defense) (last visited Feb. 6, 2012); MODEL CRIMINAL CODE, 18 U.S.C. § 3014 (Draft Proposed by Nat'l Ass'n of Criminal Defense Lawyers 2011), *available at* http://www.nacdl.org/NewsReleases.aspx?id=20531 (follow "NACDL Proposed 18 USC § 3014" hyperlink at bottom of page) (requiring prosecutors to disclose information favorable to the defendant) (last visited Feb. 6, 2012).  The exhaustive efforts of Mr. Schuelke and Mr. Shields, which involved review of more than 150,000 pages of documents, twelve depositions, witness interviews, and a comprehensive understanding of the government's investigation, charges, pre-trial and trial

proceedings, not only in the *Stevens* matter, but also in

relevant aspects of at least two other federal prosecutions

brought by the Department of Justice's Public Integrity Section

against Alaskan state officials, can greatly inform that

national discussion.[25,26]

## III. Conclusion

As set forth above, the public has a First Amendment right

of access to Mr. Schuelke's Report.  In fact, under the

circumstances of this case, it would be a disservice and an

injustice to withhold the results of the Report, particularly

---

[25] *See supra* n.12.

[26] As noted *supra*, n.16, Rule 42(a)(2) authorizes the court to
appoint a private attorney to prosecute a criminal contempt
proceeding where the "interest of justice" so requires.  The
purpose of the rule is "to preserve respect for the judicial
system itself."  *See Young*, 481 U.S. at 800-01.  While the need
to initiate criminal contempt proceedings, and to make such an
appointment in the interest of justice, is thankfully rare, when
it does arise, the rule's purpose of "preserving respect for the
judicial system" depends on the willingness of a private
attorney to accept and carry out such an appointment.  Here, the
appointment to investigate the six subject attorneys and
determine the extent of any prosecutorial misconduct in the
*Stevens* case was a tremendous undertaking, both because of the
scope and the nature of the investigation.  The Court is
profoundly grateful first and foremost to Mr. Schuelke, and also
to his colleague Mr. Shields and the law firm of Janis, Schuelke
& Wechsler, for the significant resources they invested in this
matter over the course of nearly three years.  The Court is
particularly appreciative of what is so evident in the Report,
and that is the thoughtful, diligent, fair, and sensitive way in
which Mr. Schuelke and Mr. Shields approached their
responsibilities pursuant to this appointment.  In the Court's
view, their professionalism does indeed "preserve respect for
the judicial system itself."

where the Court indicated from the outset that it would make the
Report public.  Mr. Schuelke's Report chronicles significant
prosecutorial misconduct in a highly publicized investigation
and prosecution brought by the Public Integrity Section against
an incumbent United States Senator.  The government's ill-gotten
verdict in the case not only cost that public official his bid
for re-election, the results of that election tipped the balance
of power in the United States Senate.  That the government later
moved to dismiss the indictment with prejudice and vacate the
verdict months after the trial does not eradicate the
misconduct, nor should it serve to shroud that misconduct in
secrecy.  The First Amendment serves the important function of
monitoring prosecutorial misconduct, but the public cannot
monitor the misconduct in the *Stevens* case without access to the
results of Mr. Schuelke's investigation, which are detailed in
his five-hundred-page Report.

Accordingly, it is hereby

**ORDERED** that the two motions to withhold the Report are
**DENIED**; it is further

**ORDERED** that Mr. Schuelke shall distribute an unredacted
version of this Memorandum Opinion to all attorneys who received
copies of the Report, pursuant to the Court's November 21, 2011
Order and the executed Confidentiality Agreement; it is further

**ORDERED** that by no later than March 8, 2012, each subject attorney may submit to Mr. Schuelke four paper copies and one electronic copy of written comments or objections to be filed as addenda to Mr. Schuelke's Report; it is further

**ORDERED** that Mr. Schuelke shall file his Report on the public docket on March 15, 2012, which shall include as addenda to the Report any comments or objections received from the subject attorneys; it is further

**ORDERED** that when the Report is made public, the individuals who are subject to the Confidentiality Agreement as a condition to having access to the Report shall be released from that Confidentiality Agreement; it is further

**ORDERED** that on March 15, 2012, all pleadings related to Mr. Schuelke's Report and filed in response to this Court's November 21, 2011 Order shall be unsealed and placed on the public docket; finally, it is further

**ORDERED** that on March 15, 2012, an unredacted version of this Memorandum Opinion shall be placed on the public docket.

An appropriate Order accompanies this Memorandum Opinion.

**Signed:     Emmet G. Sullivan**
**United States District Court Judge**
**February 8, 2012**